**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS (BOSTON)**

| | |
|---|---|
| In re:<br><br>CELEXA AND LEXAPRO MARKETING AND SALES PRACTICES LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ANGELA JAECKEL, MELVIN M. FULLMER and JILL POWELL, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>FOREST PHARMACEUTICALS, INC., and FOREST LABORATORIES, INC.,<br><br>        Defendants. | MDL No. 2067<br><br>Judge Nathaniel M. Gorton<br><br>Magistrate Judge Judith G. Dein<br><br>Civil Action No.: 09-11518-NMG<br><br><br><br>JURY TRIAL DEMANDED |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Angela Jaeckel, Melvin M. Fullmer and Jill Powell, by and through their counsel of record, Stephen A. Swedlow of Korein Tillery LLC, bring this action against Defendants Forest Pharmaceuticals, Inc. ("Forest Pharmaceuticals") and Forest Laboratories, Inc. ("Forest Labs") (collectively, "Forest"). The facts and information averred herein are based upon Plaintiffs' personal knowledge and beliefs and upon investigation of counsel. In support of this Amended Complaint against Defendants, Plaintiffs allege the following:

## I.      NATURE OF ACTION

1.      Over the course of more than half a decade, Defendants Forest

Pharmaceuticals, Inc. ("Forest Pharmaceuticals") and Forest Laboratories, Inc. ("Forest

Labs") (collectively, "Forest") illegally marketed two related antidepressant drugs,

Celexa and Lexapro, for off-label use in pediatric patients when both drugs had been

approved only for adult use.  During much of that time, Forest misled physicians by

promoting the results of a positive study on pediatric use of Celexa while failing to

disclose the results of a contemporaneous negative study for the same pediatric use.

Forest also paid kickbacks to physicians to induce them to prescribe the drugs.  By

knowingly and actively promoting these antidepressants for off-label pediatric use

without disclosing the results of the negative pediatric study and by paying kickbacks,

Defendants have damaged the Plaintiffs and Class as alleged herein.

2.      Forest engaged in a fraudulent scheme to market and promote Celexa

(citalopram) and Lexapro (escitalopram) off-label to treat depression and other

psychiatric conditions in pediatric patients.  Forest did so even though the Food and Drug

Administration ("FDA") had not approved the drugs as safe and effective for any use in

the pediatric population.  In the case of Celexa, the FDA had specifically denied approval

for any pediatric use.

3.      Forest disseminated and caused others to disseminate false and misleading

information to doctors and the public about the safety and efficacy of Celexa and Lexapro

in treating pediatric patients.  The company failed to disclose the negative results of a

large, placebo-controlled study that found Celexa no more effective than placebo for

pediatric use and in which more patients taking Celexa attempted suicide or reported suicidal ideation than those taking only placebo.

4.      Forest sought to induce physicians and others to prescribe Celexa and Lexapro by providing them with various forms of illegal remuneration, including cash payments disguised as grants or consulting fees, expensive meals and lavish entertainment, and other valuable goods and services.

## II.      JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), because at least one member of the class is a citizen of a different State than the Defendants, there are 100 or more class members and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and cost.

6.      This action was original filed in the Eastern District of Missouri, where venue was properly set pursuant to 28 U.S.C. § 1391(a) because Defendants reside in that District, Defendants transact business and are found within that District, and a substantial part of the events giving rise to the claims at issue in this Complaint arose in that District, and Defendants marketed in that District and made material omissions and misrepresentations in that District.  The Panel on Multidistrict Litigation transferred this action pursuant to 28 U.S.C. § 1407 to this District for coordinated or consolidated pretrial proceedings.

## III.      PARTIES

7.      Plaintiff Angela Jaeckel is a citizen of the State of Illinois, residing in Mundelein located in Lake County.  Plaintiff Jaeckel paid, in whole or in part, for Celexa and/or Lexapro for use by her minor child.

8.      Plaintiff Melvin M. Fullmer is a citizen of the State of Utah, residing in Salt Lake City located in Salt Lake County.  Plaintiff Fullmer paid, in whole or in part, for Celexa and/or Lexapro for use by his minor child.

9.      Plaintiff Jill Powell is a citizen of the State of Missouri, residing in Lee's Summit in Jackson County.  Plaintiff Powell paid, in whole or in part, for Celexa and/or Lexapro for use by her minor child.

10.      Defendant Forest Pharmaceuticals, Inc. is organized under the laws of Delaware and is a wholly owned subsidiary of Forest Labs with its principal place of business in St. Louis, Missouri.  Forest Pharmaceuticals manufactures, distributes, and sells Forest prescription products in the United States.

11.      Defendant Forest Labs is a pharmaceutical company organized under the laws of Delaware with its principal place of business in New York, New York.  Forest Labs has a license from H. Lundbeck A/S ("Lundbeck"), a Danish company, to promote and sell Celexa and Lexapro in the United States.

## IV.      FACTUAL ALLEGATIONS

### A.      Celexa and Lexapro

12.      Celexa and Lexapro are closely-related selective serotonin reuptake inhibitor ("SSRIs") drugs.  Lundbeck developed both Celexa and Lexapro, which contains the active agent in Celexa, and subsequently licensed both drugs to Forest for marketing in the United States.  Forest began selling Celexa in 1998.  In 2002, with Celexa soon due to face generic competition, Forest began selling Lexapro.

1.      **The FDA Has Not Approved Celexa Or Lexapro For Pediatric Use.**

13.     In 1998, the FDA approved Celexa for the treatment of adult depression. The FDA never approved Celexa for treatment of any conditions other than adult depression, or for any pediatric use.

14.     In 2002, the FDA approved Lexapro for the treatment of adult depression. In 2003, Lexapro received approval for treatment of Generalized Anxiety Disorder ("GAD") in adults. Lexapro has not been approved for any other conditions and was not approved for pediatric use.

15.     The use of Celexa and Lexapro in pediatric patients is not supported by a citation included or approved for inclusion in any of the compendia.  The use of Celexa and Lexapro in pediatric patients is not a "medically accepted" indication for those drugs.

16.     If a manufacturer conducts pediatric clinical studies on a drug, a manufacturer may obtain an additional six months of patent exclusivity for the previously-approved, on-label indications for that particular drug subject to certain FDA requirements.  21 U.S.C. § 355a.  In such circumstances, the FDA issues a "Written Request" that details the studies that should be performed.  21 U.S.C. § 355a(c)(2)(A).

17.     In August 1998, Forest submitted a "Proposed Pediatric Study Request for Celexa."  On April 28, 1999, the FDA issued a Written Request to Forest to conduct "two independent, adequate and well-controlled clinical trials in pediatric depression" for Celexa.

18.     On September 24, 1999, Forest submitted to the FDA protocols for two pediatric studies:  1) a double-blind, placebo-controlled pediatric study being conducted in Europe by Lundbeck (the "Lundbeck study"); and 2) a double-blind, placebo-

controlled pediatric study to be conducted in the United States by Forest through University of Texas child psychiatrist Karen Wagner (the "Wagner study").

19.     In mid-2001, the Wagner and Lundbeck studies were unblinded and their results were disseminated to senior Forest executives.  The Wagner study was positive, *i.e.*, it indicated that Celexa was more effective than placebo in treating pediatric patients suffering from depression, but the Lundbeck study was negative, *i.e.*, it did not show Celexa to be any more effective than placebo in treating pediatric depression. Furthermore, in the Lundbeck study, 14 of the patients taking Celexa attempted suicide or reported suicidal ideation (*i.e.*, contemplation of suicide) compared to only 5 patients taking placebo.  Under one statistical test, this result was "significant," and, under another statistical test, it was "borderline significant."

20.     On April 18, 2002, Forest submitted the results of both the Lundbeck and Wagner studies to the FDA in support of requests for both a six-month extension of patent exclusivity and a pediatric indication for Celexa.  Forest's submission to the FDA was not public.

21.     On July 15, 2002, the FDA granted Celexa six additional months of patent exclusivity for the on-label use of treating depression in adults.

22.     On September 23, 2002, the FDA denied Forest's request for a pediatric indication for Celexa.  The FDA concluded that the Lundbeck study "is a clearly negative study that provides no support for the efficacy of citalopram in pediatric patients with [major depressive disorder]."

## 2. The FDA-Mandated Black Box Warnings On The Celexa And Lexapro Labels

23.     On March 22, 2004, the FDA issued a public health advisory requesting that certain SSRI manufacturers, including Forest, change the labels on their SSRI drugs to include "a [w]arning statement that recommends close observation of adult and pediatric patients treated with these agents for worsening depression or the emergence of suicidality."

24.     Later that year, the FDA directed the SSRI manufacturers, including Forest, to include on their labels a black box warning and expanded statements to alert physicians about the potential for increased risk of suicidality in children and adolescents taking SSRIs.  The black box warning specifically stated that "[a]ntidepressants increased the risk of suicidal thinking and behavior (suicidality) in short-term studies in children and adolescents with Major Depressive Disorder (MDD) and other psychiatric disorders." In addition, the FDA required SSRI manufacturers to state, in relevant part, that:

> The risk of suicidality for these drugs was identified in a combined analysis of short-term (up to 4 months) placebo-controlled trials of nine antidepressant drugs, including the selective serotonin reuptake inhibitors (SSRIs) and others, in children and adolescents with major depressive disorder (MDD), obsessive compulsive disorder (OCD), or other psychiatric disorders. A total of 24 trials involving over 4400 patients were included. The analysis showed a greater risk of suicidality during the first few months of treatment in those receiving antidepressants.

25.     The Lundbeck study on pediatric use of Celexa was one of the 24 trials considered by the FDA in mandating this warning.

26.     Forest revised the Celexa and Lexapro labels in early 2005 to include the required black box warning and to state under each label's "Pediatric Use" subheading that safety and effectiveness in the pediatric population have not been established.  The Celexa label further stated that "[t]wo placebo-controlled trials in 407 pediatric patients

with MDD have been conducted with Celexa, and the data were not sufficient to support a claim for use in pediatric patients," while the Lexapro label stated that a "placebo-controlled trial in 264 pediatric patients with MDD has been conducted with Lexapro, and the data were not sufficient to support a claim for use in pediatric patients."

27.     In 2007, the Celexa and Lexapro labels were again modified to state that, after evaluating the pooled analyses of placebo-controlled SSRI trials in children and adolescents and of trials in adults, "[t]here was considerable variation in risk of suicidality among drugs, but a tendency toward an increase in the younger patients for almost all drugs studied."

28.     To date, Forest has not obtained FDA approval for a pediatric indication for Celexa or Lexapro.  Both the Celexa and Lexapro labels currently include black box warnings explicitly indicating that the safety and efficacy of the drugs in the pediatric population have not been established.

**B.      Forest's Dissemination Of Half Truths As A Result Of Its Failure To Disclose The Results Of The Negative Lundbeck Study**

29.     Although Forest submitted the Lundbeck study to the FDA in 2002 in order to seek a six-month extension of patent exclusivity for Celexa (which Forest later valued at $485 million), Forest failed otherwise to disclose the negative study beyond a small group of its senior executives.  At the same time, Forest aggressively promoted the Wagner study, thereby relaying the false impression that the only available pediatric data on Celexa was positive.

30.     Although the Forest senior executives learned about the negative Lundbeck results in mid-2001, Forest failed for the next three years to disclose that negative data to, among others: its thousands of sales representatives who were detailing

pediatric specialists; pediatric specialists whom it hired to give promotional speeches on Celexa and Lexapro; the members of its Executive Advisory Board of leading psychiatrists upon whom it ostensibly relied for advice concerning new data and upon whom it also relied to convey information to others; its own Professional Affairs Department, which it charged with disseminating "balanced" information in response to physician requests for available data on Forest drugs; or even its own pediatric researchers such as Dr. Wagner.

31.     During this same time period, Forest took aggressive steps to publicize the positive results of the Wagner study.  On August 27, 2001, Forest presented the Wagner study results to its Executive Advisory Board without making any mention of the contemporaneous negative Lundbeck results.  Forest thereafter arranged for Dr. Wagner to present a poster summary of the Wagner study to various professional groups, including the American Psychiatric Association, the American College of Neuropsychopharmacology, and the Collegium Internationale Neuro-PsychopharrnaIogicum.  In conjunction with these presentations, Forest coordinated the "placement" of news stories about the positive Wagner data in numerous national and local media outlets.

32.     Over the course of 2002, Forest arranged for Dr. Wagner to give promotional presentations on the pediatric use of Celexa and to serve as the chair of a seven-city Continuing Medical Education ("CME") program on treating pediatric depression.  Forest also sponsored 20 CME teleconferences that addressed the Wagner study results.

33.     Forest's simultaneous failure to disclose the negative Lundbeck study results and wide publication of the positive Wagner study results caused Forest and its consultants to make false or misleading statements.  For example, because not even Dr. Wagner was aware of the negative Lundbeck data, she never discussed that data in her many Forest-sponsored talks addressing the pediatric use of Celexa and Lexapro.  Her slide presentations addressed negative studies on pediatric use of other SSRIs, but falsely indicated that there were no negative studies on the pediatric use of Celexa.

34.     Forest's failure to disclose the negative Lundbeck results to the members of Forest's Executive Advisory Board caused those members to make false or misleading statements in promotional teleconferences on Celexa and Lexapro.  During the teleconferences, which were targeted to large numbers of physicians across the country, the Forest Executive Advisory Board members represented, based on the Wagner data, that Celexa was safe and effective for pediatric use even though, unbeknownst to them, the FDA had specifically rejected Forest's attempt to gain approval for such a claim because of the negative Lundbeck data.

35.     During details to physicians, Forest's sales representatives made false or misleading representations by distributing off-label publications on the pediatric use of Celexa and Lexapro that did not include the negative Lundbeck data.  Forest sales managers, also unaware of the Lundbeck data, directed the dissemination of these publications.

36.     Forest had a Professional Affairs Department that responded to health care provider inquiries.  Under the company's own written policy, the Professional Affairs Department was:

> *required to provide balanced information* to help the health care practitioner (HCP) make the best decision on behalf of the patient. For this reason, *there is an ethical prohibition in "cherry picking" studies that are favorable to Forest products.* The Food and Drug Administration Division of Drug Marketing, Advertising, and Communications (DDMAC) monitors drug information departments to insure information provided to FICPs is balanced, and that it is not selective.

(Emphasis added.)  Forest's failure to disclose the negative Lundbeck data to its Professional Affairs Department caused it to disseminate misleading information to physicians on the pediatric use of Celexa and Lexapro.  When physicians sought information from Forest's Professional Affairs Department in the years following the un-blinding of the Wagner and Lundbeck studies, the Professional Affairs Department responded with letters that cited only positive data.  The letters cited just one double-blind placebo-controlled trial on the use of Celexa to treat pediatric depression, the Wagner study.  The letters never mentioned that there was another, negative, double-blind placebo-controlled trial, the Lundbeck study.

37.     Several senior Forest executives — including Lawrence Olanoff (then Forest's Chief Scientific Officer and now its President), Ivan Gergel (Vice President of Clinical Development and Medical Affairs), and Amy Rubin (Director of Regulatory Affairs) — reviewed the letters before the Professional Affairs Department disseminated them.  All of these senior Forest executives knew about the negative Lundbeck data.

38.     Forest paid a medical writing firm to ghost-write an academic article on the Wagner study, and Forest arranged to have the article published in the June 2004 issue of The American Journal of Psychiatry, with Dr. Wagner listed as the lead author. The article did not mention that the only other double-blind, placebo-controlled trial on pediatric use of Celexa had shown no efficacy and had an incidence of suicide attempts

and suicidal ideation among those taking Celexa that was almost three times higher than in the group taking the placebo.

39.     On June 21, 2004, The New York Times published a news story titled "Medicine's Data Gap — Journals in a Quandry; How to Report on Drug Trials."  The story featured The American Journal of Psychiatry article on the Wagner study, revealing the negative results of the Lundbeck study and noting that the Wagner article failed to mention them.

40.     Three days after the story ran, Forest issued a press release acknowledging the existence of the Lundbeck study and its finding that Celexa "did not show efficacy versus placebo."  That same day, Forest also disclosed the results of an earlier double-blind placebo-controlled study of Lexapro in children and adolescents.  That study also failed to show efficacy in comparison to placebo.

41.     By failing to disclose the Lundbeck study results, which raised serious questions about the efficacy and safety of Celexa, while simultaneously promoting the Wagner study, Forest told prescribing physicians a half-truth and thereby prevented them and the public from having all potentially available information when making decisions about how to treat a serious medical condition in pediatric patients.

42.     Forest's conduct regarding the Lundbeck study results was consistent with the way it handled prior negative study data on Celexa.  Just a few months before the pediatric Lundbeck study was unblinded, senior executives from Forest and Lundbeck discussed whether publicly to disclose the negative results from a study of Celexa in a primary care population.  The study included three groups: patients taking Lexapro, patients taking Celexa, and patients taking placebo.  Although Lexapro showed efficacy

versus the placebo in the study, Celexa did not.  Minutes of a December 2000 meeting of senior Forest and Lundbeck executives show that Forest wanted to publicize only the Lexapro versus placebo results, while Lundbeck wanted the results from the entire study to be publicly disclosed.  As Lundbeck executives noted a month earlier, "Forest made clear their concern over disclosing any data that could put Celexa in an unfavorable light."  In May 2001, Lundbeck executives observed that "Forest are at the moment unwilling to release data where citalopram does not sufficiently surpass placebo."  Forest ultimately prevailed over Lundbeck and, as it did later with Lundbeck's negative pediatric data, kept the negative Celexa versus placebo results confidential.

> **C.** **Forest's Fraudulent Course Of Conduct To Promote Celexa And Lexapro For Off-Label, Pediatric Use**

43.     To obtain FDA approval for a drug, a drug must be demonstrated to be safe and effective for each of its proposed uses.  The approved uses for a drug are limited to those uses identified in the FDA-approved product label.  *See* 21 U.S.C. § 355(a), (b). "Off-label" use refers to the promotion of an approved drug for any purpose, or in any manner, other than what is described in the drug's FDA-approved labeling.

44.     From 1998 through at least 2005, Forest engaged in a widespread campaign to promote Celexa and Lexapro for pediatric use, even though neither drug was approved for pediatric use and the science was, at best, inconclusive about the safety and efficacy of these drugs for pediatric use.  Forest used its sales representatives to detail or target pediatric specialists; paid pediatric specialists to give promotional speeches to other physicians on pediatric use; selectively distributed publications on pediatric uses to pediatric specialists; misrepresented the safety and effectiveness of the drugs; and made

extensive payments and gifts to induce physicians to prescribe Celexa and Lexapro for pediatric uses.

45.     Forest knew that its off-label promotion for pediatric use was unlawful. Shortly before the FDA ordered the black box warning in September 2004, a Forest executive testified before Congress: "I want to emphasize that, because the FDA has not approved pediatric labeling for our products, Forest has always been scrupulous about not promoting the pediatric use of our antidepressant drugs, Celexa and Lexapro.  That is the law, and we follow it."  In fact, Forest had been illegally promoting the pediatric use of Celexa and Lexapro throughout the preceding six years.

46.     Forest assigned its sales representatives to specific geographic regions across the United States.  Within each region, sales representatives encouraged specific doctors to increase their prescriptions of Celexa and Lexapro.  A specific component of this marketing scheme included the promotion of Celexa and Lexapro for pediatric indications.

47.     From 1998 through the end of 2004, the lists of physicians whom Forest directed its sales representatives to target, also known as "call panels," included thousands of child psychiatrists, pediatricians, and other physicians who specialized in treating children.  Forest had more than 500,000 promotional sales calls or "details" with these pediatric specialists.  The sales representatives documented these details through "call notes."  Forest recorded thousands of call notes evidencing pediatric promotion. Examples of such notes include the following:

- "discussed cx [Celexa] use in children . . . and results of dr. karen wagner study regarding cx use for children and adolescents."

- "went over peds use, 0 drug interactions, less ae, less compliance issues for children, he is sold on that. closed on keeping cx first choice."

- "went over Celexa children, the invitation to the winery."

- "[doctor] trying in children and asked if [Lexapro] could be dissolved in water for children. Told him to crush and put in apple sauce. Liked idea!"

- "discuss lx [Lexapro] brief and what he [is] using dosing w children . . . reinforce safety for children."

- "Let him know some child psychs are using LX for children."

- "Discussed children and adolescents with ADH[D] and how Lexapro fits in to treat the anxiety and depression and OCD."

- "dinner program [with child psychiatrist as speaker] at amato's with yale child study center."

- "focus on Lexapro efficacy at just 10mg..great choice for child/adolescents."

- "mainly sees children but always felt comfortable with CX & children - got his commitment to give [Lexapro] a fair clinical trial."

- "went over lxp use on children and efficacy."

Call notes such as these represent only some of the instances when sales representatives memorialized their illegal off-label promotion of Celexa and Lexapro. The call notes exemplify the tip of what was a much more pervasive and widespread off-label campaign.

48.     Forest maintained a list of "approved" promotional speakers that included numerous pediatric specialists. Forest sales representatives and managers identified speakers from these lists to organize promotional lunches and dinners on Celexa and Lexapro. As late as 2005, approximately 14% of Forest's 2,680 approved speakers were pediatric specialists. Many of the Forest promotional programs for Celexa and Lexapro explicitly focused on off-label pediatric use: the programs had titles such as "Adolescent Depression," "Adolescent Treatment of Depression," "Updates in Depression," "Depression," "Treatment of Child/Adolescent Mood Disorders," "New Treatment

Options in Depressive Disorders in Adolescents," "New Age Depression Treatment," "Use of Antidepressants in Adolescents," "Benefits of SSRIs in Child Psychology," "Treating Depression and Related Illnesses in Children," "Adolescents, and Adults," "Celexa in CHP/Ped Practice," "Treating Difficult Younger Patients," "Treatment of Depression," "Assessment and Treatments of Suicidal Adolescents," and "Treating Pediatric Depression."  Forest management approved each of these programs.

49.    From 1999 through 2006, one pediatric specialist, Dr. Jeffrey Bostic, Medical Director of the Massachusetts Child Psychiatry Access Project at Massachusetts General Hospital, gave more than 350 Forest-sponsored talks and presentations, many of which addressed pediatric use of Celexa and Lexapro.  Dr. Bostic's programs, which took place in at least 28 states, had topics such as "Uses of Celexa in Children" and "Celexa Use in Children and Adolescents."  Forest also paid Dr. Bostic to meet other physicians in their offices in order to ease their concerns about prescribing Celexa or Lexapro off-label for pediatric use.

50.    Dr. Bostic became Forest's star spokesman in the promotion of Celexa and Lexapro for pediatric use.  As one sales representative wrote, "DR. BOSTIC is the man when it comes to child Psych!"  Between 2000 and 2006, Forest paid Bostic over $750,000 in honoraria for his presentations on Celexa and Lexapro.

**D.     Forest's Illegal Inducements To Physicians To Prescribe Celexa And Lexapro**

51.    Forest augmented its off-label promotion efforts through extensive payments and gifts to physicians to induce them to prescribe Celexa and Lexapro. Forest's marketing department directed some of the kickbacks, such as honoraria for participation in advisory boards and in a large marketing study on Lexapro.  Forest's sales

representatives, often acting with the knowledge and encouragement of their managers, arranged for other kickbacks, such as restaurant gift certificates for physicians, lavish entertainment of physicians and their spouses, and grants to individual physicians.

### 1.   Advisory Boards

52.     Between 2000 and 2005, Forest hosted over 900 local or regional "advisory boards" on Celexa and Lexapro, with over 19,000 advisory board attendees that Forest called "consultants."  Forest paid each "consultant" an honorarium of $500.

53.     Ostensibly, Forest paid physicians to attend these advisory boards to get their feedback on the marketing of Celexa and Lexapro.  In reality, as repeatedly reported in internal company documents, Forest intended that the advisory boards induce the attendees to prescribe more Celexa and Lexapro.

54.     In a May 2000 proposal for a series of 44 Celexa advisory boards, a Forest contractor, Intramed, wrote that the advisory boards, each with 20 physicians attendees, would "give Forest an opportunity to influence more physicians." Forest's marketing department approved this proposal.  Later that year, Steve Closter, the Forest marketing executive who organized the advisory boards, wrote that the Celexa advisory boards begun in June 2000 had been successful and, as a result, "will become an even larger part of the promotional mix in the future."  For years thereafter, Forest's marketing department included the cost of advisory boards in its annual promotional budgets for Celexa and Lexapro.

55.     With the early success of the advisory board programs, the Forest sales force enthusiastically used them to drive up sales.  As one Forest District Manager told his Regional Director in a November 2000 planning document, he intended to conduct a

local advisory board to "target the highest prescribers" in several of his territories because "[t]here is no doubt that a program of this magnitude will increase Celexa market share." In approximately January 2002, a marketing strategy slide deck given to Forest's chief executive, Howard Solomon, quoted a Regional Director stating that, "[w]ell planned Advisory Board meetings will be key to our efforts of reaching hesitant physicians."

56.     In June 2002, Forest's two Vice Presidents of Sales sent a memorandum to all sales managers observing that, notwithstanding new promotional guidelines for the industry, advisory boards remained among "the wealth of activities and programs that we can conduct that will impact physicians."  Similarly, in August 2002, a Forest Regional Director sent an e-mail to his District Managers stating that, "[w]ith the new guidelines in place, Ad Boards have become even a more valuable resource, thus each one needs to be a home run!  With your attention and focus, we can make [sic] maximize this opportunity!"

57.     In the fall of 2002, to coincide with the launch of Lexapro, Forest conducted a series of 200 advisory boards reaching over 4,000 potential new Lexapro prescribers.

58.     Forest monitored its return on investment, or "ROI," from the advisory boards.  To conduct its ROI analyses, Forest measured the increase in prescriptions written by physicians that attended the local advisory boards, and then compared the value of those prescriptions to the cost — primarily the honoraria payments — of putting on the programs.  A November 2000 ROI analysis of a single advisory board program reached the following conclusion:

> Post program the Ad Board group [24 attendees] wrote an average of
> 19.6% Celexa as measured by a 5-week 1st Rx average. This is an
> increase of 3.7% in share. At first glance, the share increase might not

appear substantial. However, considering the volume of SSRIs written by these physicians, 3.7% translates into almost 2000 new prescriptions on a yearly basis.

59.     In May 2001, an internal ROI analysis of all of the Celexa advisory boards in 2000 found that "participants in the program prescribed nearly 14 additional prescriptions of Celexa vs. the control group over a seven-month period."

60.     Three months later, in August 2001, the author of the ROI analysis reiterated to the Celexa marketing team that, "[o]ur goal is to increase the ROI on these advisory boards."  That same month, a Forest Regional Director reported to the company's Vice President of Sales that three local advisory boards had "generated close to $30K" from just a subset of the attendees and that "the scripts will continue, and continue to generate additional $$$ and ROI."

61.     After 2003, Forest stopped conducting ROI analyses of advisory boards because of concerns about memorializing illegal intent, but the company continued to use the same types of advisory board programs as a means of inducing doctors to prescribe Celexa and Lexapro.  As a Forest Area Business Director noted in a September 2003 memorandum to his Regional Directors, "[w]e are not able to do as many Ad Boards as we have in the past, so it [is] critical that we get the best targets to the programs."  Similarly, in March 2004, a Texas-based Forest District Manager reported to her Regional Director and fellow District Managers that she had met with her sales team about "the types of doctors" they wanted to recruit for an upcoming advisory board and that they had come "up with 40 doctors that are either high Celexa writers or can be converted/persuaded to write Lexapro."  In August 2004, a Massachusetts District Manager wrote to his colleagues and sales team that, for an upcoming Lexapro advisory board, "we are looking for the best ROI."

### 2.    The EXCEED Study

62.    In 1998, Forest successfully used a so-called "seeding study" — a clinical study intended to induce participating physicians to prescribe the drug under study — as part of the promotional strategy for the launch of Celexa. With the launch of Lexapro in 2002, Forest sought to replicate the success of the Celexa seeding study.  Forest called the Lexapro seeding study EXCEED (Examining Clinical Experience with Escitalopram in Depression).

63.    In the planning stages for EXCEED, a senior Forest marketing executive wrote that the purpose of the study was to ensure a "fast uptake" for Lexapro.  The overall Lexapro marketing plan, which was reviewed by the company's most senior executives, stated:

> Another component of the rapid uptake of Lexapro will be to encourage trial.  The experience trial for Lexapro (EXCEED) will follow approval and will be larger in scope than the Celexa experience trial (EASE).  More prescribers will have the ability to trial Lexapro on several patients to gain experience.  Trial leads to adoption and continued usage of a product if a prescriber has successful results.

At the conclusion of EXCEED, Forest's marketing department planned to calculate the study's "ROI," *i.e.*, the number of prescriptions generated as compared against the cost of funding the study.

64.    To the extent the EXCEED trial had a scientific purpose, it was secondary to the purpose of inducing participating physicians to prescribe Lexapro.  Forest conceived the study as a promotional tool and then sought out company scientists "to discuss possible endpoints/outcomes to look at for our early usage trial."  Forest hired Covance, a contract research organization, to conduct the study, but, according to Covance's own study implementation plan, Covance, too, understood that "the primary

goal of this trial is to provide experience to physicians."  Similarly, Forest openly referred to the EXCEED trial as a "seeding" study in their internal communications.

65.     Forest aimed the EXCEED study at 2,000 physicians.  Under the study protocol, each participating physician could enroll up to five patients in the study, which would last eight weeks and involve three patient visits.  After the first visit, the physician would fill out a one- page form with the patient's age, race, gender, and basic medical history, and Forest would pay the physician $50.  After each of the next two visits, the physician would fill out an additional page requiring the physician to write the date of the visit and to check one of seven boxes describing the change, if any, in the patient's condition.  After the physician completed this additional page and two other pages showing the patient's Lexapro dosing information and any adverse events or concomitant medications, Forest would pay the physician an additional $100.  Forest ultimately allowed physicians to enroll up to ten patients in the study, so that physicians could make up to $1,500 for starting patients on Lexapro, plus an extra $100 if the physician dialed in to a pre-study teleconference.

66.     By the time the EXCEED study was completed, Forest had made study participation payments to 1,053 physicians, who in turn put 5,703 patients on Lexapro during the course of the study.

### 3.     Preceptorships

67.     Between 1999 and 2003, Forest paid millions of dollars to physicians who participated in so-called "preceptorships."  Each physician who participated in a preceptorship received a "grant" of as much as $1,000 per preceptorship.

68.     Ostensibly, preceptorships were a training opportunity where Forest sales representatives would spend a half-day or full day with a physician and learn about how

Celexa and Lexapro were used in practice.  In reality, Forest sales representatives used the preceptorships to induce physicians to prescribe Celexa and Lexapro.

69.     Forest was fully aware of how sales representatives actually used preceptorships.  Company policy mandated that sales representatives fill out "Return on Investment (R.O.I.)" forms to obtain approval to pay a doctor for a preceptorship.  Each ROI form provided for a statement of the amount of the payment to the physician and a projection of how many incremental prescriptions the preceptorship would cause, along with an estimate of the dollar value of those prescriptions to Forest.  Thus, the preceptorship ROI forms enabled Forest to evaluate whether a payment to a participating physician was intended to induce an increase in prescriptions sufficient to justify the cost to Forest.  Senior Forest sales managers and headquarters staff reviewed and approved the completed preceptorship ROI forms.

70.     The preceptorship ROI forms also provided for sales representatives to write narrative justifications for the preceptorship payments, included the following:

- "Dr. ___ is the managing partner of the ___ Psychiatric Group and is very influential among his colleagues in the ___ Hospital network. He currently averages @ 12 per week on 1" RX. His #s are trending up even till this day + we need to keep a good thing going as long as we are still getting this kind of growth from Dr. ___."

- "Dr. ___ is the largest prescriber of SSRI's in a 3 state area. . . .  We are currently her first line SSRI. We must, however, continue to support her monetarily or this will not continue to be the case. . . . We have to keep the pressure on to continue to receive the growth we are getting with Dr ___."

- "Dr. ___ is my largest prescribing Celexa physician. He is a high maintenance target and doing round tables and preceptorships will help me to keep his business and to continue to grow his business."

- "2 different preceptorhsips. Doc is 3rd ranked phys. in SSRI potential + bus had dropped. Needed his full attention."

- "Dr. ___ is my fourth largest SSRI writer. . . A preceptorship will provide opportunity for rapport and for future detail time and sales."

- "# 1 physician in Territory. . . . Dr. ___ is on the verge of writing a lot of Celexa. Will present new studies during preceptorship."

- "This full day preceptorship will give me the opportunity to sell Celexa as a first-line choice in doctor's practice."

- "To influence doctor to Rx Celexa."

Forest approved all of these preceptorship payment justifications.

### 4.   Lavish Entertainment And Gifts

71.   During the period from 1998 through at least 2005, each Forest sales representative typically had a quarterly marketing budget of thousands of dollars to spend on physicians.  As a Forest Regional Director put it in an April 2006 memo to his sales team, "we have a ton of promotional money."  Forest sales managers put pressure on their sales representatives to spend their entire marketing budgets.

72.   Prior to 2003, Forest sales representatives commonly spent their marketing money on fishing, golf, and spa outings for physicians, and on buying tickets to sporting events and the theater for physicians.  Both prior to and after 2003, Forest sales representatives also attempted to induce physicians to prescribe Celexa and Lexapro by spending their marketing budgets on restaurant gift certificates, subsidies for physician office parties, and lavish entertainment that could be disguised on an expense report as meals accompanying a supposed exchange of scientific information.  Examples of these various types of kickbacks include the following:

- In 1998, a District Manager (whom Forest later named to be its nationwide Director of Compliance) arranged for sales representatives in his district to give St. Louis Cardinals tickets to physicians on the condition, he said, that the tickets be "leveraged and sold as a reward for prescriptions" and that "A Solid Return on Investment can be demonstrated."

- In September 2002, a sales representative gave a high-prescribing child psychiatrist a $1,000 gift certificate to Alain Ducasse, a New York restaurant that at the time was one of the most expensive in the United States.

- In June 2001, two Forest sales representatives took a physician and his three sons on a deep sea fishing trip off Cape Cod, Massachusetts.

- In June 2002, a sales representative arranged a salmon fishing charter cruise for four physicians in his territory.

- In February 2002, a sales representative purchased $400 in Broadway theater tickets for a physician and his wife.

- In February 2002, a Division Manager purchased $2,276 in Boston Red Sox tickets for his sales representatives to use, he said, "throughout the next six months with all of our key targets."

- From 2001 to 2005, Forest sales representatives in North Carolina repeatedly arranged social dinners for a psychiatrist who ran multiple offices and reportedly was the highest prescriber of Celexa and Lexapro in the state.

- From 2001 to 2005, Forest sales representatives in Louisiana repeatedly paid for a physician and his family to eat at some of the most expensive restaurants in that state; one of those sales representatives reported that the physician had promised he would "always rxlex [i. e. , prescribe Lexapro] 141 aslong [sic] as we have fun and take care of him."

73.     All of this spending was intended to induce physicians to prescribe Celexa or Lexapro.

### E.     Defendants' Illegal Conduct Emanated From Missouri

74.     The injury causing conduct detailed above was planned, coordinated and disseminated from Forest Pharmaceuticals' headquarters in Missouri and the fraud was conceived of and executed from Missouri.

75.     Celexa and Lexapro sales representatives are employed by Forest Pharmaceuticals, located in Missouri, and function under the direction of senior sales management in St. Louis. Forest's primary mode of communication with physicians and other prescribers about Celexa and Lexapro is through its sales force.  As indicated on the company website, Forest Pharmaceuticals, Inc. "employs 3,000 professionally-trained sales reps to inform healthcare professionals about our products."  According to Forest, the company's national sales force "serves practitioners, hospitals, managed care

organizations and pharmacies nationwide as the first point of contact for information about our health-improving therapies."

76.    Forest Pharmaceuticals uses its extensive Medical Information and Communication Department in St. Louis, Missouri to provide healthcare providers and consumers with information about its drugs.  According to the company website, Forest Pharmaceuticals' Medical information and Communications Department's role is to "respond to those who have questions with accurate, up-to-date, and clinically-relevant information on our products and the underlying disease states they help treat."

77.    A large majority, if not all, of Forest's communications to healthcare providers and consumers concerning the efficacy and safety of using Celexa or Lexapro in pediatric patients came from Forest Pharmaceuticals, Inc.'s St. Louis, Missouri-based national sales force and Medical Information and Communication Department.  For example, Forest Pharmaceuticals, Inc.'s national sales force engaged in a widespread campaign to promote Celexa and Lexapro for pediatric use, even though neither drug was approved for pediatric use and the science was, at best, inconclusive about the safety and efficacy of the drugs for pediatric use.  In addition, Forest Pharmaceuticals, Inc.'s Medical Information and Communication Department routinely responded to inquiries about the use of Celexa and Lexapro in pediatric patients by withholding significant, negative clinical trial information about the drugs.

78.    Forest Phamaceuticals' senior-level employees in charge of overseeing the sales of Celexa and Lexapro were based in Missouri. These individuals were allegedly connected to deliberate suppression and/or misrepresentation of damaging information concerning Celexa and Lexapro.

79.     Missouri has the most significant relationship of any state to this controversy.

80.     Missouri has a strong interest in deterrence of wrongful conduct emanating from within its borders and a desire to encourage truth and fair dealing in the market place.

## V.     CLASS ACTION ALLEGATIONS

81.     Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and a Class defined as:

> All individuals and entities in the United States and its territories (other than state governmental entities) who, for purposes other than resale, purchased, reimbursed and/or paid for Celexa or Lexapro, during the period from 1998, through the present (the "Class Period") for use by a minor. For purposes of the Class definition, individuals and entities "purchased" Celexa or Lexapro if they paid or made a non-flat co-payment for some or all of the purchase price.

82.     Excluded from the Class are Defendants and any entity in which any Defendant has a controlling interest, and their legal representatives, officers, directors, assignees and successors.  Also excluded from the Class are any judge or justice to whom this action is assigned, together with any relative of such judge or justice within the third degree of relationship, and the spouse of any such person.

83.     The Class consists of large numbers of individuals and entities in the United States, making individual joinder impractical, as required by Rule 23(a)(1).  The disposition of the claims of the members of the Class in a single class action will provide substantial benefits to all parties and to the Court.

84.     The claims of the representative Plaintiffs are typical of the claims of the Class they seek to represent, as required by Rule 23(a)(3), in that the representative

Plaintiffs are persons who, like all members of the Class, purchased, reimbursed, and/or paid or co-paid for Celexa or Lexapro.  Such representative Plaintiffs, like all members of the Class, have been damaged by Defendants' misconduct, in that, among other things, they paid for Celexa or Lexapro as Defendants misrepresented the safety and efficacy of Celexa or Lexapro.

85.     The factual and legal bases of Defendants' misconduct are common to all members of the Class and represent a unifying and common plan of fraud and other misconduct resulting in injury to Plaintiffs and all members of the Class.

86.     Numerous questions of law and fact exist that are common to Plaintiffs and the Class.  Those common questions predominate over any questions that may affect individual members of the Class, within the meaning of Rule 23(a)(2) and 23(b)(3).  Common questions of law and fact include, but are not limited to, the following:

a.   Whether Defendants concealed material information from Plaintiffs, members of the Class, physicians, and the general public concerning the efficacy and safety of Celexa or Lexapro;

b.   Whether Defendants concealed material information from Plaintiffs, members of the Class, physicians, and the general public as part of a scheme of deception;

c.   Whether Defendants engaged in a fraudulent and/or deceptive scheme of marketing and selling Celexa or Lexapro;

d.   Whether it was the policy and practice of Defendants to prepare, fund, and publish materials which contained false information and misrepresentations regarding the safety and efficacy of Celexa or Lexapro;

    e.   Whether Defendants are liable to members of the Class for damages;

    f.   Whether Defendants unjustly enriched themselves at the expense of the members of the Class;

    g.   Whether members of the Class are entitled to compensatory damages and, if so, the nature and extent of such damages;

    h.   Whether members of the Class are entitled to punitive damages and if so, the extent of such damages.

87.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class, as required by Rule 23(a)(4). Plaintiffs have retained counsel with substantial experience in the prosecution of nationwide class actions. Plaintiffs and their counsel are committed to the vigorous prosecution of this action on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor counsel have any interests adverse to those of the Class.

88.    Plaintiffs and members of the Class have suffered, and will continue to suffer, economic harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy under Rule 23(b)(3). Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and would thus have no effective access to the courts or remedy at law. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

89.     Plaintiffs seek nationwide certification, under Missouri law, for violations of the Missouri Merchandising Practices Act and for unjust enrichment.  Plaintiffs allege that nationwide class certification, under a single state's law, is superior to all other available methods for the fair and efficient adjudication of this action.

90.     This case presents common issues of fact and law that are appropriate for issue-class certification under Rule 23(c)(4); and the management of this action may be facilitated through the certification of additional subclasses under Rule 23(c)(5), if necessary and appropriate.

**COUNT I**

**Unjust Enrichment**

91.     Plaintiffs incorporate by reference the previous allegations as if they were set fully set forth herein.

92.     This claim is asserted by Plaintiffs on their own behalf and on behalf of all other similarly situated members of the Class against Defendants.

93.     As the intended and expected result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from payments Plaintiffs and Class Members made for Celexa and Lexapro.

94.     In exchange for the payments they made for Celexa and Lexapro, and at the time they made these payments, Plaintiffs and the Classes expected that the drug was a safe and medically effective treatment for pediatric use, the condition, illness, disease, disorder, or symptom for which it was prescribed.

95.      Defendants have voluntarily accepted and retained these payments, with full knowledge and awareness that, as a result of their wrongdoing, Plaintiffs and the

Classes paid for Celexa and Lexapro when they otherwise would not have done so.  By its improper and wrongful conduct described herein, Defendants were unjustly enriched at the expense of Plaintiffs and the members of the Classes.

96.     It would be inequitable for Defendants to retain the profits, benefits, and other compensation they obtained through their wrongful acts.  Plaintiffs and the Classes are entitled in equity to seek restitution of Defendants' wrongful profits, revenues and benefits to the extent, and in the amount, deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

## COUNT II

### Missouri Merchandising Practices Act

97.     Plaintiffs incorporate by reference the previous allegations as if they were set fully set forth herein.

98.     This Count is brought pursuant to the Missouri Merchandising Practices Act, § 407.010, *et seq*.

99.     This claim is asserted by Plaintiffs on their own behalf and on behalf of all other similarly situated members of the Class against Defendants.

100.    At all times relevant hereto, Plaintiffs and members of the Class and Defendants were persons within the meaning of § 407.010(5) RSMo.

101.    At all times relevant hereto, Plaintiffs and members of the Class were purchasers within the meaning of § 407.025.1 RSMo.

102.    At all times material hereto, Defendants conducted trade or commerce within the meaning of § 407.010(7) RSMo.

103.     The Missouri Merchandising Practices Act, § 407.020.1 *et seq*., provides in pertinent part:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce … in or from the state of Missouri, is declared to be an unlawful practice. … Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

104.     Defendants, individually and/or jointly, by and through their employees, agents and/or brokers, engaged in misrepresentations, unlawful schemes and courses of conduct that induced Plaintiffs and members of the Class to purchase Celexa or Lexapro through one or more unfair and/or deceptive acts and/or practices alleged in this Complaint.

105.     The facts which Defendants misrepresented as alleged in this Complaint were material to Plaintiffs' and Class Members' decisions about whether to purchase Celexa or Lexapro, in that they concerned facts that would have been important to a reasonable consumer in making a decision whether to purchase Celexa or Lexapro.

106.     Defendants' conduct as alleged herein was unfair in that: (1) it offended public policy; (2) it was immoral, unethical, oppressive, or unscrupulous; and/or (3) it caused substantial economic injury to consumers, namely Plaintiffs and members of the Class.

107.     Defendants' unfair and/or deceptive acts and/or practices alleged in the preceding paragraphs occurred in connection with Defendants' conduct of trade and commerce in Missouri.

108.     Defendants' unfair and/or deceptive acts and/or practices were committed

with willful and wanton disregard for the rights and interests of Plaintiffs and members of the Class.

109.     Defendants' unfair and/or deceptive acts and/or practices violate the Missouri Merchandising Practices Act. § 407.020.1 RSMo.

110.     As a direct and proximate result of Defendants' violation of the Missouri Merchandising Practices Act § 407.020.1 RSMo, Plaintiffs and members of the Class were damaged in an amount to be proven at trial.

## COUNT III

### Fraudulent Concealment and Misrepresentation

111.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein, and further allege as follows:

112.     Defendants fraudulently, negligently, falsely and/or deceptively represented or knowingly omitted, suppressed or concealed facts of such materiality regarding the risk-benefit profile and lack of efficacy of Celexa and Lexapro for pediatric use.

113.     Defendants made assertions that were not in accord with the facts known to them at the time.

114.     Defendants remained silent and/or offered misleading information despite its knowledge of the growing public acceptance of misinformation and misrepresentations regarding both the risk-benefit profile and lack of efficacy of Celexa and Lexapro for pediatric use, and did so because the prospect of huge profits, all to the significant detriment of Plaintiffs and members of the Class.

115.     Defendants were otherwise careless, fraudulent, negligent, grossly negligent, and acted with willful and wanton disregard for the rights of Plaintiffs and members of the Class in the representations regarding the risk-benefit profile and lack of efficacy of Celexa and Lexapro for pediatric use.

116.     Defendants failed to use reasonable care or competence in obtaining and communicating such information to Plaintiffs and members of the Class, and said information was, in fact, false and/or omitted material facts.

117.     The material misrepresentations and omissions of defendants were likely to induce a reasonable person to manifest their assent without being fully informed of all the facts.

118.     Plaintiffs and members of the Class justifiably relied upon the information provided by defendants to their economic detriment.

## COUNT IV

### Fraud

119.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein, and further allege as follows:

120.     As previously alleged with particularity in this Complaint, each of the representations by Defendants was false, material to the pediatric marketability and commercial value of Celexa and Lexapro, and were intended by defendants to induce and mislead physicians to prescribe Celexa and Lexapro, Plaintiffs and Class Members to purchase Celexa and Lexapro for pediatric use, and Plaintiffs and Class Members to refrain from taking steps to seek alternative treatment options with a more favorable risk-benefit profile.

121.    As alleged above, Defendants made representations known to be false, and with a reckless disregard for the truth, concerning the risk-benefit profile and lack of efficacy of Celexa and Lexapro for pediatric use.

122.    Defendants knowingly omitted material facts concerning the safety and risk-benefit profile and lack of efficacy of Celexa and Lexapro for pediatric use from prescribing physicians, consumers, and the general public.

123.    Defendants intended that others would rely on these material misrepresentations to the economic benefit of Defendants.

124.    In reasonable reliance upon these material misrepresentations of Defendants, physicians were in fact induced to prescribe, and Plaintiffs and Class Members were induced to purchase Celexa and Lexapro for pediatric use.

125.    As a direct and proximate consequence of Defendants' fraudulent misrepresentations, Plaintiffs and Class Members were damaged by:  1) failing to receive full value for their direct or indirect payment of money for Celexa and Lexapro for pediatric use; 2) incurring personal debt and/or out-of-pocket expenditures to purchase Celexa and Lexapro for pediatric use; 3) payment for Celexa and Lexapro for pediatric use on behalf of purchasers; and 4) foregoing safe and effective alternative treatment options in reliance upon Defendant's misrepresentations that Celexa and Lexapro for pediatric use was effective and had a positive risk-benefit profile.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

126.    An order certifying the Class, appointing Plaintiffs as class representatives, and appointing Plaintiffs' undersigned counsel as counsel for the Class;

127.    Refund and reimbursement of all monies for purchase of Celexa and Lexapro for pediatric use and disgorgement of all moneys acquired by means of the above practices and through the sales of Celexa and Lexapro for pediatric use to Plaintiffs and members of the proposed Class;

128.    Prejudgment and post judgment interest as provided by law;

129.    Attorney's fees, expenses, and costs of this action; and

130.    Such further relief as this court deems necessary, just and proper.

Further, Plaintiffs hereby request a trial by jury on all claims set forth herein.

Dated: January 19, 2010                                  Respectfully Submitted,

                                                         Plaintiffs, by their counsel:

                                                         /s/ Stephen A. Swedlow
                                                         Stephen A. Swedlow (Pro Hac Vice)
                                                         KOREIN TILLERY
                                                         205 N. Michigan Ave., Ste. 1940
                                                         Chicago, IL 60601
                                                         Telephone: (312) 899-5063
                                                         Facsimile: (312) 641-9555

                                                         Michael Baum
                                                         Roger Drake
                                                         BAUM, HEDLUND, ARISTEI & GOLDMAN
                                                         12100 Wilshire Blvd., Suite 950
                                                         Los Angeles, CA 90025
                                                         Tel: (800) 827-0087
                                                         Fax: (310) 820-7444

                                                         *Class Counsel*
                                                         **Counsel for Angela Jaeckel,Melvin
                                                         M. Fullmer and Jill Powell**

## <u>CERTIFICATE OF SERVICE</u>

I, Stephen A. Swedlow, hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 19, 2010.

/s/ Stephen A. Swedlow
Stephen A. Swedlow
sswedlow@koreintillery.com
