## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re: CELEXA AND LEXAPRO MARKETING AND SALES PRACTICES LITIGATION | MDL No. 2067<br>Master Docket No. 09-MD-2067 (NMG) |
| THIS DOCUMENT RELATES TO: | Judge Nathaniel M. Gorton |
| *Jill Powell, Angela Jaeckel & Melvin M. Fullmer v. Forest Pharmaceuticals, Inc. et al.*, Case No. 09-cv-11518-NMG | Magistrate Judge Judith G. Dein |
| *Martha and Peter Palumbo, Jayne Ehrlich, and Anna Murret v. Forest Laboratories, Inc. et al.*, Case No. 09-cv-11532-NMG | |

### PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
### LEAVE TO FILE GRANTED ON AUGUST 3, 2010

Consumer Plaintiffs Jill Powell, Angela Jaeckel, Melvin M. Fullmer, Martha and Peter Palumbo, Jayne Ehrlich, and Anna Murret in MDL No. 2067: *In re: Celexa and Lexapro Marketing and Sales Practices Litigation*, by and through their attorneys, respectfully submit this joint Opposition to Defendants Forest Pharmaceuticals, Inc. and Forest Laboratories, Inc.'s Motion to Dismiss, and in support thereof state as follows:

### INTRODUCTION

To safeguard the health and safety of the general public, pharmaceutical manufacturers are required by law to speak fully and truthfully about the effectiveness and safety of their products. Defendants Forest Pharmaceuticals, Inc. and Forest Laboratories, Inc. (hereinafter, collectively, "Forest" or "Defendants") failed to honor this obligation with respect to the prescription drugs Celexa and Lexapro. Specifically, Forest misrepresented the safety and efficacy of Celexa and Lexapro in minors. Plaintiffs seek to represent a class of consumers who purchased and/or paid for Celexa and Lexapro for consumption by a minor from 1998 to the

present. Forest seeks to dismiss Plaintiffs' Complaints on a variety of grounds. Forest's

arguments are not only without merit, each of them depends on factual assertions made by Forest

throughout its motion. In reality, it was Forest's material misrepresentations that led physicians

to prescribe and consumers to buy Celexa and Lexapro.

Forest perpetrated a carefully-orchestrated scheme to wrongfully market and promote

Celexa and Lexapro for "off-label" pediatric use – *i.e.*, an indication not approved by the Food

and Drug Administration – for which the safety and efficacy of the drugs had not been

established. This was part of a concerted and coordinated strategy from which Forest reaped

millions upon millions of dollars. Plaintiffs, and others similarly situated, paid money for these

drugs that they would not have paid without Forest's wrongful conduct. Plaintiffs have pled their

causes of action with specificity and have undoubtedly been injured by Forest's conduct. In order

to evade liability to Plaintiffs, Forest injects numerous factual assertions into its lengthy motion

to dismiss. These matters should not – and cannot – be addressed at this stage. Forest's motion

must therefore fail.

## **FACTUAL BACKGROUND**

Celexa (citalopram) and Lexapro (escitalopram) are closely-related selective serotonin

reuptake inhibitor ("SSRIs") drugs. Defendants Forest Pharmaceuticals, Inc. ("Forest

Pharmaceuticals") and Forest Laboratories, Inc. ("Forest Labs") (collectively, "Forest") engaged

in a fraudulent scheme to market and promote Celexa and Lexapro off-label to treat depression

and other psychiatric conditions in pediatric patients.  Forest did so even though the Food and

Drug Administration ("FDA") had not approved the drugs as safe and effective for any use in the

pediatric population.  In the case of Celexa, the FDA had specifically denied approval for any

pediatric use. Plaintiffs' Complaints present detailed allegations about the campaign of

2

misinformation, misleading information, concealment, and misdirection that Forest engaged in while attempting to expand the market for its Celexa and Lexapro products to pediatric use. (*See* Jaeckel Cmplt. ¶¶ 1-4, 12-73; Palumbo Cmplt. ¶¶ 9-11, 16-93).

Beginning in 1998, Forest sought approval for Celexa for pediatric use, and was rejected by the FDA. The FDA concluded that the one of the pediatric studies submitted by Forest (the "Lundbeck study") "is a clearly negative study that provides no support for the efficacy of citalopram in pediatric patients with [major depressive disorder]." (Jaeckel Cmplt. ¶¶ 17-22; Palumbo Cmplt. ¶¶ 34-39). In 2004, the FDA required that the Celexa and Lexapro labels be revised to include the most severe label warning – a "black box" warning – which includes the explicit statement that Celexa and Lexapro had not been approved for pediatric use.[1] (Jaeckel Cmplt. ¶¶ 23-26; Palumbo Cmplt. ¶¶ 40-43). In 2007, the Celexa and Lexapro labels were again modified to state that, after evaluating the pooled analyses of placebo-controlled SSRI trials in children and adolescents and of trials in adults, "[t]here was considerable variation in risk of suicidality among drugs, but a tendency toward an increase in the younger patients for almost all drugs studied." (Jaeckel Cmplt. ¶ 27; Palumbo Cmplt. ¶ 44).

Yet for years Forest disseminated, and caused others to disseminate, false and misleading information to doctors and the public about the safety and efficacy of Celexa and Lexapro in treating pediatric patients. Forest improperly promoted Celexa and Lexapro through its Professional Affairs Department, its medical articles, its press releases, and its responses to physician inquiries. (Jaeckel Cmplt. ¶¶ 29-42; Palumbo Cmplt. ¶¶ 37-59). Specifically, Forest minimized the dissemination of the negative results of a large, placebo-controlled study that found Celexa no more effective than placebo for pediatric use and in which more patients taking

---

[1] It is important to note that, although the FDA required the label changes in 2004, the important fact is *when* Forest did so *and* when Forest disseminated the appropriate information to physicians and the consuming public.

Celexa attempted suicide or reported suicidal ideation than those taking only placebo (the "Lundbeck study") while concurrently promoting the supposedly "positive" results of a different study (the "Wagner study"). (Jaeckel Cmplt. ¶¶ 29-42; Palumbo Cmplt. ¶¶ 46-59).

Forest misled physicians about the safety and efficacy of the drugs through this selective disclosure. (Jaeckel Cmplt. ¶¶ 35-36; Palumbo Cmplt. ¶¶ 52-53). Forest also hired a medical writing firm to ghost-write an academic article on the Wagner study – an article that never even mentioned, let alone addressed, the contrary results in the Lundbeck study. (Jaeckel Cmplt. ¶ 36; Palumbo Cmplt. ¶ 55). Forest specifically targeted child psychologists, pediatricians, and other physicians who specialized in treating children in their off-label promotional campaign for Celexa and Lexapro. (Jaeckel Cmplt. ¶¶ 46-50; Palumbo Cmplt. ¶¶ 64-68). Forest also sought to induce physicians and others to prescribe Celexa and Lexapro for pediatric use by providing them with various forms of remuneration and inducements. (Jaeckel Cmplt. ¶¶ 51-73; Palumbo Cmplt. ¶¶ 61-69). Forest did so even though the Food and Drug Administration ("FDA") had not approved the drugs as safe and effective for any use in the pediatric population.

Plaintiffs were injured by this unfair and unscrupulous conduct when they paid for Celexa and Lexapro for pediatric uses. As a result of Forest's wide-reaching, multi-million dollar campaign to promote these drugs, the medical community and physicians prescribed the drugs and Plaintiffs and Class Members paid the bill. In this action, they seek to recover what they lost through Forest's wrongful conduct.

## ARGUMENT

When evaluating a motion to dismiss, the court must "take all factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Rodriguez-Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 96 (1st Cir. 2007). While the plaintiff must allege enough facts to state a claim

to relief that is plausible on its face, a court must accept as true all well-pled facts and construe all reasonable inferences in favor of the non-moving party. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-58 (2007); *Gargano v. Liberty Int'l Underwriters, Inc.*, 572 F.3d 45, 48 (1st Cir. 2009) (citing *Fitzgerald v. Harris*, 549 F.3d 46, 52 (1st Cir. 2008)). Thus, the court must "neither weigh the evidence nor rule on the merits because the issue is not whether the plaintiffs will ultimately prevail, but whether they are entitled to offer evidence to support their claims." *Raytheon v. Cont'l Cas. Co.*, 123 F. Supp. 2d 22, 27 (D. Mass. 2000) (citing *Day v. Fallon Cmty. Health Plan, Inc.*, 917 F. Supp. 72, 75 (D. Mass. 1996)).

In addition, and contrary to the implication in Forest's motion, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), did not change the basic standards that apply to considering a motion to dismiss. "[T]he Supreme Court never said that it intended a drastic change in the law, and indeed strove to convey the opposite impression; ... the Court does not appear to have believed that it was really changing the Rule 8 or Rule 12(b)(6) framework." *Phillips v. County of Allegheny*, 515 F.3d 224, 230 (3d Cir. 2008). "The Supreme Court also reaffirmed that, on a Rule 12(b)(6) motion, the facts alleged must be taken as true and a complaints may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Id.* at 231. As explained in *Iqbal*, the standard only requires that a claim be "plausible on its face" and that "facial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. This standard "is not akin to a 'probability requirement'" but only asks "for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Perhaps most importantly, given Forest's extremely cramped reading of

Plaintiffs' complaints, the "complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden v. WalMart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

Moreover, *Twombly* does *not* impose a new requirement of heightened factual pleading, and did *not* authorize a court to make a judgment at the pleading stage as to whether the plaintiff will probably prevail. "The Court emphasized throughout its opinion that it was neither demanding a heightened pleading of specifics nor imposing a probability requirement." *Phillips*, 515 F.3d at 233. The Supreme Court reaffirmed that Fed. R. Civ. P. 8 "'requires only a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests,'" and that this standard does not require "detailed factual allegations." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While Forest attacks some of the Complaints' allegations as merely conclusory, the Supreme Court's decision in *Erickson v. Pardus*, 551 U.S. 89 (2007), decided after *Twombly*, makes clear that that label is inappropriate here. In *Erickson*, the lower court had dismissed the complaints on the grounds that the complaints' allegations were too "conclusory." Reversing, the Supreme Court held:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"

*Id.* at 93 (quoting *Twombly*, 550 U.S. at 555).

Finally, it is well established within this Circuit that Fed. R. Civ. P. 9(b) must be read in conjunction with Fed. R. Civ. P. 8, which requires that averments in pleadings be concise and direct. *See McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228 (1st Cir. 1980). Pleading is sufficient under Rule 9(b) if the complaint provides adequate notice of the circumstances

constituting the alleged fraud so that the defendant can prepare an adequate answer from the allegations. *See Simcox v. San Juan Shipyard, Inc.*, 754 F.2d 430, 439-40 (1st Cir. 1985) (holding that a complaints should not be struck for the failure to follow a form if the nature of the claim is apparent). Here, Plaintiffs' allegations go well beyond what is required under Rule 9(b), setting forth in detail Forest's deceptive scheme that resulted in Plaintiffs and Class Members purchasing Celexa and Lexapro for pediatric use. In short, the Complaints provide the "who, what, where, and when of the allegedly false or fraudulent representations." *JSB Indus., Inc. v. Nexus Payroll Servs., Inc.*, 463 F. Supp. 2d 103, 107 (D. Mass. 2006).

## I.     Forest's Motion is Based Upon Its Own Factual Assertions.

Although styled as a Motion to Dismiss, Forest's papers raise many disputed factual matters that should not – and cannot – be resolved at the pleading stage. For example, Forest states that "there is no basis for any assumption that these drugs ever were inherently unsafe or ineffective, or did not deliver the bargained-for value." Forest Br. at 29. First, Plaintiffs are clearly not seeking an "assumption" of any facts. Second, and more importantly, Forest's assertions that Celexa and Lexapro are safe and effective for pediatric use – made throughout its brief – require a factual inquiry that is inappropriate at the pleading stage. Similarly, Forest states that "[i]t would be nearly impossible to ascertain any difference in value – assuming there was one – between a drug with a positive study for use the FDA had not approved and a drug with one positive and one negative study for a use the FDA had not approved." Forest Br. at 29. Factual discovery will show not only that Forest diligently tracked sales of pediatric Celexa and Lexapro but that the sales of Celexa and Lexapro for pediatric use dropped significantly after Forest's fraud began to be revealed. What is clear is that none of these issues can be resolved on a motion to dismiss. At this stage, Plaintiffs' claims must be evaluated on the basis of the

allegations in their Complaints and not Forest's unsupported factual assertions.

This is made all the more clear by Forest's citations to cases, such as *Rivera v. Wyeth-Aherst Laboratories*, 283 F.3d 315 (5th Cir. 2002), in which the court was addressing a motion for class certification and thus applied an entirely different standard. Forest has largely ignored the substance of Plaintiffs' Complaints in favor of injecting its own self-serving factual contentions. At this stage, the Court should decline Forest's improper invitation to go beyond the substance of the Complaints.

## II.     Plaintiffs Have Standing to Pursue Their Claims.

As Forest points out, in order to demonstrate standing, a plaintiff must show (1) they have suffered a concrete and particularized injury-in-fact that is not conjectural or hypothetical, (2) the injury is fairly traceable to the challenged conduct and (3) the injury is likely to be redressed by a favorable ruling. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Plaintiffs clearly meet this minimal standard.

### A.  Plaintiffs Have Alleged an Injury-in-Fact.

As the extensive and specific factual allegations of the Complaints make clear, Forest engaged in a massive, multi-pronged campaign to promote the pediatric use of Celexa and Lexapro to physicians. Both the breadth and depth of that campaign assured that Forest's misrepresentations about the safety and efficacy of the drugs would be widely accepted in the medical community. Plaintiffs have alleged a cognizable injury; first, by alleging that Celexa and Lexapro were not found to be safe or effective for pediatric uses, and, secondly, by alleging that Plaintiffs paid for a drug they would not have paid for had it not been for Forest's misrepresentations. Plaintiffs will demonstrate that Forest created an off-label pediatric market

for Celexa and Lexapro and Plaintiffs were injured when they paid for the drug for pediatric uses.

Forest's injury-in-fact arguments defy common sense. As alleged in the Complaints, Forest spent millions of dollars per year, over many years, to wage a massive advertising campaign. Yet Forest now argues, in an effort to avoid Plaintiffs' claims, that its marketing tidal wave played no part in Plaintiffs' purchases of Celexa and Lexapro. Here, there is a direct tie between Forest and Plaintiffs – Plaintiffs paid for Forest's product. That is a quintessential injury-in-fact and the factual allegations regarding Forest's extensive marketing campaign links Plaintiffs' purchases of Forest's product to Forest's misrepresentations regarding the safety and efficacy of its drug for pediatric use.

Federal courts have long classified this type of injury – amounts paid due to illegal or deceptive marketing practices – as a concrete injury. Earlier this year, the Eastern District of New York rejected indistinguishable standing arguments in the pharmaceutical drug context, holding that "[e]conomic injuries are sufficient for standing. Moreover, courts have long held that a plaintiff is injured, suffering an ascertainable loss, when he receives less than what he was promised." *In re Bayer Corp. Combination Aspirin Prods. Mktg. and Sales Pracs. Litig.*, 2010 WL 1268196, at *14 (E.D.N.Y. March 30, 2010). *See also In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531 (3d Cir. 2004) ("TPPs, like individual consumers, suffered direct economic harm when, as a result of [the pharmaceutical companies'] alleged misrepresentations, they paid supracompetitive prices for [the brand drug] instead of purchasing lower-priced generic [drug]"); *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 349-50 (2d Cir. 2002) (recognizing the rights of plaintiffs to recover from drug companies amounts that were overpaid due to illegal or deceptive marketing practices); *Kinetic Co. v. Medtronic, Inc.*, 672 F. Supp. 2d 933 (D. Minn.

2009) (plaintiffs had standing to pursue claims for payments for medical device); *In re Zyprexa Prods. Liab. Litig.*, 493 F. Supp. 2d 571, 576-577 (E.D.N.Y. 2007) (finding that consumers have standing to sue for economic damages where the plaintiffs overpaid from their own funds because of the defendants' fraud); *In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672 (S.D. Fla. 2004) (certifying 17-state class of third-party payors and consumers to pursue overcharge litigation against pharmaceutical manufacturer); *In re Lupron Mktg. & Sales Pracs. Litig.*, 295 F. Supp. 2d 148, 153 (D. Mass. 2003) (finding that overpayments by patients and health plans resulting from cancer drug marketing scheme satisfied RICO's standing requirements); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326 (E.D. Mich. 2001) (certifying class including consumers who paid for prescription drugs).

Faced with this overwhelming authority, Forest instead attempts to analogize the allegations here to pharmaceutical cases in which courts have dismissed claims alleging economic loss on the part of plaintiffs who bought a drug that physically injured others. *Rivera v. Wyeth-Aherst Laboratories*, 283 F.3d 315 (5th Cir. 2002), cited by Forest, summarizes those claims as follows: "Wyeth sold Duract; Rivera purchased and used Duract; Wyeth did not list enough warnings on Duract, and/or Duract was defective; other patients were injured by Duract; Rivera would like her money back." *Id.* at 319. Plaintiffs here have alleged something quite different: Forest sold Celexa and Lexapro; Forest provided inaccurate and misleading information regarding the efficacy of Celexa and Lexapro for pediatric indications; Plaintiffs purchased Celexa and Lexapro for pediatric use; Plaintiffs would not have purchased Celexa and Lexapro for this off label use if Forest had not fraudulently misrepresented its efficacy; Plaintiffs seek damages based on their purchases. These claims are not derivative of an injury to someone else, as were the claims in *Rivera*. In *Rivera*, the Fifth Circuit stated that Rivera "paid for an

effective pain killer, and she received just that – the benefit of her bargain … Duract worked. Had Wyeth provided additional warnings or made Duract safer, the plaintiffs would be in the same position they occupy now." *Id.* at 320. As alleged in the Complaints here, Plaintiffs would *not* be in the same position if Forest had not fraudulently promoted Celexa and Lexapro for pediatric use. *See Kinetic Co.*, 672 F. Supp. 2d at 943 ("The alleged causative chain is not complicated."). Forest's other cited cases are similarly inapposite. *See Williams v. Pharm. Co.*, 297 F. Supp. 2d 171, 177 (D.D.C. 2003) (Plaintiff "fails to allege any particularized and specific injury-in-fact suffered by these plaintiffs…. *Rivera* concerned a case similar to the one here.").

Plaintiffs' claims here are analogous to the claims brought in the cases cited above, where standing was easily met. For example, in *Zyprexa*, the court found that plaintiffs who paid for the drug "in whole or in part out of their personal funds" had suffered "a direct injury to themselves that is not dependent on any physician's decision or injury suffered by those who ultimately ingested" the drug. 493 F. Supp. 2d at 577. Here, Plaintiffs allege that Forest actively promoted Celexa and Lexapro for pediatric uses, despite their awareness of data and studies – many of which *they themselves* conducted – indicating that it was *in*effective for those uses, or the absence of scientifically sound evidence that it *was* effective. Plaintiffs are damaged because they paid for Celexa and Lexapro as a consequence of Forest's unfair conduct.

## B. Plaintiffs Have Alleged a Nexus Between Their Injury and Forest's Misconduct and Forest's Attempt to Invoke the Learned Intermediary Doctrine Has Been Repeatedly Rejected in this District.

Despite the liberal pleading standard, Forest argues that Plaintiffs have not pled any causal link between Forest's misconduct and Plaintiffs' payments for Celexa and Lexapro even though Plaintiffs have chronicled Forest's deliberate decision – taken at the highest corporate levels – to unlawfully promote Celexa and Lexapro for pediatric uses in the hope and expectation

of greatly increasing sales.

Although Forest only hints at its argument, it is clear that it is invoking a version of the

learned intermediary doctrine to negate causation. However, the Complaints make abundantly

clear that Forest's misrepresentations and omissions were aimed at – and received by – doctors

**and** consumers. Thus, similar arguments have been consistently rejected by federal courts,

including this District:

> Defendant argues that Relator has not stated a claim because he has not accounted for the
> independent actions of the physicians who wrote the off-label prescriptions and the
> pharmacists who accepted and filled the off-label prescriptions. In other words,
> Defendant argues that – as a matter of law – …the actions of these professionals were an
> intervening force that breaks the chain of legal causation. Under black letter law,
> however, such an intervening force only breaks the causal connection when it is
> unforeseeable. In this case, when all reasonable inferences are drawn in favor of the
> Relator, the participation of doctors and pharmacists in the submission of false Medicaid
> claims was not only foreseeable, it was an intended consequence of the alleged scheme of
> fraud.

*United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39, 52-53 (D. Mass. 2001)

(citations omitted). In this case, it was an equally foreseeable and intended consequence of

Forest's scheme that physicians would prescribe Celexa and Lexapro for pediatric uses. And it

was just as foreseeable that consumers would make payments for the drugs. *See also In re*

*Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 175 (D. Mass. 2003) (district court

rejected defendants' arguments that plaintiff's claims for overpayment for pharmaceuticals were

too remote, stating that defendants ignored the "corollary requirement that the intervening act [to

break the chain of causation] be unforeseeable and completely independent of any act taken by

the original actor").

Plaintiffs meet the required causal nexus requirement by alleging that Forest's over-

arching scheme, or uniform pattern of omissions and misrepresentations about Celexa and

Lexapro, allowed it to make sales for pediatric uses that it otherwise could not have made. In

support, Plaintiffs allege that:

- "Forest sought to induce physicians and others to prescribe Celexa and Lexapro by providing them various forms of illegal remuneration, including cash payments disguised as grants or consulting fees, expensive meals and lavish entertainment, and other valuable goods and services." (Jaeckel Cmplt. ¶ 4; Palumbo Cmplt. ¶ 11).

- "Forest took aggressive steps to publicize the results of" the positive study, while failing to disclose the negative study beyond a small group of senior executives. (Jaeckel Cmplt. ¶¶ 30-31; Palumbo Cmplt. ¶¶ 47-48).

- Forest's Executive Advisory Board, Forest employees, its consultants and sales representatives made "false and misleading statements." (Jaeckel Cmplt. ¶¶ 33-35; Palumbo Cmplt. ¶¶ 50-52). These misrepresentations included the distribution of a publication on the pediatric use of Celexa and Lexapro which excluded the negative study (a study which caused the FDA to deny a pediatric indication). (Jaeckel Cmplt. ¶ 35; Palumbo Cmplt. ¶ 52). Forest even paid a medical writing firm to ghost-write an academic article which never mentioned the negative data. (Jaeckel Cmplt. ¶ 38; Palumbo Cmplt. ¶ 55).

- "From 1998 through at least 2005, Forest engaged in a widespread campaign to promote Celexa and Lexapro for pediatric use, even though neither drug was approved for pediatric use and the science was, at best, inconclusive about the safety and efficacy of these drugs for pediatric use. Forest used its sales representatives to detail or target pediatric specialists; paid pediatric specialists to give promotional speeches to other physicians on pediatric use; selectively distributed publications on pediatric uses to pediatric specialists; misrepresented the safety and effectiveness of the drugs; and made extensive payments and gifts to induce physicians to prescribe Celexa and Lexapro for pediatric uses." (Jaeckel Cmplt. ¶ 44; Palumbo Cmplt. ¶ 61).

- "[S]ales representatives encouraged specific doctors to increase their prescriptions of Celexa and Lexapro. A specific component of this marketing scheme included the promotion of Celexa and Lexapro for pediatric indications." (Jaeckel Cmplt. ¶ 46; Palumbo Cmplt. ¶ 64).

- "Forest augmented its off-label promotion efforts through extensive payments and gifts to physicians to induce them to prescribe Celexa and Lexapro." (Jaeckel Cmplt. ¶ 51; Palumbo Cmplt. ¶ 69).

- "By failing to disclose the Lundbeck study results, which raised serious questions about the efficacy and safety of Celexa, while simultaneously promoting the Wagner study, Forest told prescribing physicians a half-truth and thereby prevented them and the public from having all potentially available information when making decisions about how to treat a serious medical condition in pediatric patients." (Jaeckel Cmplt. ¶ 41; Palumbo Cmplt. ¶ 58).

Plaintiffs detail how Forest promoted Celexa and Lexapro for pediatric uses, all the while knowing that medical evidence did not substantiate its claims. All of this was done in a calculated effort to increase the demand for Celexa and Lexapro. The named Plaintiffs clearly suffered an injury by paying for the drugs, and the requisite casual nexus exists between that injury and Forest's wrong.

As noted above, Forest's argument that Plaintiffs may not recover because doctors were the recipients of the alleged misstatements has been repeatedly rejected by the federal courts. In *In re Pharmaceutical Indus. Average Price Litig.*, this District rejected as "bordering on the frivolous" these same causation arguments by the pharmaceutical company defendants:

> In the private, end-payor context, the harm alleged by Defendants' alleged actions is visited directly upon the end-payor Plaintiffs, as they have paid directly for the named drugs.... Similar arguments about intervening causes between the setting of an AWP by a defendant and injuries to plans and individual co-payors were recently rejected as "border[ing] on the frivolous," for "the argument ignores ... the corollary requirement that the intervening act be unforeseeable and completely independent of any act undertaken by the original actor," a requirement not met in this case.

307 F. Supp. 2d 196, 207-08 (D. Mass. 2001) (citations omitted). Plaintiffs have extensively detailed how ***Forest misled physicians and the medical community***. As this District has noted,

> A proximate cause need not be a precipitating or "but for" cause, in the sense of being the last cause in a chain of events leading to the harm, but need only be a substantial cause of a succession of events that in a logical sequence ultimately causes a plaintiff injury. Here it was defendants who instigated both the culpable and the innocent intermediaries to commit acts that were not only foreseeable but intended. By way of analogy, a company that issues its stock at a fraudulently inflated price is not insulated from liability by the intervening acts of the brokers, transfer agents, and financial analysts who promote the sales of its stock, execute trades on behalf of injured investors, and report the company's falsified financial statements. Plaintiffs' allegations that as a result of the Lupron® marketing scheme they were induced to make many millions of dollars in overpayments for the drug is more than sufficient[.]

*In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d at 175 (citation omitted).

Moreover, Forest is incorrect in arguing that their misrepresentations were made *only* to

doctors. The Complaints does not so allege. *See, e.g.*, Jaeckel Cmplt. ¶ 3; Palumbo Cmplt. ¶ 10 ("Forest disseminated and caused others to disseminate false and misleading information to doctors and the public about the safety and efficacy of Celexa and Lexapro in treating pediatric patients."). Forest's argument would lead to the perverse result whereby the individuals who paid the money due to Forest's fraudulent conduct would have no redress simply because physicians write the prescriptions. In this way Forest would be insulated from any repercussions from its fraud.

*Desiano* is on all fours: "Plaintiffs allege an injury directly to themselves; an injury, moreover, that is unaffected by whether any given patient who ingested Rezulin became ill. Plaintiffs' claim is that the Defendants' wrongful action was their misrepresentation of Rezulin's safety, and that this fraud directly caused economic loss to them as purchasers." *Desiano*, 326 F.3d at 349.

Consumer protection claims do not depend on direct-to-consumer advertising or other forms of privity. To the contrary, such claims implicate what defendants do as well as what they say, and involve the full spectrum of defendants' conduct – both overt and covert – in order to effectively protect from economic loss or harm those who buy and pay for defendants' products. In this case, Plaintiffs meet the causal nexus requirement by alleging that Forest's overarching scheme, and uniform pattern of omissions and misrepresentations about Celexa and Lexapro, allowed Forest to make sales it otherwise could not.

## III.    As Courts Have Consistently Recognized, A Choice of Law Determination Should Not Be Made at the Pleading Stage.

This Court should reject Forest's invitation to use choice of law to dismiss Plaintiffs' claims at this stage of the case. The choice of law analysis in a class action is properly undertaken in the context of the class certification predominance analysis under Fed. R. Civ. P.

23. *See In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) ("This Court will

not make determinations on issues that depend on an interpretation of particular states' statutes

or law without first determining which state law is applicable to the claim(s)…. This Court is

unwilling to predict which state law(s) would be applicable in the event the class is certified,

particularly given the fact that the anticipated complexity of a choice-of-law analysis may itself

be a factor in determining the certifiability of the class."); *Rios v. State Farm Fire and Cas. Co.*,

469 F. Supp. 2d 727, 742 (S.D. Iowa 2007) ("[I]t would be more appropriate for the Court to

address the commonality, *i.e.*, conflicts of law analysis, during the class certification stage, after

class discovery."); *In re Hypodermic Prods. Antitrust Litig.*, 2007 WL 1959225, at *16 (D.N.J.

June 29, 2007) ("To the extent that Defendant moves to dismiss Plaintiffs' claims of unjust

enrichment on the basis that certain individual states impose additional requirements...the Court

likewise determines that it is premature to consider these requirements on a state by state basis,

at this time….[T]he Court will not predict which state law(s) would be applicable in the event

that said classes are certified[.]"). This case is not at the class certification stage. It makes

intuitive sense to defer analysis and decision on the choice of law issue to the class certification

juncture. As the court in *In re Bayer Corp. Combination Aspirin Prods. Mktg. and Sales Pracs.*

*Litig.*, 2010 WL 1268196 (E.D.N.Y. March 30, 2010), held:

> Granting this motion would permit Bayer to accomplish indirectly what it cannot directly.
> As defendant acknowledges, it is widely acknowledged that choice of law is determined
> at class certification to determine whether there is commonality. It follows that it would
> be premature to narrow the scope of state laws pursuant to which plaintiffs could pursue
> their claims at this early stage of the litigation.

*Id.* at *14 (citations omitted).

   This Court should delay any consideration of choice of law for obvious reasons: as

Plaintiffs have not had an opportunity to conduct any discovery on the issue, neither this Court

nor the parties are in a position to thoroughly evaluate the relevant state contacts (or the representations made by Forest in its motion regarding the contacts).

In order to hold that Missouri law does not apply to all of the Plaintiffs' claims, this Court would have to, by definition, look past the four corners of the Complaints, as Plaintiffs pled facts alleging that Missouri law applies. Forest makes certain bare representations in its motion which it asks this Court to accept in determining choice of law. The Court cannot accept these representations at the pleading stage as: (1) they go beyond what is pled in the Complaint; (2) as demonstrated below, they are insufficient to conduct a legitimate choice of law analysis; and (3) the only way for Plaintiffs to respond to or challenge them is through discovery. As a result, any determination of choice of law at this stage would prejudice the Plaintiffs. Plaintiffs respectfully request that this Court decline Forest's invitation to evaluate the choice of law question before Plaintiffs have the opportunity to conduct discovery relating to relevant state contacts.

## IV.   Under Both Missouri and New York Choice of Law Principles, Missouri Law Applies to the Claims of the Consumer Plaintiffs.

### A.   There is No Actual Conflict Between the Potentially Applicable Laws.

As explained above, this Court should decline to make a choice of law decision at the pleading stage. However, rather than engage in a legitimate choice of law analysis, Forest argues for a traditional *lex loci delicti* (place of injury) test that has been rejected by nearly every state in the country. "The modern rule, followed by the majority of States, employs an interest-analysis approach." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 502 n.1 (1987) (citing E. SCOLES & P. HAY, CONFLICT OF LAW § 17.7 at 560-561 (1982)).

As a result of its overly simplistic approach, Forest has ignored the "false conflict" present here and thus has failed to identify how any state's policies would conflict with the application of Missouri law. When no true conflict exists, the Court need not determine whether

17

a different law may apply. *See Griggs v. Riley*, 489 S.W.2d 469, 471-72 (Mo. App. 1972);

*Glasscock v. Miller*, 720 S.W.2d 771, 775 (Mo. App. 1986). A true conflict only exists "when

the governmental interest of both jurisdictions would be impaired if their law were not applied."

*Garcia v. Plaza Oldsmobile Ltd.*, 421 F.3d 216, 220 (3d Cir. 2005) (quotation omitted).

Conversely, ***a false conflict exists where only one jurisdiction's governmental interests would***

***be impaired by the application of the other jurisdiction's law*** or where there is no difference

between the laws of the potentially applicable bodies of law. *Id.* Forest only acknowledges the

latter of these false conflicts. However, as numerous cases and authorities have recognized, a

court must determine whether there exists either type of false conflict.

> In any conflict of laws case, the court's first task is to determine if an actual conflict
> exists and, if the laws and interests of the concerned states are not in conflict, the result is
> deemed a "false conflict" or no conflict at all. The court need not engage in any choice
> of law analysis where no conflict is established between laws of the states which are
> potentially applicable….***A "false conflict" exists where …the policies of one state***
> ***would be furthered by the application of its laws while the policy of the other state***
> ***would not be advanced by the application of its laws***[.]

15A CORPUS JURIS SECUNDUM § 28 (2010) (emphasis added). *See also Engine Specialists, Inc. v.*

*Bombardier Ltd.*, 605 F.2d 1, 19 n.26 (1st Cir. 1979) (A false conflict "is invoked when (1) ***there***

***is no true conflict of laws because only one state is interested in the application of its law*** or (2)

the laws of the two states are found to be compatible.") (emphasis added).

Here, Missouri has a keen interest in regulating the business practices of Missouri

companies. While other states have an interest in protecting their own resident consumers from

the unfair practices of Missouri companies, Forest does not suggest that those interests would be

impaired by application of Missouri law. In fact, quite the opposite is true – pursuing their claims

in a class action protects the interests of every state's consumers. Moreover, in a class action, it is

clear that the selection of Missouri law will not only protect Missouri's regulatory interest but

will more efficiently vindicate the interest of other states' in protecting their own residents as manageability concerns will be more easily dealt with.  *See Randle v. Spectran*, 129 F.R.D. 386 (D. Mass. 1998) ("Even accepting defendants' argument that the laws of other states on fraud and misrepresentation are significantly different and that each jurisdiction has an interest in seeing its own law applied, the interest of each jurisdiction in having the injuries of its citizens litigated and compensated outweigh any interest in applying its own law.")

### B.  Under Both Missouri and New York Choice of Law Principles, Missouri Law Applies to the Claims of the Consumer Plaintiffs.

While this Court need not progress past the lack of an actual conflict ignored by Forest and addressed above, Forest is correct that Missouri choice of law rules apply to the claims of Plaintiffs Jaeckel, Fullmer and Powell and New York choice of law rules apply to the claims of Plaintiffs Martha and Peter Palumbo, Ehrlich and Murret.

### 1.  Under Missouri's "most significant relationship" choice of law test from the Restatement (Second) of Conflict of Laws, Missouri law applies to the claims of the Plaintiffs.

"When determining choice-of-law issues in a tort action, Missouri courts apply the most significant relationship test set out in Section 145 of the Restatement, Second, on Conflict of Laws." *Goede v. Aerojet General Corp.*, 143 S.W.3d 14, 24 (Mo. App. 2004) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145). Thus, the rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in Restatement section 6. *Id*. at 24 n.6 (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 145(1)).

"Section 6 is the cornerstone of the entire Restatement." SCOLES, HAY, BORCHERS &

SYMEONIDES, CONFLICT OF LAWS § 2.14 at 59 (4th ed. 2004) (hereinafter "SCOLES").[2] "The principles stated in § 6 underlie all rules of choice of law and are ***used in evaluating the significance of a relationship***, with respect to the particular issue, to the potentially interested states, the occurrence and the parties." RESTATEMENT (SECOND) CONFLICT OF LAWS § 145 cmt. b (1971) (emphasis added) (hereinafter "RESTATEMENT"). "Section 6 is important in that it establishes the test that should guide the application of almost all other sections of the Restatement, most of which incorporate § 6 by reference." SCOLES at 60. The Restatement's repeated admonition that a choice of law decision is to be made "under the principles stated in § 6" by evaluating contacts "according to their relative importance with respect to the particular issue" (*see, e.g.*, §§ 145(1) & 148(1)) "suggests the policy part of this analysis should carry more weight than the evaluation of the factual contacts. Yet, courts have tended to do it the other way around by first focusing on the factual contacts listed in the pertinent Restatement section and then, if ever, on the policies of § 6." SCOLES at 63.

The correct analysis under the applicable choice of law rules governing this case requires the Court to utilize the Restatement's "most significant relationship" factors to compare Missouri's interest in having its law applied to Forest (a Missouri corporation engaging in the conduct at issue in Missouri) and each of the other state's interests in having their law applied to a Missouri corporation. This analysis counsels for the application of Missouri law.

    **a.   The relevant § 145 and 148 contacts are place of the injury and place of the defendant's conduct, and the place of the defendant's conduct is**

---

[2] The factors to be considered under section 6 are: "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied."

**to be given the "greatest weight" and is of peculiar significance in a case like this.**

As one court has noted, a proper Restatement analysis can be "somewhat tedious" but that is only because "[a]ny analysis under the Restatement approach is necessarily driven by the unique facts, issues, applicable law, and jurisdictions implicated in a particular case." *Phillips v. Gen. Motors Corp.*, 995 P.2d 1002, 1007 (Mont. 2000) (describing Restatement test as "a policy analysis approach"). In preference to its *lex loci delicti* rule, Forest does not offer this analysis.

Section 145 applies to all torts cases. The section 145(2) contacts to be evaluated in light of section 6 principles are:

  (a)     the place where the injury occurred,
  (b)     the place where the conduct causing the injury occurred,
  (c)     the domicil, residence, nationality, place of incorporation and place of business of the parties, and
  (d)     the place where the relationship, if any, between the parties is centered.

As section 145 states, "[t]hese contacts are to be evaluated according to their relative importance with respect to the particular issue."

Even though the place of the injury is an important factor in some tort cases, "[s]ituations do arise, however, where the place of injury will not play an important role in the selection of the state of the applicable law." RESTATEMENT § 145 cmt. e. For instance, and of particular relevance here,

[W]hen the primary purpose of the tort rule involved is ***to deter*** or to punish misconduct, ***the place where the conduct occurred has peculiar significance***.

RESTATEMENT § 145 cmt. e (emphases added).  Similarly, "the place of injury does not play so important a role for choice-of-law purposes in the case of false advertising … as in the case of other kinds of torts. Instead, ***the principal location of the defendant's conduct*** is the contact that ***will usually be given the greatest weight***[.]" *Id.* cmt. f (emphases added). The primary purpose of the Missouri Merchandising Practices Act is to eradicate unfair business practices and deter

misconduct. *See Schuchmann v. Air Servs. Heating & Air Conditioning, Inc.*, 199 S.W.3d 228, 233 (Mo. App. 2006) ("Due to the unrestricted and all-encompassing nature of Section 407.020 of the MPA, the Supreme Court of Missouri, in speaking of the statute, has stated that 'the literal words cover every practice imaginable and every unfairness to whatever degree.'").

"Situations do arise, however, where the place of injury will not play an important role in the selection of the state of the applicable law. … This will also be so when, such as in the case of fraud and misrepresentation, there may be little reason in logic or persuasiveness to say that one state rather than another is the place of injury[.]" RESTATEMENT § 145(2) cmt. e. "[T]he place of loss does not play so important a role in the determination of the law governing actions for fraud and misrepresentation as does the place of injury in the case of injuries to person or to tangible things." RESTATEMENT § 148 cmt. c. "The place where the defendant made his false representations, on the other hand, is as important a contact in the selection of the law governing actions for fraud and misrepresentation as is the place of the defendant's conduct in the case of injuries to persons or to tangible things." *Id.* Thus the Restatement comments establish that in misrepresentation actions the "place of loss" is ***not important*** while the place of defendant's conduct ***is important***. *See also First Nat'l Bank of Boston v. Heuer*, 702 F. Supp. 173, 175 (N.D. Ill. 1988) ("[I]n cases of fraud or misrepresentation, unlike personal injury actions, the place of the loss is less important than the place the defendant allegedly made the misrepresentations."). "The Second Restatement, while treating unfair competition as part of tort (§ 145), suggests that the most significant factor is not the place of the injury, as in personal injury cases, but the place of the defendant's conduct." SCOLES § 17.53 at 870. As the authors note, unfair competition as contemplated by the Restatement includes unfair competition statutes and deceptive acts and practices statutes which "[a]lmost all states have enacted …, codifying or adding to the common

law." SCOLES § 17.53 at 869 n.2.

Celexa and Lexapro sales representatives are employed by Forest Pharmaceuticals, located in Missouri, and function under the direction of senior sales management in St. Louis. (Jaeckel Cmplt. ¶ 75; Palumbo Cmplt. ¶ 24). As the Complaints extensively detail, Forest's communications and misrepresentations were made through its sales force. Forest Pharmaceutical's Medical Information and Communication Department, likewise located in St. Louis, communicated extensive information about Forest's drugs to healthcare providers and consumers. (Jaeckel Cmplt. ¶¶ 76; Palumbo Cmplt. ¶¶ 25). As a result, the injury causing conduct was planned, coordinated and disseminated from Missouri and the fraud was conceived and executed from Missouri. Thus Forest unquestionably has significant contacts with Missouri and the misrepresentations at issue originated there. Forest cannot seriously dispute Missouri's legitimate and strong interest in having its law applied to insure that its corporate residents comply with its consumer protection laws while serving Missouri and out-of-state consumers.

**b. Evaluation of the relevant contacts in light of § 6 factors demonstrates that Missouri has the "most significant relationship" to the occurrence and the parties and, thus, that Missouri law should be applied.**

The Restatement enumerates seven general choice of law principals to be used in interpreting its specific provisions relevant to the subject matter of the litigation. The general principles are found in section 6 and include the relevant policies of the forum and other interested states, the protection of justified expectations, certainty, predictability and uniformity of result, and ease in the determination and application of the law to be applied. RESTATEMENT § 6(2). Each of these factors counsels for the application of Missouri law.

"In general, it is fitting that the state whose interests are most deeply affected should have its local law applied." RESTATEMENT § 6 cmt. f. In addition, "where the policies of the

interested states are largely the same but where there are nevertheless minor differences between their relevant local law rules" "there is good reason for the court to ***apply the local law of that state which will best achieve the basic policy***, or policies, underlying the particular field of law involved." RESTATEMENT § 6 cmt. h (emphases added).

Forest does not identify a single state interest that trumps Missouri's interest in having its law applied to Forest, a Missouri resident engaging in the conduct at issue in Missouri. Forest does not even attempt to identify *any* state interests implicated by the allegations in this case. Although other states undeniably have an interest in ensuring that their own consumers' rights are adequately protected, there is no suggestion that application of Missouri law to this case will in any way frustrate that interest; to the contrary, application of Missouri law is fully compatible with the other states' interest in protecting their consumers and thus "will best achieve the basic policy" of consumer protection actions. The Restatement clarifies that where, as here, a defendant's conduct emanates from one state and injures consumers all over the country, it is appropriate to apply the law of the state of defendant's conduct, as it has the "most significant relationship" with the cause of action.

> **2. New York choice of law principles dictate that Missouri law applies to the claims of Plaintiffs Martha and Peter Palumbo, Murret, and Ehrlich.**

If the Court decides to conduct a choice of law inquiry at this early stage, Forest is correct that New York choice of law rules apply to the claims of the *Palumbo* Plaintiffs. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941) (applying the choice of law rules of the forum state to determine the substantive law governing a plaintiff's claims).

New York's choice of law analysis, commonly referred to as an "interest analysis," involves several steps and focuses on determining which jurisdiction, "because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issues

raised in the litigation." *Cooney v. Osgood* Mach., Inc., 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919,

612 N.E.2d 277 (N.Y. 1993) (quoting *Babcock v. Jackson*, 12 N.Y.2d 473, 481, 240 N.Y.S.2d

743, 191 N.E.2d 279 (N.Y. 1963)). This analysis addresses two inquiries: "(1) what are the

significant contacts and in which jurisdiction are they located; and, (2) whether the purpose of

the law is to regulate conduct or allocate loss." *Padula v. Lilarn Props. Corp.*, 84 N.Y.2d 519,

521, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (N.Y. 1994) (citing *Schultz v. Boy Scouts of Am., Inc.*,

65 N.Y.2d 189, 198, 491 N.Y.S.2d 90, 480 N.E.2d 679 (N.Y. 1985)). The first inquiry simply

involves addressing the domicile of the parties and where the most significant contacts between

the parties occurred.[3] The second inquiry involves a more complex analysis of whether the laws

at issue focus on loss allocation or conduct regulation.

Loss allocating rules apply once there is admittedly tortuous conduct, while conduct-

regulating rules are those which people and entities use as a guide to governing their primary

conduct. *See Schultz*, 65 N.Y.2d at 198; *K.T. v. Dash*, 37 A.D.3d 107, 112-13, 827 N.Y.S.2d 112

(N.Y. App. Div. 2006). "Conduct-regulating rules have the prophylactic effect of governing

conduct to prevent injuries from occurring." *Padula*, 84 N.Y.2d at 522.

The statutes governing Plaintiffs' claims in this case, addressing unjust enrichment,

fraudulent concealment and misrepresentation, fraud and violations of consumer protection laws,

are clearly conduct-regulating statutes. Each of the laws at issue is designed to regulate

individuals' and corporations' conduct so that consumers are not injured by fraudulent,

misleading and unfair acts or omissions. *See also id.* (holding that sections of New York's Labor

Laws are primarily conduct-regulating rules ensuring that adequate safety measures are applied

---

[3] As stated in the Complaint, the *Palumbo* Plaintiffs are citizens of Pennsylvania, Connecticut and Texas; Forest Laboratories, Inc. is located in New York; and Forest Pharmaceuticals, Inc. is located in Missouri (Palumbo Complaint, ¶ ¶ 3-5.) Because of this, and the fact that the Complaint does not address "significant contacts" between the parties, factor number one is neutral.

at worksites).

      **a.**   **New York's "interest analysis" mandates the application of law of the State of Missouri - Where the wrongful behavior has occurred and where defendant is located.**

Because the laws at issue in Plaintiffs' Complaint are conduct-regulating statutes, New York's law requires an analysis of where the alleged torts occurred. "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney*, 91 N.Y.3d at 72.

Under New York law, in determining the jurisdiction where the tort occurred, the courts hold that the locus of the tort is the place where the ***tortious conduct*** occurred – in the present case, Missouri. *See Carlenstolpe v. Merck & Co., Inc.*, 638 F. Supp. 901, 910 (S.D.N.Y. 1986). *Carlenstolpe* involved a Swedish plaintiff injected with, and injured by, an allegedly defective hepatitis vaccine in Sweden. The plaintiff sued the New Jersey manufacturer of the vaccine, which had been developed and produced by the manufacturer's Pennsylvania subsidiary, in New York federal court. The court noted that, under New York law, when the location of the wrongful behavior and the location where the injury occurred are different, the place of the wrong is generally defined as the location of the injury. Despite this general rule, applying New York's interest analysis as interpreted in *Schultz v. Boy Scouts of America, Inc.*, *supra*, the *Carlenstolpe* court concluded that Pennsylvania law, *i.e.*, the law of the jurisdiction where the alleged tortious conduct occurred, should be applied rather than the law of Sweden, where the injury occurred. Importantly, the court recognized that the "***fundamental rationale respecting a particular jurisdiction's interest in affecting primary behavior clearly applies to the place of the wrong, i.e., where defendant is located and where his allegedly wrongful behavior has***

*occurred, rather than the place of the injury*." *Carlenstolpe*, 638 F. Supp. at 910 (emphasis

added) (citing *Long v. Pan Am. World Airways*, 16 N.Y.2d 337, 342-43, 266 N.Y.S.2d 513, 213

N.E.2d 796 (N.Y. 1965) and *Shultz*).  Moreover, the court clearly found that the most important

factor it considered was which state had the greater interest in governing the liability of the

pharmaceutical company defendant.  In doing so, it determined that the state where the

pharmaceutical company defendant was located, where the wrongful conduct had occurred,

possessed the greater interest.  *See id.* (citing *In re Air Crash Disaster at Mannheim, Germany*,

769 F.2d 115 (3d Cir. 1985) (applying the "interest approach" to conflicts of law determination

that law of the place of manufacture rather than place of injury applies since the state of

manufacture has the greatest interest in governing the liability of manufacturers within its

borders)). Applying this analysis to the allegations made in Plaintiffs' Complaint results in a

finding that Missouri law should be applied here.[4]  (See *Palumbo* Complaint, ¶¶ 5, 23-33.)

Specifically regarding fraud related claims in the conflict of laws arena, New York

federal courts interpreting New York laws have determined that courts should apply the laws of

the "jurisdiction where the fraud originated and where substantial activities in furtherance of the

fraud were committed." *Pension Plan v. Banc of America Securities, LLC*, 446 F. Supp. 2d 163,

194-95 (S.D.N.Y. 2006) (citing and quoting *Cromer Finance Ltd. v. Berger*, 137 F. Supp. 2d

452, 493 (S.D.N.Y. 2001); *Solow v. Stone*, 994 F. Supp. 173, 177 (S.D.N.Y. 1998), *aff'd*, 163 F.

3d 151 (2d Cir. 1998); *Cromer Finance Ltd. v. Berger*, No. 00 Civ. 2284, 2003 WL 21436164, at

*8 (S.D.N.Y. June 23, 2003)); *see Sussman v. Bank of Israel*, 801 F. Supp. 1068 (S.D.N.Y.

---

[4] Plaintiffs emphasize that the face of the Complaint, especially paragraphs 5 and 23-33, clearly shown that the tortious conduct about which Plaintiffs complain emanated from Missouri.

1992).  In the *Cromer* cases,[5] the court recognized that the plaintiffs were domiciled in, and the

injuries had occurred in, locations with only limited connection to the fraudulent conduct at issue

in the case.  *See Cromer*, 137 F. Supp. at 492.  Consequently, the court focused on the

jurisdiction "where the fraud originated and where substantial activities in furtherance of the

fraud were committed." *Id.*

The court in *Sussman v. Bank of Israel*, 801 F. Supp. 1068 (S.D.N.Y. 1992), in applying

New York choice of law principles to torts of fraud, fraudulent misrepresentation, negligent

misrepresentation and fraudulent concealment applied the law of the place where defendants'

tortious conduct took place – Israel.

> Whether or not defendants' conduct was tortuous will be measured by the law of
> Israel.  It is the law upon which the parties, plaintiffs and defendants alike, relied
> in respect of defendants' conduct; and the interest of Israel in applying its law to
> admonish or prevent similar conduct in the future assumes a critical and, in my
> opinion, controlling importance in choice of law analysis.  Consistent with that
> analysis, this Court has regarded the place where the victim of fraud or negligence
> suffered economic loss as less significant for choice of law purposes than the law
> of the place by which the defendant's conduct is evaluated.

*Id.* at 1075.

Plaintiffs aver that this Court's analysis in the case at bar should mirror that of the

*Cromer* and *Sussman* courts.  Doing so will result in application of the laws of Missouri, the

location where Forest's fraud originated and where substantial activities in furtherance of the

fraud were committed.  (*See Palumbo* Complaint, ¶¶ 23-33.)

Further, Plaintiffs aver that this Court's application of Missouri law will in no way

frustrate the laws of Pennsylvania, Connecticut or Texas, where Plaintiffs are domiciled.  As

New York courts have noted, this is an important consideration when considering a conflict of

---

[5] Two decisions out of the same case in the Southern District of New York address New York's internet analysis in the context of fraud claims: (1) *Cromer Finance Ltd. v. Berger,* 137 F. Supp. 2d 452, 492-93 (S.D.N.Y 2001) and (2) *Cromer Finance Ltd. v. Berger,* No. Civ. 2284, 2003 WL 21436164, at *8 (S.D.N.Y June 23, 2003).

laws analysis.  *See K.T.,* 37 A.D. 3d 107, 114-16 ("it is useful in our analysis to consider whether the application of the law of Brazil would thwart or threaten an important policy underlying New York's law, or . . . whether the application of New York law would frustrate any policies underlying Brazil's applicable rule of law") (citing and quoting *Shultz*, 65 N.Y. 2d at 196, 201). In the instant case, Forest has made no showing indicating that the application of Missouri law would thwart or threaten any important policy underlying Pennsylvania, Connecticut or Texas laws.  However, because of the strength of Missouri's consumer laws, if the laws of Pennsylvania Connecticut, or Texas were applied in this case, Missouri's interest in ensuring that corporations located within its borders are held to Missouri's high legal standards would certainly be frustrated.  Therefore, the application of Missouri law is most appropriate here.

### C.  There is No Prohibition Against Application of Missouri Law to non-Missouri Residents.

Giving deference to the interest of the most affected state (in this case Missouri) "is of particular importance in situations where the policies of the interested states are largely the same but where there are nevertheless *minor differences* between their relevant local law rules." RESTATEMENT § 6 cmt. h (emphasis added). "In such instances, there is good reason for the court to *apply the local law of that state which will best achieve the basic policy*, or policies, underlying the particular field of law involved." *Id*. (emphasis added). *See also In re Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15, 18 (N.D. Cal. 1986) (where the defendant was incorporated and headquartered in California and the alleged misrepresentations emanated from California, "California has a strong interest in the allegedly fraudulent conduct of its corporations and residents, and in protecting its residents *and others* from such fraud."). Application of Missouri law will advance the policies of the other 49 states. Missouri and the other states have dual, non-conflicting policies, and each has an interest in prohibiting false advertising and of providing

redress to those injured by false advertising in their respective states. As explained by the

Missouri Appellate Court, "[w]here two states have significant contacts and legitimate state

interests in the choice of law, we must apply the law of the state whose interest would be more

impaired if its policy were subordinated to the policy of the other state." *Gilmore v. Attebery*,

899 S.W.2d 164, 167 (Mo. App. 1995).

Time and again, federal courts, including this District, have recognized that multi-state

class actions may be appropriate in circumstances such as this one. *See, e.g.*, *Randle v. Spectran*,

129 F.R.D. 386 (D. Mass. 1998) (applying Massachusetts law to nationwide class); *Grace v.*

*Perception Tech. Corp.*, 128 F.R.D. 165, 171-72 (D. Mass. 1989) (applying Massachusetts law to

class claims because "[a]ll of the individual defendants reside in Massachusetts and all alleged

misrepresentations emanated from Massachusetts.").[6] Forest simply argues that this Court should

---

[6] Numerous other courts have approved of applying a single state's law to claims of non-residents.  *See, e.g.*, *In re Bendectin Litig.*, 857 F.2d 290, 304-05 (6th Cir. 1988) ("Throughout this litigation there has been some discussion of the law of states in which non-Ohio plaintiffs are domiciled.  We, however, see the law of the state of manufacture of the product as being more significant in this type of case than that of the state where an individual plaintiff happens to live."); *In re Great S. Life Ins. Co. Sales Practices Litig.*, 192 F.R.D. 212 (N.D. Tex. 2000) (applying Texas law to nationwide class when decisions made in Texas); *Boyes v. Greenwich Boat Works, Inc.*, 27 F. Supp. 2d 543, 547 (D.N.J. 1998) ("[T]his state has a powerful incentive to insure that local merchants deal fairly with citizens of other states and countries."); *Grove v. Principal Mut. Life Ins. Co.*, 14 F. Supp. 2d 1101, 1106 (S.D. Iowa 1998) (Iowa law applied to the claims of nationwide class members when the defendant's principal place of business was in Iowa, "the sales presentation materials were designed and prepared in Iowa," and "plaintiffs allege that Iowa is the state from which the alleged nationwide fraudulent scheme was orchestrated"); *In re Badger Mountain Irrigation Dist. Sec. Litig.*, 143 F.R.D. 693, 700 (W.D. Wash. 1992) (Washington law would be applied to the claims of all class members when "all defendants reside or do business in Washington, and the alleged wrongful acts occurred in Washington."); *In re Kirschner Medical Corp. Sec. Litig.*, 139 F.R.D. 74, 84 (D. Md. 1991) (Maryland law governed claims of nationwide class where defendant's principal place of business was located in the state and "many of the alleged false and misleading statements upon which the Consolidated Complaints is based were prepared in and disseminated from Maryland."); *Zinberg v. Washington Bancorp., Inc.*, 138 F.R.D. 397, 411-12 (D.N.J. 1990) (applying New Jersey law to claims of all class members because the defendant's principal place of business was in New Jersey and "many of the false and misleading statements emanated from

ignore a longstanding rule of class action law: when a defendant commits wrongful acts that

harm persons in other states, it is entirely appropriate for the law of the state where the conduct

occurred to be applied to the claims of all wronged persons in the nation. Authority from across

the country demonstrates the error of Forest's simplified analysis and further show that

application of the law of the place of the defendant's conduct – here the law of Missouri – is

required in a case like this.

---

the corporate offices within the State"); *Gruber v. Price Waterhouse*, 117 F.R.D. 75 (E.D. Pa.
1987) (applying Pennsylvania law to claims of plaintiffs in a nationwide class action); *In re
DeFelice*, 77 B.R. 376, 381 (D. Conn. Bkrpt. 1987) ("New York does not and need not limit its
interest in consumer protection to its citizens.  New York's quasi-sovereign interest is served
whenever the perpetrators of consumer fraud within its borders are brought to justice regardless
of whether their victims happen to be citizens."); *In re ORFA Sec. Litig.*, 654 F. Supp. 1449 (D.
N.J. 1987) (applying New Jersey law to the class where defendant's principal place of business
was New Jersey and alleged misrepresentations originated there); *In re Computer Memories Sec.
Litig.*, 111 F.R.D. 675, 686 (N.D. Cal. 1986) (California law applied to the claims of all class
members when, among other things, "the public offering of securities involved in the case
emanated from California and most of the activities of the defendants in connection with the
public offering took place in California."); *In re Activision Sec. Litig.*, 621 F. Supp. 415, 430-31
(N.D. Cal. 1985) (selecting California law to govern a class where defendant maintained its
principal place of business in the state, issued securities in the state, and the purchasers'
acceptances were directed at the state); *State ex rel. Corbin v. Pickrell*, 667 P.2d 1304, 1312
(Ariz. 1983) ("[T]he state has a legitimate interests in redressing the wrongs committed from
within Arizona."); *Wershba v. Apple Computers, Inc.*, 110 Cal. Rptr. 2d 145 (Ct. App. 2001)
("California courts normally may apply California's pro-consumer laws to consumers from other
states"); *Lobo Exploration Co. v. Amoco Prod. Co.*, 991 P.2d 1048, 1054 (Okla. Ct. Civ. App.
1999) ("Oklahoma has an interest in redressing wrongs committed within the state.");
*Renaissance Cruises, Inc. v. Glassman*, 738 So. 2d 436, 439 (Fla. Dist. Ct. App. 1999) (applying
Florida law to all class members' claims because defendant's principal place of business was in
Florida and defendant's business operations were controlled and carried out in Florida "[f]or the
most part."); *Clothesrigger, Inc. v. GTE Corp.*, 236 Cal. Rptr. 605 (Ct. App. 1987) (holding that
if a choice-of-law analysis points to the application of California law, then the claims of a
nationwide class are appropriately decided under that law); *Rio Grande Oil Co. v. State*, 539
S.W.2d 917, 921 (Tex. Ct. App. 1976) (Texas law applied in securities case because "[a] state is
damaged if its citizens are permitted to engage in fraudulent practices even though those injured
are outside its borders."); *State v. Camera Warehouse, Inc.*, 496 N.Y.S.2d 659, 660 (N.Y. Sup.
Ct. 1985) ("A state is damaged if its citizens are permitted to engage in fraudulent practices even
though those parties damaged are non-residents of the state."); *Brown v. Market Dev., Inc.*, 322
N.E.2d 367, 372 (Oh. Ct. Comm. Pleas 1974) ("Ohio has an interest in illegal activities
conducted within its border, even though the damaged person may be located outside its
borders.").

**V.      Plaintiffs Have Adequately Stated a Claim Under the Missouri Merchandising Practices Act.**

The Missouri Merchandising Practices Act ("MMPA") was enacted to expand protections afforded to Missouri consumers beyond those provided by common law fraud. *Schuchmann v. Air Servs. Heating & Air Conditioning, Inc.*, 199 S.W.3d 228, 232 (Mo. App. 2006) (noting the MMPA "eliminates the need to prove intent to defraud or reliance"). Missouri courts have consistently recognized that the purpose of the MMPA is remedial, *i.e.*, the protection of consumers. *State ex rel. Nixon v. Polley*, 2 S.W.3d 887, 892 (Mo. App. 1999). More specifically, the MMPA "supplement[s] the definitions of common law fraud in an attempt to preserve fundamental honesty, fair play, and right dealings in public transactions." *State ex rel. Danforth v. Independence Dodge, Inc.*, 494 S.W.2d 362, 368 (Mo. App. 1973). Thus, the MMPA is to be liberally construed. *State ex rel. Nixon v. Continental Ventures, Inc.*, 84 S.W.3d 114, 117 (Mo. App. 2002). In other words, the statute is written to "give broad scope to the meaning of the statute and to prevent evasion because of overly meticulous definitions." *Webster v. Areaco*, 756 S.W.2d 633, 635 (Mo. App. 1988). In evaluating a motion to dismiss for failure to state a claim, this Court need simply determine whether the Complaint sets forth a claim that "fair dealing has been violated." *Id.*

"Section 407.020 bars a variety of conduct, including concealment, suppression or omission of any material fact in connection with the sale of merchandise." *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 773 (Mo. 2007). "Due to the unrestricted and all-encompassing nature of Section 407.020 of the MPA, the Supreme Court of Missouri, in speaking of the statute, has stated that 'the literal words cover every practice imaginable and every unfairness to whatever degree.'" *Schuchmann*, 199 S.W.3d at 233 (quoting *Ports Petroleum Co., Inc. of Ohio v. Nixon*, 37 S.W.3d 237, 240 (Mo. 2002)).

In the same vein, the Missouri Attorney General has promulgated regulations that make clear the breadth of protection afforded by the MMPA. For example, "unfair practice" is defined as "a practice that either: (1) offends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade Commission, or its interpretative decisions or (2) is unethical, oppressive, or unscrupulous; and (3) presents a risk of, or causes, substantial injury to consumers." *Schuchmann*, 199 S.W.3d at 233 (citing 15 Mo. Code of State Regulations 60-8.020). "Proof of deception, fraud, or misrepresentation is not required to prove unfair practices[.]"15 Mo. Code of State Regulations 60-8.020. Most importantly, unlike in common law fraud actions, proof of reliance or intent to induce reliance is not required under the MMPA. *See e.g.*, *Hess*, 220 S.W.3d at 774 ("a fraud claim requires both proof of reliance and intent to induce reliance; the MPA claim expressly does not").

Finally, a plaintiff need not show that he *purchased* a product as a result of, or in reliance on, deceptive conduct that violates Section 407.020; rather, the plaintiff must show only that he *suffered ascertainable loss* as a result of that conduct. Mo. Rev. Stat. § 407.025.1; *Gibbons v. J. Nuckolls, Inc.*, 216 S.W.3d 667, 670 (Mo. 2007) (objective of MMPA is consumer protection; privity of contract not required).

### A.  Plaintiffs Have Adequately Pled an Ascertainable Loss.

In order to state a claim under the MMPA, a plaintiff must allege that: (1) she purchased or leased merchandise; (2) for personal, family, or household purposes; and (3) suffered an ascertainable loss; (4) as a result of deception or unfair practices. *See Hess*, 220 S.W.3d at 773.

To survive a motion to dismiss for failure to state a claim for damages under the MMPA, Plaintiffs need only allege they suffered an ascertainable loss. Forest's argument boils down to its *factual* contention that there is "no basis for any assumption" that the drugs "did not deliver

the bargained-for value." Br. at 29. But Plaintiffs do not seek any such assumption and intend to prove their claims. At the pleading stage, however, they need only allege the ascertainable loss. Determination of the precise amount of the payments is matter to be developed through discovery. It is Forest, of course, that asks this Court to assume that Celexa and Lexapro were safe and effective (based on nothing more than its own representations) and thus that Plaintiffs cannot *prove* the ascertainable loss which they have clearly *pled*.

In *Sunset Pools of St. Louis, Inc. v. Schaefer*, 869 S.W.2d 883 (Mo. App. 1994), the plaintiff thought he was buying a new spa but received a "three year old spa that had a warped control plate and buttons that did not work." *Id.* at 885. Put another way, the *Sunset Pools* plaintiff thought he was buying one product, and received another less valuable product. The fact that there was a difference, no matter how small, between the value of the product the plaintiff bargained for, and the one that he received, was sufficient to meet the ascertainable loss requirement under the MMPA. *Id.* at 886. *See also Freeman Health Sys. v. Wass*, 124 S.W.3d 504, 507 (Mo. App. 2004) (stating that the buyer's loss in *Sunset Pools* was real and ascertainable because the spa was worth less than the value he gave for it).

According to Forest, plaintiffs must do more than simply allege that all putative class members have suffered an ascertainable loss. In reality, while Forest is free to challenge Plaintiffs' damages at a later juncture, an examination into the merits at this stage is impermissible. *See, e.g.*, *Craft v. Philip Morris Cos.*, 190 S.W.3d 368, 385 (Mo. App. 2005) (rejecting nearly identical argument by defendant that trial court's damages conclusions should be rejected "because they were based on conjecture rather than upon evidence"). Plaintiffs suffered an ascertainable loss by paying more for Celexa and Lexapro than the drugs were worth. Plaintiffs allege that all class members suffered this ascertainable loss. What class members

"would have" done under hypothetical circumstances is irrelevant to Plaintiffs' MMPA claim. *See also State ex. rel The Coca-Cola Co. v. Nixon*, 249 S.W.3d 855, 863 (Mo. 2008) (Ascertainable loss exists when "all consumers suffered an *economic injury* that was based on an objective characteristic.") (emphasis added).

### B.  Forest Misstates the Causal Connection Required Under the MMPA.

The plain language of the MMPA itself makes clear what a plaintiff needs to prove: "Any person *who purchases* or leases merchandise primarily for personal, family or household purposes and thereby suffers *an ascertainable loss* of money or property, real or personal, *as a result of* the use or employment by another person of *a method, act or practice declared unlawful* by section 407.020, may bring a private civil action ...." Mo. Rev. Stat §407.025.1 (emphasis added). The "as a result of" language of the MMPA plainly refers to the *ascertainable loss.* It requires a showing that the *loss* resulted from the unlawful conduct – not, as Forest argues, that the *purchase* resulted from the unlawful conduct. Had the legislature intended to couple the "result of" language with the purchase decision, it could have done so. It did not. As a result, Missouri courts have repeatedly confirmed that reliance is not required under the MMPA. *See, e.g.*, *Hess*, 220 S.W.3d at 774 ("[A] fraud claim requires both proof of reliance and intent to induce reliance; the MMPA claim expressly does not."). This construction is also made clear by the prohibition in section 407.020 of "[a]ny act, use or employment declared unlawful by this subsection violates this subsection whether committed ***before, during or after the sale, advertisement or solicitation.***" (emphasis added).

Thus, Forest's argument that Plaintiffs have failed to allege causation is incorrect. In *Hess*, the Missouri Supreme Court held that, under the MMPA and its accompanying regulations, a consumer's loss may be found to be "as a result of an act declared unlawful by section

407.020," if the defendant concealed, omitted or misrepresented in connection with the sale "any fact which a reasonable consumer would likely consider to be important in making a purchasing decision," as opposed to the requirement at common law that "the ultimate result would not have followed if there had been no representation." *Hess*, 220 S.W.3d at 773-74. *See also Areaco*, 756 S.W.2d at 637 ("The entire thrust of the Merchandising Practices Act is that consumers rely upon the fair dealing of those selling merchandise and services. … It is presumed from the statute that the customer relied upon the obligation of fair dealing in making his purchase."). *Hess* makes clear that the fourth element of an MMPA claim, "*as a result of* an act declared unlawful by section 407.020," is satisfied by a demonstration of the materiality of the misrepresented or omitted fact pursuant to a reasonable person standard. *Hess*, 220 S.W.3d at 773. As this District recently noted in a similar drug case, "None of the bellwether jurisdictions requires anything more than that causation be pled, in other words, that plaintiffs plausibly plead that defendants made representations about the weight-reducing properties of their products, that plaintiffs purchased the products expecting to lose weight, and that the products did not perform as advertised." *In re WellNx Mktg. & Sales Pracs. Litig.*, 673 F. Supp. 2d 43, 56 (D. Mass. 2009).

Plaintiffs need merely allege that they suffered an ascertainable loss and that the loss was connected to Forest's unfair conduct. *See* Jaeckel Cmplt. ¶ 110; Palumbo Cmplt. ¶ 128 ("As a direct and proximate result of Defendants' violations of the Missouri Merchandising Practices Act, Plaintiffs and members of the Class were damaged in an amount to be proven at trial.") (statutory citation omitted). The specific and extensive allegations in Plaintiffs' Complaints, detailed above, regarding Forest's unfair conduct in promoting Celexa and Lexapro for pediatric use unquestionably meet this standard.

36

VI.     **Even if this Court determines that Missouri law does not apply, Plaintiffs'
        Complaints satisfactorily state claims for Fraud, Fraudulent Concealment and
        Misrepresentation.**

Assuming, *arguendo*, that this Court determines that Missouri law does not apply;

Plaintiffs' allegations sufficiently establish fraud claims pursuant to common law and the

respective state laws of the home states of each Plaintiff.  Generally, the elements of a cause of

action for fraud require a showing of reliance, causation and damages.  *See, e.g., Miller v.

Guimaraes, 78 Conn. App.* 760, 780, 829 A.2d 422 (2003); s*ee also Caltabiano v. L & L Real

Estate Holdings II, L.L.C.,* No. CV074019729S, 2009 WL 1054288 (Conn. Super. Ct. March 20,

2009)(addressing Connecticut law outlining essential elements to establish a fraud claim).

A.      **Plaintiffs' Complaints sufficiently allege Reliance, Causation and Injury.**

Defendants assert that Plaintiffs' Complaints fail to adequately allege reliance, causation

and injury in order to sustain their claims.  However, Defendants assertions are wholly inaccurate

as the complaints allege that Plaintiffs and/or their prescribing physicians were provided and

deceived by Defendants' fraudulent and false advertising of Celexa and Lexapro, and this

deception caused actual injury to the Plaintiffs.

1.      **Reliance**

Plaintiffs have made the following allegations in their Complaints and, thus, have clearly

and adequately alleged reliance:

- Forest disseminated and caused others to disseminate false and misleading information to
  doctors and the public about the safety and efficacy of Celexa and Lexapro in treating
  pediatric patients.  The company failed to disclose the negative results of a large,
  placebo-controlled study that found Celexa no more effective than placebo for pediatric
  use and in which more patients taking Celexa attempted suicide or reported suicidal
  ideation than those taking only placebo. (Jaeckel Cmplt. ¶ 3; Palumbo Cmplt. ¶ 10).

- Forest has misrepresented information concerning the safety and efficacy of Celexa and
  Lexapro for treating children and adolescents. For instance, Forest has allowed positive
  information about pediatric use of Celexa and Lexapro to be disclosed publicly, but has

withheld and concealed negative information concerning the safety and effectiveness of the drug as a treatment for pediatric patients. (Palumbo Cmplt. ¶ 22).

- In deciding whether to prescribe a drug for an off-label use, physicians typically **rely on their assessment of information received about the drug**. Such information must be accurate and provide an unbiased picture of a drug's safety and efficacy in treating a condition. If the information is false or misleading, the physician cannot accurately assess the crucial risk/benefit balance for the patient or exercise professional judgment that is independent. Consequently, the physician cannot act in accordance with the professional and fiduciary obligations owed to the patient. (Palumbo Cmplt. ¶ 30) (emphasis added).

- Concealing or providing inaccurate or biased information that is material to a prescribing decision misleads the physician and the patient who relies on that physician's professional judgment. (Palumbo Cmplt. ¶ 31).

- **Forest misled and deceived physicians and consequently the patients who relied on their professional judgment**, including the Plaintiffs and the putative class herein. Forest deprived physicians, including Plaintiffs' physicians, of the information needed to evaluate the risks and benefits of prescribing Celexa and Lexapro for children and adolescents. By doing so, Forest deceived these physicians, irrespective of whether or not they would have prescribed Celexa or Lexapro if Forest had disclosed the material facts that were known at the time. (Palumbo Cmplt. ¶ 93) (emphasis added).

- Defendants have voluntarily accepted and retained these profits, with full knowledge and awareness that, **as a result of their wrongdoing, Plaintiffs and the putative class members paid for Celexa and Lexapro when they otherwise would not have done so**. (Jaeckel Cmplt. ¶ 95; Palumbo Cmplt. ¶ 98) (emphasis added).

- The material misrepresentations and omissions of defendants were likely to induce a reasonable person to manifest their assent without being fully informed of all the facts. (Jaeckel Cmplt. ¶ 117; Palumbo Cmplt. ¶ 106).

- Plaintiffs and members of the Class **justifiably relied upon the information provided by defendant** to their economic detriment. (Jaeckel Cmplt. ¶ 118; Palumbo Cmplt. ¶ 107) (emphasis added).

A review of Plaintiffs' Complaints, including particularly the allegations stated above, reveals that sufficient allegations concerning the Plaintiffs and Plaintiffs' prescribers' reliance, to their detriment, upon the Forest's non-disclosures and misrepresentations is clearly established.

### 2.  Causation and Damages

Plaintiffs have made the following allegations in their Complaints, and, thus have clearly

alleged that the deceitful conduct of Forest caused injuries and damage to the Plaintiffs:

- Forest sought to induce physicians and others to prescribe Celexa and Lexapro by providing them with various forms of illegal remuneration, including cash payments disguised as grants or consulting fees, expensive meals and lavish entertainment, and other valuable goods and services. (Jaeckel Cmplt. ¶ 4; Palumbo Cmplt. ¶ 11).

- As a result, Plaintiffs and the putative class members have suffered damage, and Forest has been unjustly enriched.  Forest sells citalopram and escitalopram in the United States under the trade names Celexa and Lexapro, respectively.  Large numbers of medical providers, their minor patients, and their minor patients' guardians in these states, including the Plaintiffs herein, have been being misled about the drug's true efficacy and risks. (Palumbo Cmplt. ¶ 12). (*See also* Jaeckel Cmplt. ¶ 1).

- Plaintiffs thus respectfully ask the Court to: (a) award restitution and/or damages in the amount that was paid for the minors' Celexa and Lexapro prescriptions, plus interest; and (b) award all other costs, including attorneys' fees, available under the law.  (Palumbo Cmplt. ¶ 13).

- Forest has misrepresented information concerning the safety and efficacy of Celexa and Lexapro for treating children and adolescents.  For instance, Forest has allowed positive information about pediatric use of Celexa and Lexapro to be disclosed publicly, but has withheld  and concealed negative information concerning the safety and effectiveness of the drug as a treatment for pediatric patients.  Thus, Forest has prevented physicians from properly and independently exercising their professional judgment on behalf of their child and adolescent patients. Accordingly, Forest's acts have deprived these youngsters of the benefit of their physicians' independent professional judgment. (Palumbo Cmplt. ¶ 22).

- Physicians owe their patients fiduciary and professional obligations to exercise their independent professional judgment in making treatment recommendations and to recommend only those treatments that are appropriate for the individual patient. Conversely, patients (and, in the case of children and adolescents, their parents and guardians) rely on the professional judgment of their physicians in deciding whether to consent to and purchase a treatment. (Palumbo Cmplt. ¶ 28).

- Although Forest submitted the Lundbeck study to the FDA in 2002 in order to seek a six-month extension of patent exclusivity for Celexa, Forest failed otherwise to disclose the negative study beyond a small group of its senior executives.  At the same time, Forest aggressively promoted the Wagner study, thereby relaying the false impression that the only available pediatric data on Celexa was positive. (Jaeckel Cmplt. ¶ 29; Palumbo Cmplt. ¶ 46).

- Forest's simultaneous failure to disclosure the negative Lundbeck study results and wide publication of the positive Wagner study results caused Forest and its consultants to make false or misleading statements.  For example, because no even Dr. Wagner was aware of

the negative Lundbeck data, she never discussed that data in her many Forest-sponsored talks addressing the pediatric use of Celexa and Lexapro.  Her slide presentations addressed negative studies on pediatric use of other SSRIs, but falsely indicated that there were no negative studies on the pediatric use of Celexa. (Jaeckel Cmplt. ¶ 33; Palumbo Cmplt. ¶ 50).

- By failing to disclose the Lundbeck study results, which raised serious questions about the efficacy and safety of Celexa, while simultaneously promoting the Wagner study, Forest told prescribing physicians a half-truth and hereby prevented them and the public from having all potentially available information when making decisions about how to treat a serious medical condition in pediatric patients. (Jaeckel Cmplt. ¶ 41; Palumbo Cmplt. ¶ 58).

- Forest's use of various forms of media to influence prescribing health care providers and advertise, promote and otherwise call attention to Celexa and Lexapro, deceptively misrepresented Celexa and Lexapro's attributes, performance/efficacy, characteristics and risks.  Celexa and Lexapro could not and cannot perform as advertised and promoted, and Forest's promotion of Celexa and Lexapro constitutes unfair deceptive, untrue or misleading advertising. Forest's advertisements to the medical community deceived and continue to deceive that community and the consuming public.  These advertisements and promotional efforts were disseminated for the purposes of unfairly gaining consumer market share by unfair competition. Forest either knew, recklessly disregarded, or reasonably should have known that such advertising was untrue and/or misleading. (Palumbo Cmplt. ¶ 96).

- Plaintiffs and members of the Class justifiably relied upon the information provided by defendant to their economic detriment. (Jaeckel Cmplt. ¶ 118; Palumbo Cmplt. ¶ 107).

- As a direct and proximate consequence of Defendants' fraudulent misrepresentations, Plaintiffs and Class Members were damaged by:  (1) failing to receive full value for their direct or indirect payment of money for Celexa and Lexapro for pediatric use: (2) incurring personal debt and/or out-of-pocket expenditures to purchase Celexa and Lexapro for pediatric use: (3) payment  for Celexa and Lexapro for pediatric use on behalf of purchasers; and (4) foregoing safe and effective alternative treatment options in reliance upon Defendant's misrepresentations that Celexa and Lexapro for pediatric use was effective and had a positive risk-benefit profile. (Jaeckel Cmplt. ¶ 125; Palumbo Cmplt. ¶ 114).

As stated in Plaintiffs' Complaints, Plaintiffs have satisfactorily alleged facts

demonstrating that their reliance on Forest's fraudulent statements caused injury and damage to

Plaintiffs.  Plaintiffs have alleged a material injury; first, by alleging that Celexa and Lexapro

were not found to be safe or effective for pediatric uses, and, secondly, by alleging that Plaintiffs

paid for a drug they would not have paid for had it not been for Forest's misrepresentations. Moreover, Plaintiffs' Complaints demonstrate that Forest created an off-label pediatric market for Celexa and Lexapro and Plaintiffs were injured when they paid for the drug for pediatric uses. Plaintiffs would not have purchased Celexa and Lexapro for this off-label use if Forest had not fraudulently misrepresented its efficacy. Therefore, Plaintiffs seek damages based on their purchases.

**VII.  Whether Plaintiffs' Claims are Time-Barred Requires an Extensive Factual Analysis which is Inappropriate for Determination in the Context of a Motion to Dismiss.**

Defendants wrongly declare that the Plaintiffs' claims under the laws of Connecticut, Pennsylvania, Texas and Utah are time-barred. In support of this assertion, Forest bases its argument purely on assumptions and factual discrepancies which are clearly inappropriate for decision in a motion to dismiss context. Forest's arguments are based purely on speculation that Plaintiffs discovered or should have discovered Forest's fraudulent acts and Plaintiffs' resulting injuries by early 2005.

Forest posits that Plaintiffs are barred from asserting claims based on fraud that "*was discovered or should have been discovered*." Clearly, Forest's arguments are based solely on the resolution of factual disputes. Importantly, such factual inquiries are not ripe for determination at the pleading stage.

Taking it a step further, beyond an actual inquiry into each individual Plaintiffs' knowledge of the misrepresentations and the time period when these misrepresentations were made known to the Plaintiffs, the prescribing physician's knowledge of Forest's deception is critically important. Defendant claims "that by the latter half of 2004, any physician writing a pediatric prescription for Celexa or Lexapro was on full notice of the allegedly concealed facts

41

and could not have been the victim of any deception by Forest."[7]   Forest's Br. at 34.  Such a claim by Defendant is based solely on speculation and assumptions.  Certainly, it is true that Forest's deceptive ploy may have been uncovered and made public at some point in 2005.  However, the extent and scope of Plaintiffs' and Plaintiffs' prescribers' knowledge is largely unknown.

Moreover, Forest has the ultimate responsibility of ensuring that prescribers of its drugs have been provided with any changes in the drugs' prescribing information.  Plaintiffs aver that discovery will reveal that Forest failed to timely and adequately notify physicians and other prescribers of changes to prescribing information for Lexapro and Celexa.  Notably, it should be clear to this Court that none of these issues can be resolved on a motion to dismiss.

## VIII.   The Fraud Allegations in Plaintiffs' Complaints Meet the Specificity Required by Federal Rule of Civil Procedure 9(b).

As stated previously herein, it is well established within this Circuit that Fed. R. Civ. P. 9(b) must be read in conjunction with Fed. R. Civ. P. 8, which requires that averments in pleadings be concise and direct.  *See McGinty v. Beranger Volkswagen*, Inc., 633 F.2d 226, 228 (1st Cir. 1980).  Pleading is sufficient under Rule 9(b) if the complaint provides adequate notice of the circumstances constituting the alleged fraud so that the defendant can prepare and adequate answer from the allegations.  *See Simcox v. San Juan Shipyard, Inc*., 754 F.2d 430, 439-40 (1st Cir. 1985) (holding that a complaint should not be struck for the failure to follow a form if the nature of the claim is apparent).  Here, Plaintiffs' allegations go well beyond what is required under Rule 9(b), setting forth in detail Forest's deceptive scheme that resulted in Plaintiffs and Class Members purchasing Celexa and Lexapro for pediatric use.  More

---

[7] The 2005 Physicians' Desk Reference did not contain the "black box warning" explaining the potential risk for increased suicidality in children and adolescents taking SSRIs.  This warning did not appear in the Physicians' Desk Reference until 2006.

particularly, the Complaint provides the "who, what, where, and when of the allegedly false or fraudulent representations." *JSB Indus., Inc. v. Nexus Payroll Servs., Inc*. 463 F. supp. 2d 103, 107 (D. Mass. 2006).

## IX.   Plaintiffs Have Adequately Pled Their Unjust Enrichment Claim.

Plaintiffs have clearly alleged a viable unjust enrichment claim. As observed in *Lupron*, "[u]nder the doctrine of unjust enrichment, a plaintiff seeks restitution of a benefit conferred on another whose retention of the benefit at plaintiff's expense would be unconscionable." *In re Lupron Mktg. & Sales Pracs. Litig.*, 295 F. Supp. 2d 148, 182 (D. Mass. 2003). The Complaints allege that Plaintiffs conferred a benefit on Forest in the form of payment for pediatric Celexa and Lexapro, that Forest accepted that benefit, and that it would be unjust under the circumstances for Forest to retain that benefit. Plaintiffs allege a benefit to Forest at their expense in violation of fundamental principles of justice, equity, and good conscience, which Forest must disgorge under the doctrine of unjust enrichment. *See, e.g.*, *Pitman v. City of Columbia*, 309 S.W.3d 395, 403 (Mo. App. 2010) ("The essence of unjust enrichment is that the defendant has received a benefit that it would be inequitable for him to retain.").

As acknowledged by Forest, its arguments regarding unjust enrichment are largely duplicative of its earlier arguments. As explained above, Plaintiffs have alleged wrongful conduct by Forest and Forest errs in arguing otherwise. Moreover, as they have clearly pled an injury – payment for pediatric Celexa and Lexapro due to Forest's wrongful conduct – they have suffered any injury required for an unjust enrichment claim.

In *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618 (D. Mich. 2000), the defendants raised similar arguments as Forest does here, and the court rejected them, holding that "[c]ontrary to Defendants' argument, there is no additional requirement that a benefit flow solely

from Plaintiffs to Defendants. The courts do not define 'benefit' as narrowly as Defendants urge." *Id.* The "critical question" is not whether the benefit was "directly conferred" upon the Defendant – although it clearly was in this case – but whether the plaintiff "can show that his detriment and the defendant's benefit are related to and flow from the challenged conduct." *Id.* Here, Plaintiffs have clearly alleged that they conferred a benefit on Forest in the form payments for pediatric Celexa and Lexapro, that Forest accepted that benefit, and that it would be unjust under the circumstances for Forest to retain that benefit. (Jaeckel Cmplt. ¶¶ 91-96; Palumbo Cmplt. ¶¶ 94-99).

Moreover, after spending the vast majority of its motion explaining how Plaintiffs' legal claims must fail on the pleadings ***precisely because Plaintiffs do not have a sufficient legal relationship with Forest to allege injury***, Forest argues that Plaintiffs' equitable claims must fail because they have an "adequate remedy at law." In other words, Forest argues that Plaintiffs' claims are so legally remote that they do not even have standing, but that they have an adequate legal remedy. Plaintiffs are well within their rights to plead alternative theories of recovery. *See, e.g.*, *Howard v. Turnbull*, 258 S.W.3d 73, 76 (Mo. App. 2008) ("[C]ontrary to the Turnbull's argument, the fact that Mr. Howard also alleged the Turnbulls breached an agreement entitling him to repayment of the full amount does not preclude Mr. Howard from claiming in the alternative the Turnbulls were unjustly enriched."); *Kinetic Co.*, 672 F. Supp. 2d at 948 ("[t]he right of a plaintiff to try his case on alternate theories has uniformly been upheld in the federal courts and plaintiff cannot be required to elect upon which theory to proceed") (citation omitted).

## X.     If the Motion to Dismiss is Granted, Amendment Should be Permitted.

Federal Rule of Civil Procedure 15(a) expressly provides that leave to amend shall be "freely" given. Because Rule 15(a) restricts the court's discretion to dismiss without leave to

amend, Plaintiffs should be given at least one chance to amend. *DeCarlo v. Fry*, 141 F.3d 56, 62 (2d Cir. 1998). Thus, if this Court determines that Forest's motion is meritorious, Plaintiff respectfully requests that under the liberal rules providing for amendments, they be given the opportunity to amend.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motions to Dismiss the Jaeckel and Palumbo Consumer Complaints.

Dated: August 3, 2010                                                Respectfully submitted,

/s/ Christopher L. Coffin
Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Tel: (225) 687-6396
Fax: (225) 687-6398
ccoffin@pbclawfirm.com

*Member of the Plaintiffs' Steering*
*Committee and attorney for Plaintiffs*
*Martha and Peter Palumbo, Jayne Ehrlich*
*and Anna Murret*

Stephen A. Swedlow
KOREIN TILLERY
205 N. Michigan Ave., Ste. 1940
Chicago, IL 60601
Tel: (312) 899-5063
Fax: (312) 641-9555

*Consumer Class Counsel and attorney for*
*Plaintiffs Jill Powell, Angela Jaeckel and*
*Melvin M. Fullmer*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 3, 2010.

Dated: August 3, 2010                                    Respectfully submitted,

<u>/s/ Christopher L. Coffin</u>
Christopher L. Coffin
Pendley, Baudin & Coffin, L.L.P.
P.O. Drawer 71
24110 Eden Street
Plaquemine, LA 70765
Tel: (225) 687-6396
Fax: (225) 687-6398
ccoffin@pbclawfirm.com

*Member of the Plaintiffs' Steering*
*Committee and attorney for Plaintiffs*
*Martha and Peter Palumbo, Jayne Ehrlich*
*and Anna Murret*