**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| In re: | : | MDL No. 2067 |
| | : | |
| CELEXA AND LEXAPRO MARKETING AND | : | Master Docket No. 09-MD-2067 (NMG) |
| SALES PRACTICES LITIGATION | : | |
| | : | Judge Nathaniel M. Gorton |
| THIS DOCUMENT RELATES TO: | : | |
| | : | Magistrate Judge Judith G. Dein |
| *Wilcox v. Forest Laboratories, et al.* | : | |
|  10-cv-10154-NMG | : | |
| _____ | : | |

# SECOND AMENDED COMPLAINT

**FLEMING & ASSOCIATES, LLP**
1330 Post Oak Boulevard, Suite 3030
Houston, Texas 77056
Telephone (713) 621-7944
Fax (713) 621-9638


*Of counsel:*

Rand P. Nolen, Texas Bar No. 00788126
George M. Fleming, Texas Bar No. 07123000
Rand_nolen@fleming-law.com
George_fleming@fleminglaw.com



**Law Offices of Keith Morgan**
PO Box  2393
Madison, MS 39130-1300
Hwy 51
Madison, MS 39110



*Of counsel:*

Keith Morgan
Keith_morgan@mac.com

**GIANNI-PETOYAN**
17383 Sunset Boulevard
Ste. A200
Pacific Palisades, CA 90272
Telephone (310) 230-6767
Fax (310) 230-6051


*Of counsel:*

Laura Gianni
California Bar No. 178130
lag@giannipetoyan.com




**The Arkin Law Firm**
333 S. Grand Avenue, 25th Floor
Los Angeles, California 90071
Telephone (541) 469-2892
Fax (866) 571-5676



*Of counsel:*

Sharon J. Arkin
California Bar No. 154858
sarkin@arkinlawfirm.com

## CLASS ACTION COMPLAINT

Over the course of more than half a decade, Defendants, Forest Pharmaceuticals, Inc. ("Forest Pharmaceuticals"), and Forest Laboratories, Inc. ("Forest Labs") (collectively, "Forest") illegally marketed the antidepressant drug, Celexa, for off-label use in pediatric patients.  During much of that time, Forest misled physicians by promoting the results of a positive study on pediatric use of Celexa while failing to disclose the results of a contemporaneous negative study for the same pediatric use.  Forest also paid kickbacks to physicians to induce them to prescribe the drugs.  By knowingly and actively promoting Celexa for off-label pediatric use without disclosing the results of the negative pediatric study and by paying kickbacks, Defendants have damaged the Plaintiff, Class and Subclasses as alleged herein.

## I.      NATURE OF ACTION

1.      Forest engaged in a fraudulent and unlawful scheme to market and promote Celexa[1] off-label to treat depression and other psychiatric conditions in pediatric patients.  Forest did so even though the Food and Drug Administration ("FDA") had not approved the drug as safe and effective for any use in the pediatric population.  In fact, the FDA specifically denied approval of Celexa for pediatric use.

2.      Forest disseminated and caused others to disseminate false and misleading information to doctors and the public about the safety and efficacy of Celexa in treating pediatric patients.  The company failed to disclose the negative results of a large, placebo-controlled study

---

[1] Celexa is the name brand for the generic compound citalopram.  Every allegation contained herein related to the business of promoting, marketing, manufacturing and distributing Celexa in the United States is applicable to the generic compound citalopram.

that found Celexa no more effective than placebo for pediatric use and in which more patients taking Celexa attempted suicide or reported suicidal ideation than those taking only placebo.

3.     Forest sought to induce physicians and others to prescribe Celexa by providing them with various forms of illegal remuneration, including cash payments disguised as grants or consulting fees, expensive meals and lavish entertainment, and other valuable goods and services.

## II.     JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), because at least one member of the class is a citizen of a different State than the Defendants, there are 100 or more class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and cost.

5.     Venue is appropriate under 28 U.S.C. §1391(a)(2).

## III.     PARTIES

6.     Plaintiff Scott A. Wilcox, resides at 2714 Turnwater Drive, Walnut Creek, CA 94598, and is a citizen of the State of California.  Plaintiff Scott A. Wilcox paid, in whole or in part, for Celexa for use by his minor child, Robert W.S. Wilcox during the period of his minority.

7.     Defendant FOREST PHARMACEUTICALS INC. is a wholly owned subsidiary of FOREST LABORATORIES, INC. with its principal place of business in St. Louis, Missouri. Forest Pharmaceuticals manufactures, distributes, and sells Forest prescription products in the United States.

Class Action Complaint

8.     Defendant FOREST LABORATORIES, INC. is a pharmaceutical company incorporated in Delaware, and headquartered in New York, New York.

9.     Service of process on FOREST PHARMACEUTICALS INC. and FOREST LABORATORIES, INC., may be made by serving their agents for service:

FOREST PHARMACEUTICALS INC.
C/O
United States Corporation Co.
221 Bolivar Street
Jefferson City, Mo. 65101


FOREST LABORATORIES, INC.
C/O
CSC – Lawyers Incorporating Service
2730 Gateway Oaks Dr. Ste 100
Sacramento, CA 95833

At all relevant times, Forest was in the business of promoting, marketing, manufacturing and distributing the generic compound citalopram as an antidepressant.  Forest markets the drug under the trade name Celexa.  Forest Laboratories, Inc., has a license from H. Lundbeck A/S ("Lundbeck"), a Danish company, to promote and sell Celexa in the United States.

10.    Forest does business in California and at all relevant times it promoted, marketed, and distributed the drugs in question in California.

## IV.    FACTUAL ALLEGATIONS

### A.    Celexa

11.    Celexa is a selective serotonin reuptake inhibitor ("SSRIs") drugs.  Lundbeck developed Celexa and subsequently licensed it to Forest for marketing in the United States. Forest began selling Celexa in 1998.

Class Action Complaint

### 1.      The FDA Did Not Approve Celexa for Pediatric Use

12.      In 1998, the FDA approved Celexa for the treatment of adult depression.  The FDA never approved Celexa for treatment of any conditions other than adult depression, or for any pediatric use.

13.      The use of Celexa in pediatric patients is not supported by a citation included or approved for inclusion in any of the compendia.  The use of Celexa in pediatric patients is not a "medically accepted" indication for the drug.

14.      If a manufacturer conducts pediatric clinical studies on a drug, a manufacturer may obtain an additional six months of patent exclusivity for the previously-approved, on-label indications for that particular drug subject to certain FDA requirements.  21 U.S.C. § 355a.  In such circumstances, the FDA issues a "Written Request" that details the studies that should be performed.  21 U.S.C. § 355a(c)(2)(A).

15.      In August 1998, Forest submitted a "Proposed Pediatric Study Request for Celexa."  On April 28, 1999, the FDA issued a Written Request to Forest to conduct "two independent, adequate and well-controlled clinical trials in pediatric depression" for Celexa.

16.      On September 24, 1999, Forest submitted to the FDA protocols for two pediatric studies: 1) a double-blind, placebo-controlled pediatric study being conducted in Europe by Lundbeck (the "Lundbeck study"); and 2) a double-blind, placebo-controlled pediatric study to be conducted in the United States by Forest through University of Texas child psychiatrist Karen Wagner (the "Wagner study").

Class Action Complaint

17.     In mid-2001, the Wagner and Lundbeck studies were unblinded and their results were disseminated to senior Forest executives.  The Wagner study was positive, i.e., it indicated that Celexa was more effective than placebo in treating pediatric patients suffering from depression, but the Lundbeck study was negative, i.e., it did not show Celexa to be any more effective than placebo in treating pediatric depression.  Furthermore, in the Lundbeck study, 14 of the patients taking Celexa attempted suicide or reported suicidal ideation (i.e., contemplation of suicide) compared to only 5 patients taking placebo.  Under one statistical test, this result was "significant," and, under another statistical test, it was "borderline significant."

18.     On April 18, 2002, Forest submitted the results of both the Lundbeck and Wagner studies to the FDA in support of requests for both a six-month extension of patent exclusivity and a pediatric indication for Celexa. Forest's submission to the FDA was not public.

19.     On July 15, 2002, the FDA granted Celexa six additional months of patent exclusivity for the on-label use of treating depression in adults.

20.     On September 23, 2002, the FDA denied Forest's request for a pediatric indication for Celexa.  The FDA concluded that the Lundbeck study "is a clearly negative study that provides no support for the efficacy of citalopram in pediatric patients with [major depressive disorder]."

## 2.     The FDA-Mandated Black Box Warnings on the Celexa

21.     On March 22, 2004, the FDA issued a public health advisory requesting that certain SSRI manufacturers, including Forest, change the labels on their SSRI drugs to include a

Class Action Complaint

[w]arning statement that recommends close observation of adult and pediatric patients treated with these agents for worsening depression or the emergence of suicidality."

22.     Later that year, the FDA directed the SSRI manufacturers, including Forest, to include on their labels a black box warning and expanded statements to alert physicians about the potential for increased risk of suicidality in children and adolescents taking SSRIs.  The black box warning specifically stated that "[a]ntidepressants increased the risk of suicidal thinking and behavior (suicidality) in short-term studies in children and adolescents with Major Depressive Disorder (MDD) and other psychiatric disorders."   (Emphasis added).   In addition, the FDA required SSRI manufacturers to state, in relevant part, that:

> The risk of suicidality for these drugs was identified in a combined analysis of short-term (up to 4 months) placebo-controlled trials of nine antidepressant drugs, including the selective serotonin reuptake inhibitors (SSRIs) and others, in children and adolescents with major depressive disorder (MDD), obsessive compulsive disorder (OCD), or other psychiatric disorders.  A total of 24 trials involving over 4400 patients were included.  The analysis showed a greater risk of suicidality during the first few months of treatment in those receiving antidepressants.

23.     The Lundbeck study on pediatric use of Celexa was one of the 24 trials considered by the FDA in mandating this warning.

24.     Forest revised the Celexa label in early 2005 to include the required black box warning and to state under the label's "Pediatric Use" subheading that safety and effectiveness in

Class Action Complaint

the pediatric population have not been established (*see* BOX WARNING and WARNINGS-Clinical Worsening and Suicide Risk)."  The Celexa label further stated that "[t]wo placebo-controlled trials in 407 pediatric patients with MDD have been conducted with Celexa, and the data were not sufficient to support a claim for use in pediatric patients."

25.    In 2007, the Celexa label was again modified to state that, after evaluating the pooled analyses of placebo-controlled SSRI trials in children and adolescents and of trials in adults, "[t]here was considerable variation in risk of suicidality among drugs, but a tendency toward an increase in the younger patients for almost all drugs studied."

26.    To date, Forest has not obtained FDA approval for a pediatric indication for Celexa.  The Celexa label currently includes black box warnings explicitly indicating that the safety and efficacy of the drugs in the pediatric population have not been established.

**B.      Forest's Dissemination of Half Truths as a Result of Its Failure to Disclose the Results of the Negative Lundbeck Study**

27.    Although Forest submitted the Lundbeck study to the FDA in 2002 in order to seek a six-month extension of patent exclusivity for Celexa (which Forest later valued at $485 million), Forest failed otherwise to disclose the negative study beyond a small group of its senior executives.  At the same time, Forest aggressively promoted the Wagner study, thereby relaying the false impression that the only available pediatric data on Celexa was positive.

28.    Although the Forest senior executives learned about the negative Lundbeck results in mid-2001, Forest failed for the next three years to disclose that negative data to, among others: its thousands of sales representatives who were detailing pediatric specialists; pediatric specialists whom it hired to give promotional speeches on Celexa; the members of its

Class Action Complaint

Executive Advisory Board of leading psychiatrists upon whom it ostensibly relied for advice concerning new data and upon whom it also relied to convey information to others; its own Professional Affairs Department, which it charged with disseminating "balanced" information in response to physician requests for available data on Forest drugs; or even its own pediatric researchers such as Dr. Wagner.

29.    During this same time period, Forest took aggressive steps to publicize the positive results of the Wagner study.  On August 27, 2001, Forest presented the Wagner study results to its Executive Advisory Board without making any mention of the contemporaneous negative Lundbeck results.  Forest thereafter arranged for Dr. Wagner to present a poster summary of the Wagner study to various professional groups, including the American Psychiatric Association, the American College of Neuropsychopharmacology, and the Collegium Internationale Neuro-PsychopharrnaIogicum.   In conjunction with these presentations, Forest coordinated the "placement" of news stories about the positive Wagner data in numerous national and local media outlets.

30.    Over the course of 2002, Forest arranged for Dr. Wagner to give promotional presentations on the pediatric use of Celexa and to serve as the chair of a seven-city Continuing Medical Education ("CME") program on treating pediatric depression.  Forest also sponsored 20 CME teleconferences that addressed the Wagner study results.

31.    Forest's simultaneous failure to disclose the negative Lundbeck study results and wide publication of the positive Wagner study results caused Forest and its consultants to make false or misleading statements.  For example, because not even Dr. Wagner was aware of

Class Action Complaint

the negative Lundbeck data, she never discussed that data in her many Forest-sponsored talks addressing the pediatric use of Celexa.  Her slide presentations addressed negative studies on pediatric use of other SSRIs, but falsely indicated that there were no negative studies on the pediatric use of Celexa.

32.     Forest's failure to disclose the negative Lundbeck results to the members of Forest's Executive Advisory Board caused those members to make false or misleading statements in promotional teleconferences on Celexa.  During the teleconferences, which were targeted to large numbers of physicians across the country, the Forest Executive Advisory Board members represented, based on the Wagner data, that Celexa was safe and effective for pediatric use even though, unbeknownst to them, the FDA had specifically rejected Forest's attempt to gain approval for such a claim because of the negative Lundbeck data.

33.     During details to physicians, Forest's sales representatives made false or misleading representations by distributing off-label publications on the pediatric use of Celexa that did not include the negative Lundbeck data.  Forest sales managers, also unaware of the Lundbeck data, directed the dissemination of these publications.

34.     Forest had a Professional Affairs Department that responded to health care provider inquiries.   Under the company's own written policy, the Professional Affairs Department was:

> *required to provide balanced information* to help the health care practitioner (HCP) make the best decision on behalf of the patient.  For this reason, *there is an ethical prohibition in "cherry picking" studies that are favorable to Forest*

Class Action Complaint

*products.*   The Food and Drug Administration Division of Drug Marketing, Advertising, and Communications (DDMAC) monitors drug information departments to insure information provided to FICPs is balanced, and that it is not selective.

(Emphasis added.)  Forest's failure to disclose the negative Lundbeck data to its Professional Affairs Department caused it to disseminate misleading information to physicians on the pediatric use of Celexa.  When physicians sought information from Forest's Professional Affairs Department in the years following the un-blinding of the Wagner and Lundbeck studies, the Professional Affairs Department responded with letters that cited only positive data. The letters cited just one double-blind placebo-controlled trial on the use of Celexa to treat pediatric depression, the Wagner study.  The letters never mentioned that there was another, negative, double-blind placebo-controlled trial, the Lundbeck study.

35.   Several senior Forest executives — including Lawrence Olanoff (then Forest's Chief Scientific Officer and now its President), Ivan Gergel (Vice President of Clinical Development and Medical Affairs), and Amy Rubin (Director of Regulatory Affairs) — reviewed the letters before the Professional Affairs Department disseminated them.  All of these senior Forest executives knew about the negative Lundbeck data.

36.   Forest paid a medical writing firm to ghost-write an academic article on the Wagner study, and Forest arranged to have the article published in the June 2004 issue of The American Journal of Psychiatry, with Dr. Wagner listed as the lead author.  The article did not mention that the only other double-blind, placebo-controlled trial on pediatric use of Celexa

Class Action Complaint

had shown no efficacy and had an incidence of suicide attempts and suicidal ideation among those taking Celexa that was almost three times higher than in the group taking the placebo.

37.     On June 21, 2004, The New York Times published a news story titled "Medicine's Data Gap — Journals in a Quandary; How to Report on Drug Trials." The story featured The American Journal of Psychiatry article on the Wagner study, revealing the negative results of the Lundbeck study and noting that the Wagner article failed to mention them.

38.     Three days after the story ran, Forest issued a press release acknowledging the existence of the Lundbeck study and its finding that Celexa "did not show efficacy versus placebo." That same day, Forest also disclosed the results of an earlier double-blind placebo-controlled study of Lexapro (a chemical derivative of Celexa[2]) in children and adolescents. That study also failed to show efficacy in comparison to placebo.

39.     By failing to disclose the Lundbeck study results, which raised serious questions about the efficacy and safety of Celexa, while simultaneously promoting the Wagner study, Forest told prescribing physicians a half-truth and thereby prevented them and the public from having all potentially available information when making decisions about how to treat a serious medical condition in pediatric patients.

40.     Forest's conduct regarding the Lundbeck study results was consistent with the way it handled prior negative study data on Celexa. Just a few months before the pediatric Lundbeck study was un-blinded, senior executives from Forest and Lundbeck discussed

---

[2] Celexa is a mixture of R and S enantiomers of citalopram. Lexapro is just the S enantiomer of citalopram. Enantiomers are forms of molecules that are almost exactly the same but are opposites.

Class Action Complaint

whether publicly to disclose the negative results from a study of Celexa in a primary care population.  The study included three groups: patients taking Lexapro, patients taking Celexa, and patients taking placebo.  Although Lexapro showed efficacy versus the placebo in the study, Celexa did not.  Minutes of a December 2000 meeting of senior Forest and Lundbeck executives show that Forest wanted to publicize only the Lexapro versus placebo results, while Lundbeck wanted the results from the entire study to be publicly disclosed.  As Lundbeck executives noted a month earlier, "Forest made clear their concern over disclosing any data that could put Celexa in an unfavorable light."  In May 2001, Lundbeck executives observed that "Forest are at the moment unwilling to release data where citalopram does not sufficiently surpass placebo."  Forest ultimately prevailed over Lundbeck and, as it did later with Lundbeck's negative pediatric data, kept the negative Celexa versus placebo results confidential.

### C.   Forest's Fraudulent Course of Conduct to Promote Celexa for Off-Label, Pediatric Use

41.   To obtain FDA approval for a drug, a drug must be demonstrated to be safe and effective for each of its proposed uses.  The approved uses for a drug are limited to those uses identified in the FDA-approved product label.  *See* 21 U.S.C. § 355(a), (b).  "Off-label" marketing refers to the promotion of an approved drug for any purpose, or in any manner, other than what is described in the drug's FDA-approved labeling.  It is a violation of federal law for pharmaceutical companies to market drugs for uses that are not approved and which are not described in the drugs' FDA-approved labeling.

Class Action Complaint

42.     From 1998 through at least 2005, Forest engaged in a widespread campaign to promote Celexa for pediatric use, even though neither drug was approved for pediatric use and the science was, at best, inconclusive about the safety and efficacy of these drugs for pediatric use.  Forest used its sales representatives to detail or target pediatric specialists; paid pediatric specialists to give promotional speeches to other physicians on pediatric use; selectively distributed publications on pediatric uses to pediatric specialists; misrepresented the safety and effectiveness of the drugs; and made extensive payments and gifts to induce physicians to prescribe Celexa for pediatric uses.

43.     Forest knew or had reason to know that its unlawful marketing of Celexa for pediatric use would have long-term effects on the prescribing habits of physicians given that physicians generally consult the Physicians Desk Reference or product labeling when they initially begin utilizing a new drug.  Accordingly, Forest's unlawful off label marketing of Celexa was reasonably calculated to create and did create confusion among physicians about the approved uses for the drug and reaped financial benefits to the drug company for years after the unlawful marketing allegedly ended.

44.     Forest knew that its off-label promotion for pediatric use was unlawful.  Shortly before the FDA ordered the black box warning in September 2004, a Forest executive testified before Congress: "I want to emphasize that, because the FDA has not approved pediatric labeling for our products, Forest has always been scrupulous about not promoting the pediatric use of our antidepressant drugs, Celexa and Lexapro.  That is the law, and we follow it."  In

Class Action Complaint

fact, Forest had been illegally promoting the pediatric use of Celexa throughout the preceding six years.

45.     Forest assigned its sales representatives to specific geographic regions across the United States.  Within each region, sales representatives encouraged specific doctors to increase their prescriptions of Celexa.  A specific component of this marketing scheme included the promotion of Celexa for pediatric indications.

46.     From 1998 through the end of 2004, the lists of physicians whom Forest directed its sales representatives to target, also known as "call panels," included thousands of child psychiatrists, pediatricians, and other physicians who specialized in treating children. Forest had more than 500,000 promotional sales calls or "details" with these pediatric specialists.  The sales representatives documented these details through "call notes."  Forest recorded thousands of call notes evidencing pediatric promotion.  Examples of such notes include the following:

·     "discussed cx [Celexa] use in children . . . and results of dr. karen wagner study regarding cx use for children and adolescents."

·     "went over peds use, 0 drug interactions, less ae, less compliance issues for children, he is sold on that.  closed on keeping cx first choice."

·     "went over Celexa children, the invitation to the winery."

·     "dinner program [with child psychiatrist as speaker] at amato's with yale child study center."

·     "mainly sees children but always felt comfortable with CX & children - got his commitment to give [Lexapro] a fair clinical trial."

Class Action Complaint

Call notes such as these represent only some of the instances when sales representatives memorialized their illegal off-label promotion of Celexa.  The call notes exemplify the tip of what was a much more pervasive and widespread off-label campaign.

47.    Forest maintained a list of "approved" promotional speakers that included numerous pediatric specialists.  Forest sales representatives and managers identified speakers from these lists to organize promotional lunches and dinners on Celexa.  As late as 2005, approximately 14% of Forest's 2,680 approved speakers were pediatric specialists.  Many of the Forest promotional programs for Celexa explicitly focused on off-label pediatric use: the programs had titles such as "Adolescent Depression," "Adolescent Treatment of Depression," "Updates in Depression," "Depression," "Treatment of Child/Adolescent Mood Disorders," "New Treatment Options in Depressive Disorders in Adolescents," "New Age Depression Treatment," "Use of Antidepressants in Adolescents," "Benefits of SSRIs in Child Psychology," "Treating Depression and Related Illnesses in Children," "Adolescents, and Adults," "Celexa in CHP/Ped Practice," "Treating Difficult Younger Patients," "Treatment of Depression," "Assessment and Treatments of Suicidal Adolescents," and "Treating Pediatric Depression."  Forest management approved each of these programs.

48.    From 1999 through 2006, one pediatric specialist, Dr. Jeffrey Bostic, Medical Director of the Massachusetts Child Psychiatry Access Project at Massachusetts General Hospital, gave more than 350 Forest-sponsored talks and presentations, many of which addressed pediatric use of Celexa.  Dr. Bostic's programs, which took place in at least 28 states, had topics such as "Uses of Celexa in Children" and "Celexa Use in Children and

Class Action Complaint

Adolescents."  Forest also paid Dr. Bostic to meet other physicians in their offices in order to ease their concerns about prescribing Celexa off-label for pediatric use.

49.    Dr. Bostic became Forest's star spokesman in the promotion of Celexa for pediatric use.  As one sales representative wrote, "DR. BOSTIC is the man when it comes to child Psych!"  Between 2000 and 2006, Forest paid Bostic over $750,000 in honoraria for his presentations on Celexa.

### D.    Forest's Illegal Inducements to Physicians to Prescribe Celexa

50.    Forest augmented its off-label promotion efforts through extensive payments and gifts to physicians to induce them to prescribe Celexa.  Forest's marketing department directed some of the kickbacks, such as honoraria for participation in advisory boards. Forest's sales representatives, often acting with the knowledge and encouragement of their managers, arranged for other kickbacks, such as restaurant gift certificates for physicians, lavish entertainment of physicians and their spouses, and grants to individual physicians.

### 1.    Advisory Boards

51.    Between 2000 and 2005, Forest hosted over 900 local or regional "'advisory boards" on Celexa, with over 19,000 advisory board attendees that Forest called "consultants." Forest paid each "consultant" an honorarium of $500.

52.    Ostensibly, Forest paid physicians to attend these advisory boards to get their feedback on the marketing of Celexa.  In reality, as repeatedly reported in internal company documents, Forest intended that the advisory boards induce the attendees to prescribe more Celexa.

Class Action Complaint

53.     In a May 2000 proposal for a series of 44 Celexa advisory boards, a Forest contractor, Intramed, wrote that the advisory boards, each with 20 physicians attendees, would "give Forest an opportunity to influence more physicians."  Forest's marketing department approved this proposal.  Later that year, Steve Closter, the Forest marketing executive who organized the advisory boards, wrote that the Celexa advisory boards begun in June 2000 had been successful and, as a result, "will become an even larger part of the promotional mix in the future." For years thereafter, Forest's marketing department included the cost of advisory boards in its annual promotional budgets for Celexa.

54.     With the early success of the advisory board programs, the Forest sales force enthusiastically used them to drive up sales.  As one Forest District Manager told his Regional Director in a November 2000 planning document, he intended to conduct a local advisory board to "target the highest prescribers" in several of his territories because "[t]here is no doubt that a program of this magnitude will increase Celexa market share."  In approximately January 2002, a marketing strategy slide deck given to Forest's chief executive, Howard Solomon, quoted a Regional Director stating that, "[w]ell planned Advisory Board meetings will be key to our efforts of reaching hesitant physicians."

55.     In June 2002, Forest's two Vice Presidents of Sales sent a memorandum to all sales managers observing that, notwithstanding new promotional guidelines for the industry, advisory boards remained among "the wealth of activities and programs that we can conduct that will impact physicians."  Similarly, in August 2002, a Forest Regional Director sent an e-mail to his District Managers stating that, "[w]ith the new guidelines in place, Ad Boards have

Class Action Complaint

become even a more valuable resource, thus each one needs to be a home run!  With your attention and focus, we can make [sic] maximize this opportunity!"

56.     Forest monitored its return on investment, or "ROI," from the advisory boards. To conduct its ROI analyses, Forest measured the increase in prescriptions written by physicians that attended the local advisory boards, and then compared the value of those prescriptions to the cost — primarily the honoraria payments — of putting on the programs. A November 2000 ROI analysis of a single advisory board program reached the following conclusion:

> Post program the Ad Board group [24 attendees] wrote an average of 19.6% Celexa as measured by a 5-week 1 st Rx average.  This is an increase of 3.7% in share.   At first glance, the share increase might not appear substantial. However, considering the volume of SSRIs written by these physicians, 3.7% translates into almost 2000 new prescriptions on a yearly basis.

57.     In May 2001, an internal ROI analysis of all of the Celexa advisory boards in 2000 found that "participants in the program prescribed nearly 14 additional prescriptions of Celexa vs. the control group over a seven-month period."

58.     Three months later, in August 2001, the author of the ROI analysis reiterated to the Celexa marketing team that, "[o]ur goal is to increase the ROI on these advisory boards." That same month, a Forest Regional Director reported to the company's Vice President of Sales that three local advisory boards had "generated close to $30K" from just a subset of the attendees and that "the scripts will continue, and continue to generate additional $$$ and ROI."

59.     After 2003, Forest stopped conducting ROI analyses of advisory boards because of concerns about memorializing illegal intent, but the company continued to use the same

Class Action Complaint

types of advisory board programs as a means of inducing doctors to prescribe Celexa.  As a Forest Area Business Director noted in a September 2003 memorandum to his Regional Directors, "[w]e are not able to do as many Ad Boards as we have in the past, so it [is] critical that we get the best targets to the programs."  Similarly, in March 2004, a Texas-based Forest District Manager reported to her Regional Director and fellow District Managers that she had met with her sales team about "the types of doctors" they wanted to recruit for an upcoming advisory board and that they had come "up with 40 doctors that are either high Celexa writers or can be converted/persuaded to write Lexapro."

## 2.   Preceptorships

60.   Between 1999 and 2003, Forest paid millions of dollars to physicians who participated in so-called "preceptorships."  Each physician who participated in a preceptorship received a "grant" of as much as $1,000 per preceptorship.

61.   Ostensibly, preceptorships were a training opportunity where Forest sales representatives would spend a half-day or full day with a physician and learn about how Celexa was used in practice.  In reality, Forest sales representatives used the preceptorships to induce physicians to prescribe Celexa.

62.   Forest was fully aware of how sales representatives actually used preceptorships.  Company policy mandated that sales representatives fill out "Return on Investment (R.O.I.)" forms to obtain approval to pay a doctor for a preceptorship.  Each ROI form provided for a statement of the amount of the payment to the physician and a projection of how many incremental prescriptions the preceptorship would cause, along with an estimate

Class Action Complaint

of the dollar value of those prescriptions to Forest.  Thus, the preceptorship ROI forms enabled

Forest to evaluate whether a payment to a participating physician was intended to induce an

increase in prescriptions sufficient to justify the cost to Forest. Senior Forest sales managers

and headquarters staff reviewed and approved the completed preceptorship ROI forms.

63.     The preceptorship ROI forms also provided for sales representatives to write

narrative justifications for the preceptorship payments, included the following:

·   "Dr. is the managing partner of the ___ Psychiatric Group' and is very
influential among his colleagues in the ___ Hospital network. He currently
averages @ 12 per week on 1" RX.  His #s are trending up even till this day
+ we need to keep a good thing going as long as we are still getting this
kind of growth from Dr.___."

·   "Dr. ___ is the largest prescriber of SSRI's in a 3 state area. . . .  We are
currently her first line SSRI.  We must, however, continue to support her
monetarily or this will not continue to be the case. . . .  We have to keep the
pressure on to continue to receive the growth we are getting with Dr___."

·   "Dr. ___ is my largest prescribing Celexa physician.  He is a high
maintenance target and doing round tables and preceptorships will help me
to keep his business and to continue to grow his business."

·   "2 different preceptorships.  Doc is 3rd ranked phys. in SSRI potential +
bus had dropped.  Needed his full attention."

·   "Dr. ___ is my fourth largest SSRI writer. . .  A preceptorship will provide
opportunity for rapport and for future detail time and sales."

·   "# 1 physician in Territory. . . . Dr.     is on the verge of writing a lot of
Celexa.  Will present new studies during preceptorship."

·   "This full day preceptorship will give me the opportunity to sell Celexa as a
first-line choice in doctor's practice."

·   "To influence doctor to Rx Celexa."

64.     Forest approved all of these preceptorship payment justifications.

Class Action Complaint

3.        **Lavish Entertainment and Gifts**

65.        During the period from 1998 through at least 2005, each Forest sales representative typically had a quarterly marketing budget of thousands of dollars to spend on physicians.  As a Forest Regional Director put it in an April 2006 memo to his sales team, "we have a ton of promotional money."   Forest sales managers put pressure on their sales representatives to spend their entire marketing budgets.

66.        Prior to 2003, Forest sales representatives commonly spent their marketing money on fishing, golf, and spa outings for physicians, and on buying tickets to sporting events and the theater for physicians.  Both prior to and after 2003, Forest sales representatives also attempted to induce physicians to prescribe Celexa by spending their marketing budgets on restaurant gift certificates, subsidies for physician office parties, and lavish entertainment that could be disguised on an expense report as meals accompanying a supposed exchange of scientific information.  Examples of these various types of kickbacks include the following:

·      In 1998, a District Manager (whom Forest later named to be its nationwide Director of Compliance) arranged for sales representatives in his district to give St. Louis Cardinals tickets to physicians on the condition, he said, that the tickets be "leveraged and sold as a reward for prescriptions" and that "A Solid Return on Investment can be demonstrated."

·      In September 2002, a sales representative gave a high-prescribing child psychiatrist a $1,000 gift certificate to Alain Ducasse, a New York restaurant that at the time was one of the most expensive in the United States.

·      In June 2001, two Forest sales representatives took a physician and his three sons on a deep sea fishing trip off Cape Cod, Massachusetts.

·      In June 2002, a sales representative arranged a salmon fishing charter cruise for four physicians in his territory.

Class Action Complaint

·   In February 2002, a sales representative purchased $400 in Broadway theater tickets for a physician and his wife.

·   In February 2002, a Division Manager purchased $2,276 in Boston Red Sox tickets for his sales representatives to use, he said, "throughout the next six months with all of our key targets."

·   From 2001 to 2005, Forest sales representatives in North Carolina repeatedly arranged social dinners for a psychiatrist who ran multiple offices and reportedly was the highest prescriber of Celexa in the state.

67.    All of this spending was intended to induce physicians to prescribe Celexa.

## V.    CLASS ACTION ALLEGATIONS

68.    Robert W.S. Wilcox is the son of Plaintiff Scott A. Wilcox.    Robert W.S. Wilcox was born on September 2, 1990.  Robert W.S. Wilcox was 12 years old when he was first prescribed Celexa by his treating physician.    That first prescription for Celexa was filled on or about July 25, 2003, almost a year after the FDA denied Forest's request for a pediatric indication for Celexa.    Over the next 6 years, and throughout W.S. Wilcox's minority, he continued taking citalopram.    Robert W.S. Wilcox's prescription records indicate that his prescriptions were filled with citalopram manufactured or distributed by Forest, Alpharma – Purepac, Dr. Reddy's, and/or Aurobindo.  Plaintiff Scott A. Wilcox paid, in whole or in part, for Celexa and generic citalopram for use by his minor child, Robert W.S. Wilcox.

69.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of himself and a Class defined as:

> All individual persons in the State Of California who, for purposes other than resale, purchased, and/or paid for Celexa and/or citalopram during the period from July 25, 2003, through the present (the "Class Period") for use by a minor. For purposes of the Class definition, individuals "purchased" citalopram if they paid or made a copayment pursuant to the terms of a health insurance plan for some or all of the purchase price.

Class Action Complaint

70.     Included in this class are all individuals who, for purposes other than resale, purchased, and/or paid for Celexa or the bioequivalent of the brand-name drug, Celexa, which is generic citalopram.   Any and all generic manufacturers of Celexa must certify that their product is a bioequivalent of Celexa and that the labeling and warnings for the generic drug are identical to those for Celexa.   The common law duty to use due care owed by Forest in labeling and promoting Celexa extends not only to consumers of its own product, but also to those whose doctors foreseeably relied on Celexa's product information when prescribing Celexa or the generic version of the drug, citalopram.

71.     Excluded from the class are Defendants and any entity in which any Defendant has a controlling interest, and their legal representatives, officers, directors, assignees and successors.   Also excluded from the class are any judicial officers to whom this action is assigned, together with any relative of such judicial officers within the third degree of relationship, and the spouse of any such person.   Also excluded are any and all persons who allegedly suffered physical and/or psychological injures as a result of their use of citalopram or persons who allegedly suffered physical and/or psychological injures as the result of the use of citalopram by others.

72.     Based upon information and belief, the Class consists of large numbers of individuals dispersed throughout the State Of California, making individual joinder impractical, as required by Rule 23(a)(1).  The disposition of the claims of the members of the Class and its Subclasses in a single class action will provide substantial benefits to all parties and to the Court.

Class Action Complaint

73.     The claims of the representative Plaintiff is typical of the claims of the Class he seeks to represent, as required by Rule 23(a)(3), in that the representative Plaintiff is a person who, like all members of the Class, paid or co-paid for citalopram.   The representative Plaintiff, like all members of the Class, has been damaged by Defendants' misconduct, in that, among other things, he paid for citalopram for use by a minor, as Defendants misrepresented the safety and efficacy of citalopram for minors.

74.     The factual and legal bases of Defendants' misconduct are common to all members of the Class and represent a unifying and common plan of fraud and other misconduct resulting in injury to Plaintiff and all members of the Class.

75.     Numerous questions of law and fact exist that are common to the Plaintiff and the Class.  Those common questions predominate over any questions that may affect individual members of the Class, within the meaning of Rule 23(a)(2) and 23(b)(3).  Common questions of law and fact include, but are not limited to, the following:

   a.     Whether Defendants concealed material information from Plaintiff, members of the Class, physicians, and the general public concerning the efficacy and safety of citalopram;

   b.     Whether Defendants concealed material information from Plaintiff, members of the Class, physicians, and the general public as part of a scheme of deception;

   c.     Whether Defendants engaged in a fraudulent, unlawful and/or deceptive scheme of marketing and selling citalopram;

   d.     Whether it was the policy and practice of Defendants to prepare, fund, and publish materials which contained false information and misrepresentations regarding the safety and efficacy of citalopram;

   e.     Whether Defendants are liable to members of the Class for damages;

Class Action Complaint

    f.      Whether Defendants unjustly enriched themselves at the expense of the members of the Class;

    g.      Whether members of the Class are entitled to compensatory damages and, if so, the nature and extent of such damages;

76.    Plaintiff will fairly and adequately represent and protect the interests of the members of the Class, as required by Rule 23(a)(4). Plaintiff has retained counsel with substantial experience in the prosecution of class actions.  Plaintiff and his counsel are committed to the vigorous prosecution of this action on behalf of the Class and have the financial resources to do so.  Neither Plaintiff nor counsel have any interests adverse to those of the Class.

77.    Plaintiff and members of the Class have suffered, and will continue to suffer, economic harm and damages as a result of Defendants' unlawful and wrongful conduct.  A class action is superior to other available methods for the fair and efficient adjudication of the controversy under Rule 23(b)(3).  Absent a class action, most members of the Class likely would find the cost of litigating their claims to be prohibitive, and would thus have no effective access to the courts or remedy at law.  The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

78.    Plaintiff seeks statewide certification.  Plaintiff alleges that statewide class certification, under California's Unfair Competition Law and False Advertising Law is superior to all other available methods for the fair and efficient adjudication of this action.

Class Action Complaint

79.     This case presents common issues of fact and law that are appropriate for issue-class certification under Rule 23(c)(4); and the management of this action may be facilitated through the certification of additional subclasses under Rule 23(c)(5), if necessary and appropriate.

## COUNT I

## CALIFORNIA UNFAIR COMPETITION LAW AND

## FALSE ADVERTISING LAW

80.     Plaintiff incorporates by reference the previous allegations as if they were fully set forth herein.

81.     This Count is brought pursuant to the Unfair Competition Law ("the UCL") (Business & Professions Code section 17200, *et seq*.) and/or the False Advertising Law ("the FAL") (Business & Professions Code section 17500, *et seq*.).

82.     This claim is asserted by Plaintiff on his own behalf and on behalf of all other similarly situated members of the Class and against Defendants.

83.     California Business and Professions Code section 17200, *et seq*. also known as the Unfair Competition Law, provides that "unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice," including acts of intentional misrepresentation or concealment of material facts.

Class Action Complaint

84.     Unlawful acts under the Unfair Competition Law, Business and Professions Code section 17203, include any act that is unlawful and that is conducted as part of business activity, and therefore includes pharmaceutical companies making fraudulent, false and misleading claims about the beneficial uses of citalopram in pediatric patients.

85.     Pursuant to the Unfair Competition Law, Business and Professions Code section 17204, "[a]ctions for any relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by . . . any person who has suffered injury in fact and has lost money or property as a result of such unfair competition."

86.     Section 17203 specifically provides:  "Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Code of Civil Procedure section 382 ["and when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all"], . . . ."

87.     Section 17203 further provides that "[t]he court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."

88.     Plaintiff is a citizen and resident of California, who paid, in whole or in part, for citalopram for use by his minor child in California.  For all of the reasons stated above, citalopram was an inappropriate medication for Plaintiff's minor child, and Plaintiff was enticed or deceived into purchasing the drug by Defendants' fraudulent, false, unlawful and misleading

representations that the citalopram was safe and effective for minor children. Further, Defendants' representations regarding citalopram were material to the decisions by Plaintiff's son's doctor to prescribe the medication for Plaintiff's son, and Defendants' concealment of material information misled Plaintiff's son's doctor to initially prescribe, and to continue to prescribe, the medication for Plaintiff's son despite the fact that the medication was not efficacious.

89.     Plaintiff has suffered injury in fact and loss of money as a result of Defendants' unlawful, unfair or fraudulent business act or practice, and Plaintiff is representative of all similarly situated individuals within the State of California and sues for both his and their benefit.  The medication was not, in fact, efficacious for Plaintiff's son.

90.     The facts which Defendants misrepresented as alleged in this Complaint were material to physicians' decisions about whether to prescribe citalopram to minors, and Plaintiff's decisions about whether to purchase citalopram in that they concerned facts that would have been important to a reasonable consumer in making a decision whether to purchase citalopram.

91.     Business and Professions Code section 17500 prohibits false and misleading advertising.  Specifically, the section states:

> It is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the

> proposed performance or disposition thereof, which is untrue or
> misleading, and which is known, or which by the exercise of reasonable
> care should be known, to be untrue or misleading, or for any person, firm,
> or corporation to so make or disseminate or cause to be so made or
> disseminated any such statement as part of a plan or scheme with the
> intent not to sell that personal property or those services, professional or
> otherwise, so advertised at the price stated therein, or as so advertised.

92.    Defendants' conduct as alleged herein was to disseminate fraudulent, unlawful, false and misleading information about the allegedly beneficial properties of citalopram for pediatric patients in order to induce doctors to prescribe, and consumers to purchase, the drugs. The fraudulent, unlawful, false and misleading representations caused the plaintiff to purchase citalopram and caused substantial economic injury to Plaintiff as well as all similarly situated consumers.  Plaintiff was unaware of Defendants' conduct, and did not know about any of Defendants' activities in disseminating fraudulent, unlawful, false and misleading information about the allegedly beneficial properties of citalopram for pediatric patients until reading an article appearing in The New York Times on or about February 25, 2009, titled "Drug Maker Is Accused of Fraud," which stated that the Justice Department had charged Forest Laboratories with defrauding the government of millions of dollars by illegally marketing the Defendants' antidepressant drugs, Celexa and Lexapro, for unapproved uses in children and teenagers.   The article also described, without naming, the qui tam lawsuits that were pending against the Defendants, which were styled: *Christopher R. Gobble, et al., v. Forest Laboratories, Inc., and Forest Pharmaceuticals, Inc.*, Civil Action No. 03-10395-NMG, In the United States District Court for the District of Massachusetts; and *Joseph Placentile, et al., v. Forest Laboratories , Inc.*, Civil Action No. 05-10201-NMG, In the United States District Court for the District of Massachusetts.  Accordingly, prior to February 25, 2009, Plaintiff had no knowledge of any fact, act, or omission by Defendants that could potentially give rise to either a UCL or FAL claim.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

93.     An order certifying the Class, appointing Plaintiff as class representative, and appointing Plaintiff's undersigned counsel as counsel for the Class;

94.     Refund and reimbursement of all monies for purchase of Celexa and/or citalopram for pediatric use in the State of California to Plaintiff and members of the proposed Class;

95.     Prejudgment and post judgment interest as provided by law;

96.     Attorney's fees, expenses, and costs of this action; and

97.     Such further relief as this court deems necessary, just and proper.


DATED:  November 19, 2010

Respectfully submitted,

By /S/ Rand P. Nolen_____

**FLEMING & ASSOCIATES, L.L.P.**
Rand P. Nolen
Texas Bar No. 00788126
George M. Fleming
Texas Bar No. 07123000
1330 Post Oak Boulevard, Suite 3030
Houston, Texas 77056
Telephone (713) 621-7944

**GIANNI-PETOYAN**
Laura Gianni
17383 Sunset Boulevard, Ste. A200
Pacific Palisades, CA 90272
**THE ARKIN LAW FIRM**
Sharon Arkin
333 S Grand Ave, 25th Floor
Los Angeles, CA 90071

**LAW OFFICES OF KEITH MORGAN**
Keith Morgan
Mississippi Bar No. 10319
PO Box  2393
Madison, MS 39130
1300 Hwy 51
Madison, MS 39110

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served on all attorneys of record, on the 19th day of November, 2010 electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants.

_____/S/ Rand P. Nolen_____
Rand P. Nolen