```
                                    )
In re:                              )
                                    )
CELEXA AND LEXAPRO MARKETING AND     )
SALES PRACTICES LITIGATION          )
                                    )
THIS DOCUMENT RELATES TO:           )
                                    )   MDL No.
Scott A. Wilcox                     )   09-2067-NMG
                                    )
    v.                              )
                                    )
Forest Pharmaceuticals, Inc. and    )
Forest Laboratories, Inc.,          )
                                    )
Civil Action No. 10-10154-NMG       )
                                    )
```

### MEMORANDUM & ORDER

GORTON, J.

This case arises out of the marketing and sales of the anti-depressant drug Celexa by defendants Forest Laboratories, Inc. and Forest Pharmaceuticals, Inc. ("defendants" or, collectively, "Forest"). Plaintiff Scott Wilcox ("plaintiff" or "Wilcox") alleges that defendants violated the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200-17209, and the California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500-17509, by making "fraudulent, false, unlawful and misleading representations that [Celexa] was safe and effective for minor children." Plaintiff alleges that such misrepresentations were material to the decision of a physician

-1-

to prescribe Celexa to plaintiff's minor son.  He also alleges
that he was personally deceived by such representations.

I.  **Background**

  A.  **Celexa and Lexapro**

Celexa and Lexapro are closely-related selective serotonin
reuptake inhibitor ("SSRI") antidepressants.  Forest obtained
the approval of the federal Food and Drug Administration ("FDA")
to market Celexa (citalopram) for adult use in 1998.  It has
been available in generic form in the United States since 2004.
The FDA approved the marketing of Lexapro (escitalopram) for
adult use in the United States in 2002.

By law, prescription drugs must be distributed with an FDA-
approved label which includes information about the drug's
approved uses.  See 21 C.F.R. §§ 201.15, 201.50-58.  In 1998, the
FDA-approved label for Celexa stated that "Safety and
effectiveness in pediatric patients has not been established."

In 2001, the results of two double-blind, placebo-
controlled pediatric efficacy studies of Celexa were
disseminated to high level executives of Forest.  "Celexa Study
18", which was sponsored by Forest, produced positive results
supporting the conclusion that Celexa was more effective than a
placebo in treating depression in children and adolescents,
whereas the "Lundbeck Study" produced negative results that did
not support that conclusion.

Forest submitted the results of the two Celexa studies to the FDA in 2002 as part of its application for approval to market Celexa for the treatment of pediatric depression. The FDA denied the application on the basis that Forest had only submitted one positive study of efficacy in the pediatric population when at least two were required. The FDA informed Forest that it would consider a subsequent positive study of Lexapro sufficient to support marketing both Celexa and Lexapro for pediatric use.

In June, 2004, Forest issued a press release announcing the results of the negative Lundbeck study. The FDA thereafter changed its requirements for labeling of antidepressants and ordered manufacturers to add information about pediatric efficacy studies to the labels of their drugs. The revised label for Celexa, which was approved by the FDA in February, 2005, stated that

> Safety and effectiveness in the pediatric population
> have not been established.... Two placebo-controlled
> trials in 407 pediatric patients with MDD have been
> conducted with Celexa, and the data were not
> sufficient to support a claim for use in pediatric
> patients. Anyone considering the use of Celexa in a
> child or adolescent must balance the potential risks
> with the clinical need.

In 2009, the FDA approved the marketing of Lexapro to treat depression in adolescent patients aged 12 to 17 years. The FDA based its approval on the positive Celexa Study 18 and a

positive study on the use of Lexapro to treat adolescent depression.  Forest never applied for FDA approval to market Celexa for pediatric use.

**B.  Use of Celexa and Citalopram by Plaintiff's Minor Son**

Wilcox's son, Robert "Woody" Wilcox ("Woody") was first prescribed Celexa in July, 2003 when he was twelve years old. Woody took, and Wilcox paid for, Celexa for six years before he switched to generic citalopram in 2009.

Woody was initially prescribed Celexa by Dr. David Ritvo ("Dr. Ritvo").  Dr. Ritvo had been practicing for about 25 years at the time.  He is board-certified in psychiatry and has a sub-specialty in child and adolescent psychology.  About 40% of his patients at a given time were children or adolescents and he prescribed Celexa to hundreds of children.

Dr. Ritvo testified that he assessed Woody prior to prescribing Celexa in 2003 and determined that he had symptoms of obsessive-compulsive disorder ("OCD"), attention deficit disorder ("ADD"), depression and anxiety.  He initially prescribed Celexa because it was his understanding at the time that Celexa was less likely than other SSRIs to cause gastro-intestinal side effects.  He testified that he did not know if he knew at the time whether Celexa had been approved by the FDA for pediatric use.

Dr. Ritvo reported that Woody's mood appeared to improve after starting on Celexa but Dr. Ritvo nevertheless decided to stop prescribing Celexa and to prescribe Zoloft, a different SSRI, in the fall of 2003 to see if it would do more to address Woody's OCD symptoms. However, Dr. Ritvo stopped prescribing Zoloft and resumed prescribing Celexa based upon his conclusion that Celexa was more effective in treating Woody's various symptoms. He testified that, at the very least, he found Celexa effective in treating Woody's depression and anxiety. In 2004, he decided to switch Woody to generic citalopram in order to save plaintiff money.

Dr. Ritvo stopped treating Woody in March, 2006 and Woody's pediatrician, Dr. Arthur Law ("Dr. Law"), continued to prescribe citalopram. Dr. Law's treatment notes indicate that he prescribed citalopram for Woody at the request of Wilcox.

In August, 2007, Woody began treatment with Dr. Michael Schwab ("Dr. Schwab"), who had been practicing psychiatry for 34 years. Dr. Schwab continued to prescribe citalopram for Woody until he ceased to treat him in March, 2009, when Woody was 18 years old. He testified that he continued to prescribe Celexa because it was "effective" and because Woody was experiencing very few symptoms of the conditions for which it was prescribed.

Plaintiff retained Dr. Peter Breggin to review and opine upon the records of Woody's treatment with Celexa by Dr. Ritvo.

Dr. Breggin is a licensed psychiatrist who has practiced in the field since 1968 and has published several articles on the adverse effects of SSRIs, including Celexa. He concluded that Celexa was not effective based upon the fact that Dr. Ritvo increased the dose numerous times and suggested a possible link between Woody's violent nightmares and symptoms of mania or bipolar disorder and his treatment with Celexa.

Wilcox testified in his deposition that Woody's anxiety and depression improved somewhat while he was taking Celexa and citalopram under the care of Dr. Ritvo. He testified that Celexa was not effective in treating Woody's symptoms of OCD, however, and that the symptoms of depression and anxiety continued under Dr. Schwab. Wilcox attributes any improvements to the cognitive therapy that Woody received from a different physician during that period. He does not recall, however, whether he told either Dr. Schwab or Dr. Ritvo that they needed to try something else because Celexa wasn't working. He also acknowledged that he relied entirely upon the doctors to determine whether any improvement was attributable to Celexa or citalopram.

All told, Wilcox purchased Celexa for Woody between July, 2003 and November, 2004 and spent $660.88 in insurance co-payments. He bought generic citalopram between November, 2004 and June, 2010 and spent $831.34 in insurance co-payments.

**C.  Exposure of Woody's Treating Physicians to Alleged Misrepresentations**

Dr. Ritvo received a sales call from a representative of Forest in June, 2000.  The notes from the call mention that Dr. Ritvo "specialized in children" and that the caller "went thru entire celexa pres (sic)." On the following day, Forest sent a letter that said

> Thank you for your recent inquiry regarding Celexa off-label uses including treatment of obsessive-compulsive disorder (OCD) and use in the pediatric population....  The safety and effectiveness of Celexa in the treatment of depressed children and adolescents have not been established in controlled clinical trials.  Systematic studies in this population are currently in progress....  There are a number of published reports describing the use of citalopram to treat patients between 6 and 17 years of age with psychiatric conditions other than depression [including OCD and panic disorder].

In August, 2000, Dr. Ritvo went to a "dine-and-dash" sponsored by Forest at which Celexa was discussed.

According to the notes of sales representatives of Forest, Dr. Schwab was also invited to the dine-and-dash in August, 2000 and to a major league baseball game in October, 2000.  In 2011, a sales representative reported that Dr. Schwab thought that a Celexa-related program at the Mandarin Hotel was "awesome" and that he would take home the message that Celexa has the "best drug interaction profile."

Both physicians testified that they do not recall whether the efficacy of Celexa for treating pediatric depression was

-7-

discussed on any of those occasions.  They also do not recall whether they ever discussed studies of pediatric efficacy with Forest employees.

Dr. Ritvo testified during his deposition that the fact that a drug is not approved by the FDA for a certain use would not affect his decision to prescribe it.  He indicated, however, that learning that the FDA had declined to approve a particular use might alter his prescribing habits.  At his deposition in 2012, he testified that he continues to prescribe Celexa and Lexapro for pediatric use to this day.

Dr. Schwab testified that the fact that there was a negative study associated with a particular drug would not prevent him from prescribing it.  He would instead look to factors like whether there were a "substantial number" of positive studies with respect to the drug and whether there was consensus in the community that the drug was effective.  He also testified that he would have made the same decision to prescribe citalopram to Woody even if he knew all of the information asserted in plaintiff's complaint.

### D.  Exposure of Plaintiff to Alleged Misrepresentations

Plaintiff has testified that he was not personally exposed to any marketing of Celexa or any alleged misrepresentations about the efficacy of Celexa in the treatment of pediatric

depression.  He relied entirely on the prescribing physicians to determine what treatment was appropriate for Woody.

In June, 2004, the New York Times published several articles that discussed the negative Lundbeck study.  In February, 2009, the Times published an article titled "Drug Maker is Accused of Fraud" which discussed allegations relating to the off-label promotion of Celexa for pediatric use and suppression of the Lundbeck Study.  Wilcox testified that he subscribes to the Times and reads it regularly.

Wilcox filed the subject action in December, 2009.  He continued to purchase citalopram for Woody until June, 2010.

### E.  Forest's Guilty Plea

In 2010, Forest pled guilty to one misdemeanor count of distribution of a misbranded drug, Celexa, in violation of 21 U.S.C. §§ 331, 333(a)(1) and 352(f)(1).  At the plea allocution, Forest's General Counsel admitted that, from 1998 through at least 2002, Forest directed sales representatives who were responsible for promoting Celexa to make sales calls on physicians who treated children and adolescents and that some of those sales representatives promoted Celexa for use in treating children and adolescents who suffered from depression even though Celexa was not approved for pediatric use.  Forest also admitted that, from August, 2001 until at least September, 2002, Forest publicized the results of the positive Celexa 18 Study

but did not publicize the results of the negative Lundbeck Study or disclose the results to anyone besides the FDA and Lundbeck.

## II.  **Procedural History**

Wilcox filed his initial Complaint in December, 2009 in the United States District Court for the Northern District of California.  In April, 2010, Forest moved to dismiss the Complaint.  Wilcox shortly thereafter filed a First Amended Complaint which Forest also moved to dismiss.  In November, 2010, this Court denied the motion to dismiss the original Complaint as moot but allowed the motion to dismiss the First Amended Complaint without prejudice.

Wilcox filed a Second Amended Complaint later that month, which defendants again moved to dismiss as time-barred.  In January, 2011, this Court denied that motion.

In September, 2012, Wilcox moved to certify a class of individuals in California who purchased and/or paid for Celexa and/or citalopram between July 25, 2003 and present for use by a minor.  The Court denied the motion in February, 2013, finding that individualized questions overwhelmed common issues. Specifically, it explained that, under the UCL and FAL, each class member would be entitled to relief only if the individual or a prescribing physician was actually exposed to the alleged misrepresentations by Forest.

At the request of Wilcox, the Court stayed the action
pending appeal of that ruling to the First Circuit Court of
Appeals.  The First Circuit declined to hear such an
interlocutory appeal in April, 2013, and the Court thereafter
lifted the stay upon the motion of Wilcox, who indicated that he
wished to proceed with his case as an individual.

Wilcox moved for partial summary judgment on his claim for
restitution in September, 2013.  Forest filed its cross motion
for summary judgment in October, 2013.

## III. <u>Cross Motions for Summary Judgment</u>

### A.    Summary Judgment Standard

The role of summary judgment is "to pierce the pleadings
and to assess the proof in order to see whether there is a
genuine need for trial." <u>Mesnick</u> v. <u>Gen. Elec. Co.</u>*,* 950 F.2d
816, 822 (1st Cir. 1991) (quoting <u>Garside</u> v. <u>Osco Drug, Inc.</u>*,*
895 F.2d 46, 50 (1st Cir. 1990)).  The burden is on the moving
party to show, through the pleadings, discovery and affidavits,
"that there is no genuine issue as to any material fact and that
the moving party is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).

A fact is material if it "might affect the outcome of the
suit under the governing law." <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>*,*
477 U.S. 242, 248 (1986).  A genuine issue of material fact
exists where the evidence with respect to the material fact in

-11-

dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party satisfies its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the non-moving party and make all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).

The Court addresses cross motions for summary judgment separately and draws all reasonable inferences in favor of the non-moving party. Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013).  Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law.

### B.    Legal Framework for Claims Asserted Under the UCL

Unfair competition, as defined by the California state legislature, includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.  Wilcox asserts a claim under the "unlawful" prong of the UCL. Specifically, he asserts that Forest violated the California FAL

by disseminating false or misleading statements and omitting

material information in promoting Celexa for the off-label

treatment of depression in children and adolescents.

A plaintiff asserting a claim under the UCL is entitled

only to equitable relief, such as an injunction or restitution,

and not money damages. Cal. Bus. & Prof. Code §§ 17203, 17204,

17535; In re Tobacco II Cases (Tobacco II), 207 P.3d 20, 29

(Cal. 2009).  To have standing under the UCL, a plaintiff must

> (1) establish a loss or deprivation of money or
> property sufficient to qualify as an injury in fact,
> i.e. economic injury, and (2) show that the economic
> injury was the result of, i.e. caused by, the unfair
> business practice or false advertising that is the
> gravamen of the claim.

Kwikset Corp. v. Superior Court, 246 P.3d 877, 885 (Cal. 2011).

### 1.    Actual Reliance

The parties disagree about whether plaintiff is required to

demonstrate actual reliance on any misrepresentation or omission

by Forest in order to recover on his UCL claim.  The crux of

their dispute concerns the holding in Tobacco II that plaintiffs

asserting a claim under the "fraud" prong of the UCL must

demonstrate actual reliance upon false or misleading statements

in order to show that they lost money or property "as a result

of" unfair competition. Tobacco II, 207 P.3d at 39.  In a

footnote, the California Supreme Court explained that the

reliance requirement applies only to UCL actions "based on a

-13-

fraud theory involving false advertising and misrepresentations to consumers" and explained that the requirement does not apply to every action arising under UCL. Id. at 39 n.17.

Plaintiff contends that he is not required to demonstrate reliance because he asserts his claim under the "unlawful" prong rather than the "fraud" prong of the UCL. California courts rejected that very argument in the wake of the Tobacco II decision, however, and have clarified that the reliance requirement applies both to claims that expressly invoke the "fraud" prong of the UCL and claims that are asserted under the "unlawful" prong but that are based upon misrepresentations or false statements. See Ogden v. Bumble Bee Foods, LLC, No. 12-01828, 2014 WL 27527, at *7 (N.D. Cal. Jan. 2, 2014); Durell v. Sharp Healthcare, 108 Cal. Rptr. 3d 682, 693-94 (Cal. Ct. App. 2010) ("[W]e conclude that the reasoning of Tobacco II applies equally to the "unlawful" prong of the UCL when, as here, the predicate unlawfulness is misrepresentation and deception."). This Court agrees that a consumer's burden of proving causation "should hinge on the nature of the alleged wrongdoing rather than the specific prong of the UCL the consumer invokes." Durell, 108 Cal. Rptr. 3d at 694.

## 2. Burden of Proving Reliance

In order to demonstrate actual reliance under the UCL, a plaintiff must show that the defendant's alleged

-14-

misrepresentation or non-disclosure was a "substantial factor" influencing his decision to engage in the conduct that resulted in injury (here, plaintiff's decision to purchase Celexa and citalopram for use by his minor son). Tobacco II, 207 P.3d at 39. Where a plaintiff alleges that the defendants engaged in a long-term advertising campaign, he is not required to plead "with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements." Id. at 40.

The California Supreme Court has explained, moreover, that

a presumption, or at least an inference, of reliance arises whenever there is a showing that a misrepresentation was material.

Id. at 39. A misrepresentation is material if "a reasonable man would attach importance to its existence or nonexistence" in deciding whether to engage in the conduct that caused his injury. Id. (quoting Engalla v. Permanente Med. Grp., Inc., 938 P.2d 903, 919 (Cal. 1997)). Materiality is generally a question of fact unless

the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.

Id. (quoting Engalla, 938 P.2d at 919). Thus, a defendant is entitled to summary judgment only if 1) the misrepresentation was "obviously unimportant" and therefore immaterial as a matter of law, see id., or 2) the misrepresentation was material but

the defendant rebuts conclusively the presumption of reliance, see Engalla, 938 P.2d at 919.

## C.  Plaintiff's Motion for Partial Summary Judgment

Plaintiff's motion for summary judgment relies entirely upon the fact that Forest pled guilty to one misdemeanor count of distributing a misbranded drug in interstate commerce in violation of the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 331(a), 333(a)(1) & 352(f)(1).  Plaintiff asserts that Forest's liability under the UCL is not in dispute because "Forest admitted making deceptive and misleading statements and omissions which are violations of California law."

Plaintiff is incorrect about the extent of Forest's admissions.  Forest did not admit to making false or misleading statements in its plea allocution by its general counsel. Moreover, false or deceptive conduct was not an element of the strict liability misdemeanor to which Forest pled guilty and promotion of a drug for off-label use is not inherently false or misleading. See United States v. Caronia, 703 F.3d 149, 165 (2d Cir. 2012) ("[P]romotion of off-label drug use is not in and of itself false or misleading.").  Plaintiff, therefore, can prevail on his motion only by proving that 1) he relied upon false statements or misrepresentations by Forest or 2) Forest's misrepresentations or omissions were material as a matter of law.  He has not provided any evidence of reliance and therefore

-16-

the issue boils down to whether he has established that any omissions by Forest were material. Materiality is generally a question of fact for the jury, Tobacco II, 207 P.3d at 39, and Forest did not admit materiality in its plea allocation. As a result, plaintiff is entitled to summary judgment only if he can establish materiality as a matter of law.

In his opposition to Forest's cross-motion for summary judgment, plaintiff posits that there is no genuine dispute that Forest's failure to publicize or circulate the Lundbeck study was material. He suggests that the following facts establish materiality as a matter of law: 1) the Department of Justice brought charges against Forest based, in part, upon Forest's failure to publicize the Lundbeck study, 2) the FDA denied Forest's application for a pediatric indication for Celexa based upon the fact that Forest produced only one positive study, 3) the New York Times thought the issue was important enough to publish articles about it, 4) representatives of Forest reasoned that the negative study was damaging enough to conceal from the public and prescribing physicians and 5) Dr. Ritvo, one of Woody's treating physicians, asked Forest about off-label use of Celexa to treat pediatric OCD in 2000.

That evidence is insufficient to establish materiality as a matter of law. First, the reactions of the Department of Justice, the FDA and the New York Times have no bearing upon

-17-

whether a reasonable physician or consumer would find material the suggestion that there was only one, positive study of the efficacy of Celexa for treating depression in children and adolescents. Second, while a jury might infer that Forest believed that the Lundbeck study was material from its failure to disclose it to the public, Forest's belief as to materiality does not establish that the study was, in fact, material to a reasonable physician or consumer. Third, Forest has proffered sufficient evidence to create, at the very least, a genuine issue of material fact as to materiality. For instance, plaintiff admitted that he relied entirely upon the professional judgment of treating physicians. Dr. Ritvo testified that he does not recall being aware of any studies, positive or negative, that demonstrated whether Celexa was effective to treat pediatric depression or OCD when he decided to prescribe Celexa to Woody in July, 2003.

Notwithstanding his inquiry concerning off-label use of Celexa in 2000, Dr. Ritvo testified that it makes no difference to him whether a drug is approved for a certain use by the FDA and that he continues to prescribe Celexa to pediatric patients for whom he believes the drug might be effective despite his awareness of the negative Lundbeck Study and the fact that Celexa does not have a pediatric indication. Dr. Schwab, who prescribed citalopram to Woody, provided similar testimony.

Because plaintiff is unable to establish that any omissions by Forest were material as a matter of law, his motion for summary judgment will be denied.

**D.   Forest's Motion for Summary Judgment**

Forest filed a cross motion for summary judgment on the grounds that plaintiff lacks standing to assert a claim under the FAL or any of the prongs of the UCL.  To establish standing, Wilcox must establish 1) an injury-in-fact that was 2) caused by Forest's unlawful conduct.  <u>Kwikset</u>, 246 P.3d at 885.

**1.   Causation**

Forest contends that it is entitled to judgment on the issue of causation because there is no evidence that plaintiff or Woody's treating physicians were exposed to any false or misleading advertising by Forest and, even if exposure is proven or presumed, plaintiff cannot prove that he or the physicians relied upon such representations.

Plaintiff's evidence of exposure is very weak.  He admits that he was not personally exposed to any promotions of Celexa by Forest but alleges instead that he relied entirely upon the judgment and expertise of Woody's treating physicians in deciding to purchase Celexa.  Moreover, plaintiff continued to pay for generic citalopram for at least one year after learning about the Lundbeck Study, although he claims that he did so only because he believed that it would be dangerous to stop treatment

-19-

abruptly.  The Court accepts that testimony as true for the purpose of summary judgment.  While plaintiff submits evidence that representatives for Forest communicated with Dr. Ritvo and Dr. Schwab concerning Celexa in 2000, the brief notes taken by the sales representatives during or following those calls provide little insight into the substance of the conversations, and neither physician recalls being told by a representative of Forest that Celexa or citalopram were effective in treating pediatric depression.

In his opposing memorandum, plaintiff relies upon the rule that a plaintiff is not required to prove

> individualized reliance on specific misrepresentations or false statements where ... those misrepresentations and false statements were part of an extensive and long-term advertising campaign.

Tobacco II, 207 P.3d at 40-41.  That rule has no application here because Forest does not suggest that plaintiff is required to prove exposure to specific misrepresentations.  Instead, it maintains that plaintiff cannot prove exposure to any misrepresentations that Celexa was effective for pediatric use.

Nevertheless, the Court finds that there is a genuine issue of material fact concerning exposure.  While Dr. Ritvo and Dr. Schwab testified that they do not recall being exposed to misrepresentations, there is circumstantial evidence, such as the timing of the phone calls and their specialization in

pediatrics, from which a jury could infer that they were exposed
to misrepresentations.  Ultimately, however, the issue of
whether or not Woody's treating physicians were exposed to
misrepresentations is moot because the record establishes
conclusively that the physicians did not rely upon their lack of
awareness of the Lundbeck study or any suggestion by Forest that
Celexa was effective for pediatric use in deciding to prescribe
Celexa and citalopram to Woody.

First, as explained previously, both doctors testified
under oath that they do not attach much if any importance to the
fact that a drug does not have an "indication" for the purpose
for which it is prescribed, i.e. the FDA has not approved it for
a specific use such as use by children or adolescents.  Dr.
Ritvo prescribed Celexa to "hundreds" of children, including
Woody, and testified that he believed Celexa was effective for
Woody.  His testimony is supported by the fact that he
investigated whether Zoloft, a different SSRI, would be more
effective but concluded, based upon Woody's self-reported
symptoms, that Celexa was more effective than Zoloft at treating
Woody's symptoms of OCD, anxiety and depression.

Furthermore, while Dr. Ritvo admitted that he would
"possibly, but not necessarily" give weight to the FDA's
rejection of an application for a particular indication, he
continued to prescribe Celexa for use by children even after

learning about the Lundbeck Study and the fact that the FDA rejected the application by Forest to obtain a pediatric indication for Celexa.  Dr. Schwab, who did not prescribe brand name Celexa, provided similar testimony.

Thus, even if plaintiff were able to create a presumption of reliance by showing that "a reasonable man would attach importance to [the] existence or nonexistence" of the Lundbeck Study in deciding to prescribe Celexa, Tobacco II, 207 P.3d at 39, Forest could rebut that presumption with evidence that establishes conclusively that Woody's treating physicians did not rely upon Forest's suppression of information concerning the Lundbeck Study in deciding to prescribe Celexa and citalopram to Woody, see Engalla, 938 P.2d at 919.  As a result, Forest is entitled to summary judgment on plaintiff's UCL and FAL claims.

### 2.    Injury-in-Fact

Because the Court has determined that plaintiff cannot prove reliance, it will only briefly address whether plaintiff can prove that he is entitled to restitution of the full amount he spent on Celexa and citalopram in the event that its ruling with respect to causation is reversed on appeal.

First, the Court agrees with Forest that plaintiff would be entitled to claim restitution only with respect to his purchases of Celexa and may not also claim restitution of his purchases of generic citalopram.  A plaintiff is entitled to restitution only

with respect to money or property that was lost by the plaintiff and acquired by the defendant. Kwikset, 246 P.3d at 895. Plaintiff has submitted no evidence to support a finding that the money he spent on generic citalopram inured to the benefit of Forest. His reliance on Conte v. Wyeth, Inc., 85 Cal. Rptr. 3d 299 (Cal. App. Ct. 2008), is misplaced. Conte holds that a manufacturer of a brand name drug owes a duty of care to purchasers of a generic version of its product because it knows or should know that physicians rely on the product information disseminated by the brand name manufacturer when writing prescriptions for a generic equivalent. Id. at 315. It does not alter the basic requirement that a plaintiff who asserts a claim for restitution under the UCL show that the defendant received the money or property that he lost.

Second, while the Court is skeptical of plaintiff's assertion that Woody received no benefit from Celexa whatsoever, Wilcox has presented sufficient evidence of an injury-in-fact to establish standing under Cal. Bus. & Prof. Code § 17204 by asserting 1) that he did not receive the benefit of his bargain because the drug was not effective and 2) he paid more for Celexa than he would have been willing to pay had he known about the Lundbeck study at the time of his purchases. See Kwikset, 246 P.3d at 890-93.

## ORDER

For the foregoing reasons,

1) plaintiff's motion for partial summary judgment (Docket No. 34/Master Docket No. 263) is **DENIED;**

2) defendants' cross motion for summary judgment (Docket No. 38/Master Docket No. 291) is **ALLOWED;** and

3) judgment shall enter in favor of defendants on all claims asserted in plaintiff's Second Amended Complaint (Master Docket No. 59) and the case is **DISMISSED.**

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated August 8, 2014