**United States District Court**
**District of Massachusetts**

```
_____
                                 )
In re:                           )
                                 )
CELEXA AND LEXAPRO MARKETING AND )    MDL No.
SALES PRACTICES LITIGATION       )    09-2067-NMG
                                 )
_____ )
```

<u>**MEMORANDUM & ORDER**</u>

**GORTON, J.**

On July 16, 2014, the Court held a final fairness hearing with respect to a proposed settlement agreement between defendants Forest Pharmaceuticals, Inc. and Forest Laboratories, Inc. (collectively, and for simplicity, "Forest") and a class of Missouri consumers and third-party providers who purchased or paid for branded anti-depressant drugs Celexa or Lexapro between 1998 and 2013 ("plaintiffs"). Plaintiffs allege that Forest violated the Missouri Merchandising Practices Act by misrepresenting and concealing material information in their marketing of Celexa and Lexapro to treat major depressive disorder in pediatric patients. The case is part of a nationwide multi-district litigation ("MDL") assigned to this Court for consolidated proceedings.

Plaintiffs and Forest have moved for the final approval of the proposed settlement, which would create a common fund of at least $7,650,000 and no more than $10,350,000 based upon the

calculations of damages performed by experts retained by plaintiffs and Forest. Natalie Luster ("Luster" or "the objector"), the plaintiff in a parallel class action pending in a Missouri state court, contends that the common fund is inadequate because her expert has calculated damages that exceed the amounts calculated by experts retained by plaintiffs and Forest. She raised objections to the proposed settlement in writing and at the final fairness hearing.

Should the Court approve the agreement, class counsel for plaintiffs move for $2,846,250 in attorneys' fees, $325,000 in expenses and $10,000 in incentive awards for the two class representatives, Ruth Dunham and Tanya Shippy, to be paid out of the common fund. Defendants do not object. Luster, however, contends that the requested fees are excessive and moves for an award of 50% of the fees awarded to class counsel, $350,000 in litigation expenses and her own incentive award of $10,000.

The Court has considered the subject motions and supporting memoranda and finds that the proposed settlement agreement is fair, reasonable and adequate. It will approve the subject settlement, award the class representatives $10,000 each in incentive awards and award class counsel the expenses requested and a modified amount of attorneys' fees based upon ultimate payments to class members. The Court will also award modest attorneys' fees to counsel for the objector.

## I.  **Procedural History**

The instant action ("the MDL Action") is one of several lawsuits transferred to this Court for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407.  It was initially filed in the Eastern District of Missouri in 2009 by Angela Jaeckel.  Tanya Shippy and Ruth Dunham were joined as plaintiffs in a Second Amended Complaint filed in May, 2013 and represent a class of consumers and third-party payors in Missouri who purchased Celexa and Lexapro for the treatment of pediatric major depressive disorder.

The Second Amended Complaint alleges, inter alia, that Forest violated the Missouri Merchandising Practices Act (MMPA), Mo. Rev. Stat. §§ 407.025 et seq., by misrepresenting and concealing material information about the efficacy of Celexa and Lexapro for treating pediatric depression.  In January, 2014, the Court allowed plaintiffs' motion to certify a class of consumers and entities who paid for, purchased or prescribed Celexa or Lexapro in Missouri for use by a minor from July, 2001 (for Celexa) and from August, 2002 (for Lexapro) until the present.

Objector is the named plaintiff and class representative in a class action titled Luster v. Forest Pharmaceuticals, Inc., No. 0922-CC08347 (Mo. Cir. Ct. filed July 22, 2009), that is currently pending before the Circuit Court for the City of St.

Louis, Missouri ("the Missouri Action").  She represents a
certified class of citizens of Missouri who purchased Celexa for
use by children and adolescents between 1998 and 2005 ("the
Missouri Class").  In September, 2013, Objector moved to stay
the MDL Action on federal abstention grounds.  The Court denied
that motion in the Order allowing the motion to certify a
Missouri class.  After multiple continuances, the case was
tentatively scheduled to proceed to trial in March, 2014,
although Luster had moved for a brief continuance.  Forest filed
a renewed motion for summary judgment under the MMPA in
December, 2013 and a motion to decertify the Luster class in
February, 2014.  Those motions were pending before the Missouri
state court, when the Missouri Action was stayed.

In March, 2014, the parties in the MDL Action informed the
Court that they had reached a settlement agreement ("the MDL
Settlement Agreement").  Prior to reaching that agreement,
Forest also engaged in unsuccessful settlement negotiations with
counsel for Luster.

On March 14, 2014, the Court entered an Order Granting
Preliminary Approval of Settlement, Directing Notice to the
Class, and Scheduling Fairness Hearing ("the Preliminary
Order").  The Preliminary Order certified a class ("the MDL
Settlement Class") comprised of

[a]ll Individuals and entities, including third-party payors ... of prescription medicine benefits (other than governmental entities), who purchased, paid for or made a reimbursement for branded Celexa for use by a Minor between January 1, 1998 and December 31, 2013, or who purchased, paid for or made a reimbursement for branded Lexapro for use by a Minor between August 1, 2002 and December 31, 2013, where (*i*) branded Celexa or Lexapro was prescribed to the Minor in Missouri; or (*ii*) the Individual or Minor was a domiciliary citizen of Missouri at the time of the prescription or payment; or (*iii*) for an Individual, payment for the prescription was made in Missouri. This class does not include those Individuals or Minors who are seeking personal injury claims arising out of their purchase or use of branded Celexa and/or Lexapro.

As part of the Preliminary Order, the Court stayed Luster's Missouri Action pursuant to its authority under the All Writs Act, 28 U.S.C. § 1651, to issue all writs necessary or appropriate in aid of its jurisdiction. In June, 2014, the Court denied a motion by Luster to intervene in the MDL Action but allowed her to obtain minimal discovery prior to the final fairness hearing. Luster filed her written objection on June 9, 2014.

The Preliminary Order approved the appointment of Epiq Class Action and Mass Tort Solutions ("Epiq") as the Claims Administrator for the MDL Action. As of July 1, 2014, Epiq had mailed successfully the Third-Party Payor Claim Package to 97% of the entities identified as potential Third-Party Payor Class Members and published a Notice in six local Missouri newspapers with an estimated circulation of over 600,000. It also 1)

disseminated about 54 million internet-based and geographically-targeted "digital banner advertisements," and 2) established a Class Action Information Website and a toll-free phone number for class members and others seeking information about the proposed settlement.  As of July 1, 2014, Epiq had received 19 Consumer Claim Forms and 4 Third-Party Payor Forms.

On July 9, 2014, Forest and plaintiffs filed a joint motion for the final approval of class settlement and plaintiffs moved for attorneys' fees and incentive awards.  On July 15, 2014, on the eve of the final fairness hearing, Luster filed her motion for attorneys' fees and incentive awards.

The Court held a final fairness hearing on July 16, 2014, at which plaintiffs, Forest and Luster proffered arguments with respect to the Proposed MDL Settlement and Luster presented testimony by her expert on damages, Dr. Rena Conti.  The Court took the matter under advisement and now issues its rulings on the pending motions.

## II. <u>Joint Motion for Final Approval of Class Action Settlement</u>

Plaintiffs and Forest move jointly for final approval of the proposed MDL Settlement Agreement.  For the reasons that follow, the Court will allow the motion for final approval of the agreement over the objections of Luster.

**A.    Key Provisions of the Proposed Settlement Agreement**

The Proposed MDL Settlement Agreement is described in full in the Order of Preliminary Approval (Docket No. 338) but the key provisions are summarized here.

First, defendants have already made an "initial payment" of $7,650,000 into the Common Fund. See Preliminary Order, Docket No. 338, ¶ 15.  Any attorneys' fees, expenses incurred by class counsel and incentive awards for class representatives will be paid out of that initial payment, Id. ¶ 17, and Forest agrees not to oppose or support any objection to awards of reasonable attorneys' fees not to exceed 34% of the Common Fund and expenses not to exceed $325,000. See Settlement Agreement and Release, § IX (Docket No. 337-1).  The initial payment will also cover the costs of providing notice to potential class members and administrating the claims process. Preliminary Order, ¶ 17.

After deducting the maximum amounts recoverable as fees, expenses, incentive awards and costs, at least $4,215,000 of the initial payment will be distributed to class members. Id. ¶ 16. That amount will be distributed on a pro rata basis if the aggregated amount of all valid claims is less than $4,215,000. Id. ¶ 17.  If, on the other hand, aggregated valid claims exceed $4,215,000, Forest will pay up to $2,700,000 into the Common Fund to cover additional valid claims. Id. ¶ 18.  In the unlikely event that the aggregated valid claims, incentive

awards, attorneys' fees and expenses exceed $10,350,000, awards to class members will be reduced pro rata. Id. ¶ 19.

The amount of each class member who submits a valid claim stands to recover depends on 1) whether the purchase or payment was for Celexa or Lexapro and 2) when the purchase or payment was made. Specifically, the MDL Settlement Agreement provides that class members submitting valid claims stand to receive:

    a. 100% reimbursement for purchases/payments between January 1, 1998 and March 31, 2005;

    b. 65% reimbursement for purchases/payments between April 1, 2005 and March 19, 2009;

    c. 65% reimbursement for purchases/payments between March 20, 2009 and December 31, 2013, where records reflect that the prescription was for a minor who was less than 12 years old;

    d. 20% reimbursement for purchases/payments between March 20, 2009 and December 31, 2013, where records reflect that the prescription was for a minor aged 12 years or older; and

    e. $50 will be paid to individual class members who are unable to identify the amounts they paid pursuant to the Preliminary Order.

Id. ¶ 16.

In order to be entitled to reimbursement according to that schedule, a class member must submit a Proof of Claim to the Claims Administrator no later than January 26, 2015. Each Proof of Claim submitted by an Individual Class Member (as opposed to a Third-Party Payor ("TPP")) must include a declaration made under oath that

-8-

a. states the time period over which the Individual Class Member purchased or paid for Celexa or Lexapro that was prescribed to a minor,

b. identifies the minor and the doctor, hospital, medical facility or pharmacy who prescribed or dispensed the Celexa or Lexapro to the minor,

c. avers that the prescription was issued in Missouri, the payment was made in Missouri, or that the minor or Individual Class Member was domiciled in Missouri at the time of the prescription or payment,

d. identifies the amount paid for each prescription, and

e. authorizes access to records in the event that the claim is selected for an audit.

Id. ¶ 13(c).

If a claim is selected for an audit, the Individual Class Member may prove that he or she made the payments or purchases he or she claims with the following evidence: 1) receipts, cancelled checks, or credit card statements evidencing payment, 2) an explanation of benefits or similar document from an insurer or health plan, 3) records from a pharmacy or similar entity, 4) a letter from the minor's physician stating that the amount paid for Celexa or Lexapro or 5) authorizing access to pharmacy or medical records to the extent permitted by HIPAA. Id. ¶ 13(d).

## B. Legal Standard for Scrutinizing Agreements to Settle Class Actions

A class action may be settled only if a district court finds after a hearing that the proposed settlement is "fair,

reasonable, and adequate." Fed. R. Civ. P. 23(e); Nat'l Ass'n of Chain Drug Stores v. New Eng. Carpenters Health Benefits Fund, 582 F.3d 30, 44 (1st Cir. 2009).

The First Circuit has not established a fixed test for evaluating the fairness of a settlement. See New Eng. Carpenters Health Benefit Funds v. First Databank, Inc., 602 F. Supp. 2d 277, 280 (D. Mass. 2009). There is, however, a presumption of fairness for settlements that are deemed to be the result of "arms-length negotiations" following "adequate" discovery. See Drug Stores, 482 F.3d at 44 (citing City P'ship Co. v. Atl. Acquisition Ltd. P'ship, 100 F.3d 1041, 1043 (1st Cir. 1996)). Discovery is sufficient if it enables representatives of the parties to act "intelligently" when negotiating a settlement. Rolland v. Cellucci, 191 F.R.D. 3, 6 (D. Mass. 2000).

In determining the fairness of a settlement, many courts in the First Circuit have relied on factors such as

> (1) [the] risk, complexity, expense and duration of
> the case; (2) comparison of the proposed settlement
> with the likely result of continued litigation; (3)
> reaction of the class to the settlement; (4) stage of
> the litigation and the amount of discovery completed;
> and (5) quality of counsel and conduct during
> litigation and settlement negotiations.

In re Tyco Int'l, Ltd. Multidistrict Litig., 535 F. Supp. 2d 259, 259-60 (D.N.H. 2007).

**C.  Analysis**

After considering the submissions of the parties and the evidence presented at the final fairness hearing, the Court finds the Proposed MDL Settlement to be "fair, reasonable and adequate."

As an initial matter, fairness may be presumed because the Court finds that the proposed agreement was the product of an arms-length negotiation following adequate discovery. See Drug Stores, 482 F.3d at 44.  This case has been litigated vigorously before this Court for about four years and plaintiffs have provided the Court with records of the extensive discovery taken.  Furthermore, while Luster claims that the circumstances bear the hallmarks of a collusive "reverse auction" between Forest and class counsel for plaintiffs, this Court has already rejected that theory in its order denying Luster leave to intervene.

Even if the presumption of fairness did not exist, however, the Court would find the proposed settlement fair for the following reasons.

**1.  Adequacy of Common Fund**

Luster primarily objects to the amount that Forest will pay into the Common Fund.  As discussed above, Forest has already paid $7,650,000 into the Common Fund and will pay up to an additional $2,700,000 if valid claims exceed the amount of the

initial payment available for distribution to class members. Luster claims that the maximum value of $10,350,000 is inadequate and objects to the fact that Forest may be required to pay less than that amount.

### a.   Estimates of Damages

The dispute centers on the amount of damages that class members stand to recover should the case proceed to trial. Because no one knows the precise number of purchases of Celexa and Lexapro for pediatric use in Missouri between 1998 and 2013, experts for all three parties have estimated potential damages by extrapolating from imperfect data.  Experts retained by plaintiffs and Forest reached similar estimates for use of Celexa and Lexapro between 1998 and 2013 that are substantially less than the purported damages estimated by the expert retained by Luster for the use of Celexa between 1998 and 2005.

### i.   Forest's Estimates

Forest retained Pierre-Yves Cremieux, PhD ("Dr. Cremieux"), who is a Managing Principal of the Analysis Group, Inc., an economics research consulting firm, an Adjunct Professor at the University of Quebec and a Lecturer at the Yale School of Management.  He received his PhD from the University of California at Berkeley in 1992.

Dr. Cremieux estimated that sales to consumers and TPPs between 1998 and 2013 totaled approximately $10,698,444.  He

reached that figure by determining the net nationwide sales of the two drugs between 1998 and 2013 based upon Forest's profit and loss statements.  He then estimated the percentage of net sales that were attributable to consumers and TPPs based upon National Health Expenditure Account data available from the Centers for Medicare and Medicaid Services.  Next, he estimated the percentage of net sales to consumers and TPPs that can be attributed to prescriptions for pediatric use based upon a data set of individual patient prescription claims histories for approximately 18 million beneficiaries of self-funded employer health plans.  Finally, he estimated the percentage of net pediatric sales attributable to payments by Missouri consumers and TPPs based upon Missouri's share of the pediatric population of the United States according to the U.S. Census for 2000 (1.97%) and 2010 (1.92%).

### ii.  Plaintiffs' Estimates

Plaintiffs consulted with Joel W. Hay, PhD ("Dr. Hay"), a pharmaceutical economist and a tenured Professor at the University of Southern California.  Dr. Hay earned his PhD in economics from Yale University in 1980.

Dr. Hay estimated that class members incurred $11,354,254 in damages by first estimating that national sales of Celexa and Lexapro for pediatric use between 1998 and 2012 totaled $578,965,000 based on data from IMS Health, the U.S. Medical

-13-

Expenditure Panel Survey, financial statements produced by Forest and sales data from drugs.com. Dr. Hay then multiplied that figure by the percentage determined from Missouri's share of the population of the United States based on the averages of census figures for 2000 and 2010.

### iii. Objector's Estimates

Luster retained Rena Conti, PhD ("Dr. Conti"), who is an Assistant Professor in the Departments of Health Studies and Pediatrics at the University of Chicago. Dr. Conti received her PhD in Health Policy and Economics from Harvard University as part of the Interfaculty Initiative in Health Policy.

Dr. Conti estimated that, between 1998 and 2005, sales of Celexa to members of the class certified in the Missouri Action were between $14,000,000 and $16,000,000. She calculated that range by first determining the number of units of Celexa sold nationwide during each quarter of each year based on invoices obtained from Forest. Next, she determined the price per unit of Celexa paid by Missouri Medicaid during the same quarters. She multiplied the products of those figures by the percentage of national sales of Celexa attributable to Missouri based on IMS Health data. Finally, she multiplied the resulting figure, which she found to represent total sales of Celexa in Missouri, by the percentage attributable to pediatric use based on data from the IMS National Diagnosis and Therapeutic Index (NDTI).

Dr. Cremieux concluded that Dr. Conti's analysis was flawed because, among other reasons, the NDTI data is drawn from a small sample size and Medicare and Medicaid data may not approximate payments by private insurers.

**b.    Analysis**

The crucial difference between the calculations performed by Dr. Conti and those performed by the other two experts is how the experts determined the percentage of nationwide sales of Celexa attributable to Missouri.  Drs. Cremieux and Hay assumed that antidepressant use in Missouri tracked the national average and therefore based their calculations on census data which indicate that the population of Missouri is roughly 2% of the population of the United States.  Dr. Conti relied on studies indicating that antidepressant use in Missouri is much higher than the national average and relied on Medicare and Medicaid data that suggests that between 3% and 6% of nationwide purchases of Celexa can be attributed to sales in Missouri.

The Court need not decide, as a matter of law, which method of calculating uncertain damages is more accurate, although it finds noteworthy the similar outcomes reached independently by Dr. Cremieux and Dr. Hay.  Even if actual purchases were somewhere between those estimated by Dr. Conti, on the one hand, and those estimated by the other two experts, the Court finds that a settlement of between $7,650,000 and $10,350,000 is

eminently reasonable.  A settlement need not reimburse 100% of the estimated damages to class members in order to be fair. <u>See, e.g.</u>, <u>O'Brien</u> v. <u>Brain Research Labs, LLC</u>, No. 12-204, 2012 WL 3242365, at *15 (D.N.J. Aug. 9, 2012 ("When evaluating the fairness of settlements, courts have held that full compensation is not a prerequisite for a fair settlement." (citations omitted)).

Moreover, plaintiffs risked recovering significantly less than what their own expert estimated in damages if they proceeded to trial.  Forest has maintained throughout this litigation that actual damages were far less than total sales because some physicians were unaware of the off-label marketing or would have prescribed Celexa notwithstanding that marketing and many class members found the drug to be effective and therefore suffered no damages. <u>See</u> <u>Rolland</u> v. <u>Cellucci</u>, 191 F.R.D. 3, 14-15 (D. Mass. 2000) (explaining that the reviewing court should not use a benchmark the highest award that plaintiffs could have received after full and successful litigation of the claim).

### 2.  Other Objections

Luster's other objections will be addressed only briefly. First, it was reasonable for Forest and plaintiffs to agree that the Common Fund would not include interest or punitive damages and, in any event, recovery of such damages was far from

guaranteed.  Second, the Court finds that the settlement does

not include a "reversionary" arrangement with respect to the

$4,215,000 that will be distributed amongst class members who

submit valid claims. Compare Kakani v. Oracle Corp., No. 06-

06493, 2007 WL 1793774, at *3 (N.D. Cal. June 19, 2007)

(disapproving of settlement which did not guarantee a minimum

recovery to class members and would return all unclaimed funds

to the defendant).  Third, Luster's objection to the reduced

recovery for class members who purchased Celexa or Lexapro after

February, 2005 is meritless, particularly because the class she

purports to represent stands to recover 100% of the value of its

purchases.  It is reasonable for Forest and plaintiffs to tie

recovery to the strength of an individual's claim.  Similarly,

the Court finds no merit in the claim that including purchasers

of both Celexa and Lexapro in the settlement class dilutes the

claims of purchasers of Celexa.

## III. **Motion by Plaintiffs for Attorneys' Fees, Expenses and Incentive Awards**

### A. **Request for Attorneys' Fees**

Fed. R. Civ. P. 23(h) provides that a court presiding over

a certified class action may award "reasonable attorneys' fees

and nontaxable costs that are authorized by the law or by the

parties' agreement."  The First Circuit Court of Appeals has

approved of at least two different methods for calculating

attorneys' fees in the context of a class action: the "percentage of the fund" method or the "lodestar" method. In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d 295, 307 (1st Cir. 1995).

The percentage of the fund ("POF") approach awards counsel a reasonable percentage of the common fund. Id. at 305 (citation omitted). The First Circuit has explained that the POF approach may be more efficient and less burdensome on the court, particularly in complex cases. Id. at 307. Class counsel ask the Court to apply the POF approach and award $2,846,250 in attorneys' fees, which is 37% of $7,650,000, the minimum amount of the Common Fund, and 27.5% of $10,350,000, the maximum value of the Fund.

While the Court agrees that class counsel have obtained a generous settlement for the class and deserve to be fairly compensated, it disagrees that class counsel are entitled to recover a percentage based on the maximum value of the Common Fund. Courts in this Circuit generally award between 20% and 30% of the amount recovered for the class. See In re Lupron Mktg. & Sales Practices Litig., 2005 WL 2006833, at *5 (D. Mass. Aug. 17, 2005) (citation omitted); In re Compact Disc Minimum Advertised Price Antitrust Lit., 216 F.R.D. 197, 216 n. 45 (D. Mass. 2003); see also Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees & Expenses in Class Action Settlements: 1993–*

*2008,* J. of Empirical Legal Stud. 248 (2010) (Table 4) (finding that the median and mean attorneys' fees awarded in the First Circuit are 20%).  Here, class counsel have requested fees that would exceed 37% of the initial payment by Forest. Consequently, the Court will award attorneys' fees at least partially based upon valid claims paid.  Class counsel will be awarded 30% of the initial payment of $7,650,000, or $2,295,000, immediately.  Should valid claims exceed the amount available for distribution to class members from the initial payment, additional attorneys' fees shall be paid to class counsel at the rate of 20% of the amount of additional claims paid, provided, however, that total attorneys' fees (including those to be paid to objector's counsel as set forth below) shall not exceed $2,846,250.  The remainder of the Common Fund not specifically allocated to attorneys' fees, expenses and incentive payments shall be distributed on a pro rata basis to class members who have submitted valid claims.

Attorneys Coffin and Baum will be authorized to distribute the fees awarded to class counsel in a manner that fairly compensates each firm for the work contributed to the litigation and the settlement.

### B.   Request for Expenses

The Court will also allow the request for reimbursement of $325,000 in out-of-pocket expenses incurred during litigation

out of the Common Fund.  The listed expenses include, among other things, 1) costs of travel to hearings, depositions and meetings, 2) court fees, and 3) the cost of retaining experts and consultants.  The Court finds the expenses incurred reasonable and appreciates that counsel capped expenses at $325,000. See In re Fidelity/Micron Securities Litig., 167 F.3d 735, 737 (1st Cir. 1999) (explaining that reasonableness is the "touchstone" of requests for reimbursement of expenses).

### C. Incentive Awards

Finally, the Court will order that class representatives Tanya Shippy and Ruth Dunham each be awarded $10,000 to be paid out of the Common Fund.  The purpose of such incentive awards is to reimburse the plaintiffs for their effort in pursuing the claims on behalf of the entire class. See, e.g., Bussie v. Allamerica Fin. Corp., No. 97-40204, 1999 WL 342042, at *3-4 (D. Mass. May 19, 1999) (citation omitted).  Class counsel represent that Dunham and Shippy worked closely with counsel throughout the entire case, provided information and deposition testimony, produced documents and participated in settlement discussions. The incentive awards were also disclosed in the Notice and no class member has objected to the request.  Under the circumstances, the awards are reasonable and will be allowed.

## IV. **Motion by Luster for Attorneys' Fees, Expenses and Incentive Awards**

Luster also moved on the eve of the fairness hearing for attorneys' fees, expenses and an incentive award to be paid out of the Common Fund.  Plaintiffs object on the grounds that 1) the motion was filed after the deadline set by the Court for plaintiff's motion for fees and 2) the Objector has not conferred a benefit on the class.

The Court finds that the motion is not procedurally barred because it was not filed before the deadline for plaintiffs to request attorneys' fees.  Luster was not permitted to intervene in the MDL Action and therefore is not bound by the same deadlines as are plaintiffs.

Plaintiffs' objections to the substance of the request have more merit.  The Court is permitted to award attorneys' fees to objectors who 1) provided services that contributed to an increase in the size of the common fund available to the class, 2) aided the Court's review of the proposed settlement agreement or 3) otherwise advanced the interests of the class. Federal Judicial Center, Manual for Complex Litigation (Fourth) § 14.11 (2004); see also Dubin v. E.F. Hutton Grp., 878 F. Supp. 616, 622-23 (S.D.N.Y. 1995) (awarding fees to counsel of competing class actions who conferred a benefit on class members and contributed to the size of the settlement award).  Here, the

objector has not succeeded in persuading the Court that the size of the Common Fund was inadequate. Moreover, the Court is unconvinced that the pending Missouri Action was a significant factor contributing to the settlement of the MDL Action given that Forest negotiated with counsel involved in both actions during the course of several months before settling with the MDL plaintiffs.

The Court will, however, award fees in the amount of $50,000 to reimburse counsel, at least in part, for the expenses incurred in objecting to the Proposed MDL Settlement Agreement and appearing at the final fairness hearing.[1] While the Court ultimately disagreed with Luster's contentions, her objections 1) aided the Court in its consideration of the adequacy of the Common Fund and other aspects of the settlement and 2) resulted in the Court scrutinizing the request by plaintiffs for attorneys' fees based upon the maximum value of the Common Fund.

Luster invokes no authority for her request for an incentive award to a plaintiff who is not a class representative. The Court therefore declines to award her $10,000 for her service to the Missouri Action class.

---

[1] Fees payable to objector's counsel shall be paid out of the portion of the Common Fund reserved for attorneys' fees, i.e. the $2,846,250, of which Class Counsel will receive a minimum of 2,295,000 and a maximum of $2,796,250.

## ORDER

For the foregoing reasons:

1)     the joint motion for final approval of the class
       settlement (Docket No. 409) is **ALLOWED** and the
       settlement is **APPROVED**;

2)     the motion by plaintiffs for attorneys' fees, expenses
       and incentive awards (Docket No. 412) is **ALLOWED, in
       part**, and **DENIED, in part,** as follows:

       a)     plaintiffs are entitled to reimbursement of
              litigation expenses totaling $325,000 to be paid
              out of the Common Fund;

       b)     class representatives Ruth Dunham and Tanya
              Shippy are each awarded an incentive award of
              $10,000 to be paid out of the Common Fund;

       c)     class counsel shall be paid $2,295,000 in
              attorneys' fees out of the $7,650,000 already
              paid into the Common Fund and additional fees at
              the rate of 20% of all amounts paid by Forest to
              class members in excess of the initial payment,
              up to a maximum of $2,796,250 in attorneys' fees;

       d)     the remainder of the Common Fund not specifically
              allocated to attorneys' fees, expenses and
              incentive payments shall be distributed on a pro
              rata basis to the class members who have
              submitted valid claims; and

3)     the motion by objector Natalie Luster for attorneys'
       fees, expenses and an incentive award (Docket No. 423)
       is **ALLOWED,** to the extent that counsel to the
       objector, Natalie Luster, shall be paid $50,000 in
       attorneys' fees out of the Common Fund, but is, in all
       other respects, **DENIED.**


**So ordered.**

                              /s/ Nathaniel M. Gorton
                              Nathaniel M. Gorton
                              United States District Judge
Dated September 8, 2014