```
                              )
In re:                        )
                              )       MDL No.
CELEXA AND LEXAPRO MARKETING AND )    09-02067-NMG
SALES PRACTICES LITIGATION    )
                              )
─────────────────────────────)
                              )
PAINTERS AND ALLIED TRADES    )
DISTRICT COUNCIL 82 HEALTH CARE )
FUND,                         )
        Plaintiff,            )
                              )       Civil Action No.
        v.                    )       13-13113-NMG
                              )
FOREST LABORATORIES, INC. and )
FOREST PHARMACEUTICALS, INC., )
                              )
        Defendants.           )
─────────────────────────────)

                              )
DELANA S. KIOSSOVSKI and      )
RENEE RAMIREZ,                )
                              )
        Plaintiffs,           )
                              )       Civil Action No.
        v.                    )       14-13848-NMG
                              )
FOREST LABORATORIES, INC. and )
FOREST PHARMACEUTICALS, INC., )
                              )
        Defendants.           )
─────────────────────────────)
```

**MEMORANDUM & ORDER**

GORTON, J.

These cases arise out of the marketing and sales of the anti-depressant drugs Celexa and Lexapro by defendants Forest Laboratories, Inc., Forest Laboratories, LLC and Forest

-1-

Pharmaceuticals, Inc. (collectively, "defendants" or "Forest").
Plaintiffs Delana Kiossovski and Renee Ramirez (collectively,
"the Kiossovski plaintiffs") and plaintiff Painters and Allied
Trades District Council 82 Health Care Fund ("Painters")
(collectively "plaintiffs") allege that defendants 1) engaged in
a fraudulent marketing scheme designed to induce consumers to
purchase Celexa and Lexapro for pediatric use in violation of
the Racketeer Influenced and Corrupt Organizations Act ("RICO"),
18 U.S.C. §§ 1962(c) and (d), 2) were unjustly enriched, 3)
violated the Washington Consumer Protection Act (Kiossovski) and
4) violated the Minnesota Consumer Fraud Act and Minnesota
Unfair Trade Practices Act (Painters).

Pending before the Court are (1) Painters' motion for
partial summary judgment on Forest's statute of limitations
affirmative defense (Painters) (Docket No. 662), (2) Forest's
cross-motion for summary judgment on all claims (Painters)
(Docket No. 676) and (3) Forest's motions for summary judgment
on all claims (Painters and Kiossovski) (Docket Nos. 797 and
798). For the reasons that follow, this Court will deny as moot
Painters' motion for partial summary judgment, allow, in part,
and deny as moot, in part, Forest's cross motion for summary

judgment and allow Forest's motions for summary judgment on all claims.[1]

The Court heard oral argument on the pending motions on January 11, 2018.

## I.  **Background and procedural history**

Celexa and Lexapro are closely related selective serotonin reuptake inhibitor ("SSRI") anti-depressants sold by Forest. Forest obtained approval from the Food and Drug Administration ("FDA") to market Celexa for adult use in 1998 and Lexapro for adult use in 2002.  It later sought to market both drugs to treat pediatric major depressive disorder ("MDD").

### A.  **FDA Approval Process**

To obtain FDA approval to market Celexa and Lexapro for pediatric use, Forest had to show that the drugs would be more effective than placebos in treating MDD in pediatric patients. The FDA typically requires at least two "positive" placebo-controlled clinical trials before approval.  A "positive" drug study shows statistically significant improvements for patients who are administered the drug rather than a placebo while a "negative" study indicates no statistically significant difference.  Drug manufacturers submit trial results to the FDA as part of their "new drug applications" ("NDAs").

---

[1] For ease of reference, the Court will use the docket numbers from the multi-district litigation docket, 09-md-02067-NMG.

Forest and Lundbeck, the Danish pharmaceutical company that developed the drugs and licensed them to Forest, conducted four double-blind, placebo-controlled studies on the efficacy of Celexa and Lexapro in treating pediatric depression. The first two studies examined the efficacy of Celexa, were completed in 2001 and were submitted to the FDA in 2002. The Celexa Study 18 ("MD-18") produced results that the FDA determined were positive (although plaintiffs dispute that finding). On the other hand, Celexa Study 94404 ("Lundbeck Study") produced negative results. Forest submitted the results of the two Celexa studies to the FDA in a supplemental NDA in 2002. The FDA denied Forest's application for a pediatric indication for Celexa after finding that the Lundbeck Study was negative. The other two studies addressed the efficacy of Lexapro. Lexapro Study 15 ("MD-15") was completed in 2004 and produced negative results but Lexapro Study 32 ("MD-32"), completed in 2007, produced statistically significant, and therefore positive, results.

Before 2005, the FDA-approved labels for both drugs stated that "[s]afety and effectiveness in pediatric patients have not been established". In February, 2005, Forest revised Celexa's label to include a description of MD-18 and the Lundbeck Study and Lexapro's label to describe the negative study.

In 2008, Forest submitted study results to the FDA in a supplemental NDA. The following year, the FDA reviewed the

positive results in MD-18 and MD-32, noted the chemical
similarities between Celexa and Lexapro and approved Lexapro as
safe and effective in treating MDD in adolescents ages 12-17.
Forest did not seek similar FDA approval for Celexa.

**B. Delana Kiossovski and Renee Ramirez**

From July, 2001 to February, 2002, Kiossovski bought Celexa
for her daughter, who was then 13 years old, based upon the
recommendation of her daughter's psychiatrist, Dr. Stephen
Barnett.  A short time later, Kiossovski's daughter developed a
rash and stopped ingesting Celexa for approximately two months.
She resumed taking the medication in October, 2001.  In March,
2002, Kiossovski's daughter attempted suicide.  Shortly after
her attempted suicide, Kiossovski's daughter was diagnosed with
bipolar disorder by psychiatrist Dr. Carola Bosenberg.  Dr.
Bosenberg discontinued the prescription of Celexa for use by
Kiossovski's daughter and prescribed other medication.
Thereafter the daughter stopped using Celexa.  Kiossovoski
became aware in 2014 that the efficacy of Celexa for pediatric
use was unproven when it was prescribed for her daughter.

From February, 2003 to April, 2004, Ramirez purchased
Celexa for her eight-year-old son and from May, 2004 to
December, 2006 she bought Lexapro.  Ramirez continued to fill
her son's Lexapro prescriptions until March, 2010.  Dr. Michael
Saito, a neurologist, treated Ramirez's son from March, 2001 to

September, 2010.  During that time, the son was diagnosed with several disorders including autism and anxiety.  Dr. Saito prescribed Celexa and Lexapro to treat symptoms of autism.

### C. Painters and Allied Trades District 82 Council Health Care Fund

Painters is a third-party payor ("TPP") that provides medical benefits, including prescription drug coverage, to its insured beneficiaries, who are employees of unionized commercial painting companies.  Painters retains a pharmacy benefit manager ("PBM"), Prime Therapeutics ("Prime"), that administers Painters' prescription drug benefit program.  Painters delegated to Prime responsibility for 1) determining which drugs to include on the approved drug formulary, 2) negotiating rebates with pharmaceutical manufacturers, and 3) imposing limitations on coverage, if necessary.  A drug formulary lists medications that will be reimbursed by the insurer or TPP, in this case, Painters.

Between January, 1999 and October, 2004, Painters reimbursed 72 Celexa prescriptions for 16 of its pediatric insureds, at a total cost of $4,210.  Between August, 2002 and January, 2015, Painters reimbursed 234 prescriptions for Lexapro for 31 of its pediatric insureds, at a total cost of $20,262.

## D. Procedural history

Plaintiff Painters and another TPP initiated this action in the District of Minnesota on behalf of two putative nationwide TPP classes in November, 2013.  The case was transferred to this Court pursuant to a multi-district litigation assignment in December, 2013.  Plaintiffs filed a first amended complaint in February, 2014, asserting violations of RICO (Counts I and II) and three Minnesota consumer protection statutes (Counts III, IV and V) on behalf of the two putative nationwide classes of TPPs and two putative Minnesota classes of TPPs and consumers.  This Court dismissed Count V and all claims brought by TPP Allied Services Division Welfare Fund and New Mexico UFCW Union's and Employers' health and Welfare Trust Fund in December, 2014.

Painters moved for class certification in February, 2016 and that motion was denied in June, 2016.  In December, 2016, the First Circuit Court of Appeals denied Painters' Fed. R. Civ. P. 23(f) petition seeking permission to appeal this Court's order denying class certification.  Painters filed its second motion for class certification in February, 2017.  Forest has not opposed that motion but instead sought a stay of consideration of that motion until the motions for summary judgment have been resolved.

In August, 2014, former plaintiff Marlene LoConte and Kiossovski commenced an action in the United States District

Court for the Western District of Washington on behalf of themselves and putative consumer classes. They alleged that Forest fraudulently promoted the pediatric use of Celexa and Lexapro despite knowing that the drugs did not provide any clinically significant benefit over placebos in treating MDD. The case was transferred to this Court pursuant to a multi-district litigation assignment in October, 2014.

In June, 2015, this Court 1) allowed defendants' motion to dismiss the action with respect to the RICO, Massachusetts Consumer Protection Act, M.G.L. c. 93A ("Chapter 93A") and unjust enrichment claims brought by LoConte and 2) denied the motion with respect to the RICO, Washington Consumer Protection Act and unjust enrichment claims brought by Kiossovski. Plaintiffs amended the complaint in January, 2016 by replacing LoConte with Ramirez as the second putative class representative. The amended complaint raises two RICO claims by Kiossovski and Ramirez, an unjust enrichment claim by both plaintiffs and a Washington Consumer Protection Act claim by Kiossovski.

In February, 2016, defendants moved to dismiss the amended complaint which this Court denied in June, 2016. In March, 2017, the Kiossovski plaintiffs moved for class certification which defendants opposed. This Court denied the Kiossovski plaintiffs' motion for class certification in August, 2017.

## II.  Motions for Summary Judgment

### A.  Legal Standard

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991).  The burden is on the moving party to show, through the pleadings, discovery and affidavits, "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine issue of material fact exists where the evidence with respect to the material fact in dispute "is such that a reasonable jury could return a verdict for the nonmoving party." Id.

If the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The Court must view the entire record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993). Summary judgment is appropriate if, after viewing the record in the non-moving party's favor, the Court determines that no

genuine issue of material fact exists and that the moving party
is entitled to judgment as a matter of law.

## B.  Application

### 1. Civil RICO

Forest moves to dismiss plaintiffs' civil RICO claims,
contending that plaintiffs (1) lack RICO standing because they
cannot show a RICO injury or causation, (2) have failed to
establish a pattern of racketeering activity, (3) cannot
establish a RICO enterprise and (4) attempt to bring claims that
are time-barred.

The civil RICO statute prohibits, in relevant part,

> any person employed by or associated with any enterprise
> engaged in, or the activities of which affect, interstate
> or foreign commerce [from] conduct[ing] or participat[ing],
> directly or indirectly, in the conduct of such enterprise's
> affairs through a pattern of racketeering activity.

18 U.S.C. § 1962(c).  Accordingly, to prove a violation of civil
RICO under Section 1962(c), a plaintiff must show proof of (1)
conduct, (2) of an enterprise, (3) through a pattern, (4) of
racketeering activity. Kenda Corp. v. Pot O'Gold Money Leagues,
Inc., 329 F.3d 216, 233 (1st Cir. 2003) (quoting Sedima,
S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985).  18 U.S.C. §
1962(d) makes it unlawful to conspire to violate subsection (c).

### A. Injury

Forest contends that Painters and Ramirez cannot establish
a RICO injury because neither plaintiff has presented

individualized evidence of the lack of efficacy of Celexa or Lexapro for plan members or for Ramirez's son.  As to Painters, Forest suggests that plaintiffs have not identified any specific plan member for whom Celexa or Lexapro was ineffective. Further, Forest notes that Painters has not produced medical records or evidence regarding the efficacy of the subject drugs with respect to any plan member nor has it deposed any parent or physician.  With respect to Ramirez, Forest contends that plaintiff has not offered proof that either Celexa or Lexapro was ineffective for her son.  Forest presents evidence that Dr. Saito, the Ramirez's doctor, considered the drugs to be efficacious.

Plaintiffs maintain that Painters and Ramirez have demonstrated an injury sufficient to establish RICO standing. They frame the RICO injury differently than Forest, relying on a "quantity effect" theory to claim that plaintiffs suffered an injury in the form of the money paid as a result of Forest's alleged fraud.  Plaintiffs maintain that they are not required to prove the ineffectiveness of each off-label prescription in order to establish injury but rather need only show that money was paid as a result of fraudulently induced prescriptions.

Furthermore, plaintiffs recast their rebuttal of the FDA's decision with respect to MD-18 into the "efficacy" umbrella,

contending that plaintiffs have challenged the efficacy of

Celexa/Lexapro by

> exposing the corrupt nature of the clinical trials and
> subsequent reporting of the results by Forest to the FDA.

Essentially, plaintiffs suggest that they need not prove

inefficacy as to any individual because they have created a

genuine dispute of fact as to whether the FDA found the drugs

effective for pediatric use through an uncorrupted process.

To establish an injury sufficient to maintain a RICO

action, a plaintiff must demonstrate a claim of "injury" to its

"business or property". 18 U.S.C. § 1964(c); Sedima, 473 U.S. at

496 (noting that a plaintiff "only has [RICO] standing if, and

can only recover to the extent that, he has been injured in his

business or property by the conduct constituting the

violation"). Such a requirement in RICO actions has been

described as a standing issue because even where there is

> plainly a case or controversy under Article III [] the
> statutory precondition of injury to business or property
> must also be met.

DeMauro v. DeMauro, 115 F.3d 94 (1st Cir. 1997) (citing Sedima,

473 U.S. at 496). The alleged RICO injury cannot be

hypothetical or speculative. Circiello v. Alfano, 612 F. Supp.

2d 111, 114 (D. Mass. 2009).

Plaintiffs rely primarily on In re Neurontin Mktg. & Sales

Practices Litig., 712 F.3d 21 (1st Cir. 2013) (Neurontin I) in

support of their claim that they are not required to prove that the drugs were inefficacious as to Ramirez's son or any of Painters' plan members. As this Court has concluded, however, the drug at issue in Neurontin I and the claimed RICO injury are distinct from plaintiffs' claims here. In Neurontin I, the plaintiff could establish inefficacy on the basis of numerous negative double-blind, placebo-controlled trials ("DBRCTs") and the lack of a positive DBRCT for the promoted uses. 712 F.3d. at 48. Contrary to plaintiffs' suggestion that inefficacy is "not central" to demonstrating a RICO injury, the First Circuit explicitly required proof of inefficacy, holding that

> for the purpose of proving injury, [plaintiff] adequately
> proved Neurontin's inefficacy for the relevant indications.

712 F.3d at 47 n.19. Because the plaintiffs had produced evidence of the drug's ineffectiveness in the form of negative clinical studies, they were not required to produce evidence of individual inefficacy. Id. at 48-49.

The First Circuit reached the same conclusion in two related cases brought by separate plaintiffs decided on the same day. In re Neurontin Mktg. & Sales Practices Litig., 712 F.3d 51, 59 (1st Cir. 2013) (Neurontin II); In re Neurontin Mktg. & Sales Practices Litig., 712 F.3d 60, 69 (1st Cir. 2013) (Neurontin III). In Neurontin II, the court concluded that "Aetna presented sufficient evidence of Neurontin's

-13-

ineffectiveness to survive summary judgment". Neurontin II, 712
F.3d at 59 n.4.  In Neurontin III, the court reiterated that the
clinical trial evidence proffered by the plaintiffs was
sufficient to raise a genuine issue of material fact on the
inefficacy issue. Neurontin III, 712 F.3d at 69.

Contrary to plaintiffs' suggestion that the Neurontin cases
make it unnecessary to proffer evidence as to the individual
inefficacy of the subject drugs, the First Circuit there held
that the plaintiffs did not need to elicit evidence of
individual inefficacy because they had presented evidence, in
the form of negative clinical trials, of the general inefficacy
of the drug.  The Court explicitly left open the question of the
proper standard for efficacy in a case where there are positive
clinical trials or FDA approval, stating that it

> need not address what the standard for efficacy would be if
> there were no DBRCTs in existence, or if the results of
> DBRCTs were equivocal, or if there were a different mix of
> DBRCT and non-DBRCT evidence.

Id. at 49.

This Court has repeatedly made clear that this is the
hypothetical case anticipated by the First Circuit. See, e.g.,
In re Celexa (Kiossovski), 2015 WL 3751422 (D. Mass. June 15,
2015) (dismissing one of the named plaintiffs after finding that
she had not alleged that "the drug was ineffective as to her and
therefore [that] she lack[ed] standing to pursue her RICO

-14-

claims"). Unlike Neurontin I, where there was "powerful scientific evidence of inefficacy" in the form of negative DBRCTs, 712 F.3d. at 49, the FDA in this case approved the drug for use in adolescents. There is no conclusive or even strongly suggestive evidence of inefficacy in this case and plaintiffs have presented no evidence as to the inefficacy for Ramirez or for any of Painters' plan members.

Painters and Ramirez have not presented evidence to establish a RICO injury. See Maio v. Aetna, Inc., 221 F.3d 472, 488 (3d Cir. 2000) (holding that appellants could not "establish that they suffered a tangible economic harm compensable under RICO unless they allege that health care they received under [defendant's] plan actually was compromised or diminished as a result of [the allegedly fraudulent conduct]"). Plaintiffs suggest that Maio is inapposite because benefit of the bargain damages are generally not available in RICO cases. The issue at hand is not a contract damages question, however, but rather an injury issue. Plaintiffs have not presented facts sufficient to prove that they suffered injury because they do not proffer evidence that either drug was ineffective for Ramirez or any Painters' plan member.

As Forest notes, Ramirez's doctor, Dr. Saito, continued to fill prescriptions for Celexa and Lexapro for eight years. Dr. Saito testified that he continued to prescribe the drugs

-15-

because, in his clinical experience, they had been effective in treating the symptoms of his patient's autism.  Rather than presenting affirmative evidence that the drug was ineffective for Ramirez's son, plaintiffs contend that the clinician's testimony must be disregarded as unreliable and anecdotal.  To defeat a motion for summary judgment, however, the non-moving party must "establish the existence of a factual controversy that is both genuine and material".  Lohnes v. Level 3 Communs., Inc., 272 F.3d 49, 52 (1st Cir. 2001).  They are required to present affirmative evidence and a "mere denial" of the moving party's statement is insufficient to meet that burden.  Satchi v. Rheon U.S.A., Inc., 255 F. Supp. 3d 253, 259 (D. Mass. 2017) (citing Fed. Deposit Ins. Corp v. Municipality of Ponce, 904 F.2d 740, 742-42 (1st Cir. 1990)).

Similar to Ramirez, Painters fails to proffer any evidence of inefficacy of the subject drugs for any of its insureds. Painters has produced no medical records for any of its insureds nor has it deposed any parent or physician.  As Forest notes, Painters has not directed Prime to remove the subject drugs from its approved drug formulary.  Painters admits that it continues to reimburse pediatric prescriptions for Celexa and Lexapro but contends that such reimbursement is irrelevant because inefficacy is not central to the question of RICO injury.  The Court has found otherwise and concludes that Painters has failed

to meet its burden of presenting affirmative evidence as to the inefficacy of the subject drugs sufficient to establish RICO injury. Cf. UFCW Local 1776 v. Eli Lilly & Co., 620 F.3d 121, 135-36 (2d Cir. 2010) (explaining that the TPP and its PBM's decisions to approve the subject drug on the formulary and continue reimbursing for the prescriptions brought into question the plaintiffs' quantity effect theory for demonstrating RICO injury).

In lieu of any evidence of inefficacy of the drugs for specific plan members or for Ramirez, plaintiffs rely on a theory that, despite the FDA's opinion to the contrary, the drugs were ineffective in treating adolescents. Plaintiffs proffer expert testimony attempting to show that Celexa and Lexapro are generally ineffective by challenging the FDA's determination that MD-18 and MD-32 were positive. Their fraud theory is a tenuous attempt to shoehorn the facts of this case into the facts of Neurontin, where there were no positive, or even equivocal, clinical trials for the indications at issue. Plaintiffs suggest that a packaging error in MD-18 rendered the study "unblinded" and thus negative. They also proffer an expert report that MD-32 used an oversized sample and therefore ought be reclassified as negative.

The FDA in this case, however, unlike in Neurontin, determined that two clinical studies were positive. The FDA is

-17-

"the exclusive judge of safety and efficacy" and a court should not question that judgment unless "new information not considered by the FDA develops". In re Celexa and Lexapro Mktg. & Sales Practices Litig. ("Marcus"), 779 F.3d 34, 41 (1st Cir. 2015). The FDA made the determination that MD-18 was positive after being informed that there was a supply packaging error and that there were eight potentially unblinded patients.

Plaintiffs endeavor to reframe the packaging error as new information but cannot escape the fact that the FDA was informed of the potential unblinding. They proffer testimony from Dr. Laughren, a doctor at the FDA who worked on the approval of Lexapro for pediatric use, to assert that the facts surrounding that mistake constitute new information. His testimony states that he would consider a clinical trial patient who was given pills with the brand name Celexa on them "new information". The tablets were not, however, stamped with the brand name but were instead simply the wrong color (a fact of which the FDA was aware).

Given the presence of two positive clinical studies, any evidence of general inefficacy is insufficient and plaintiffs have failed to present evidence of individual inefficacy as to Ramirez or any Painters' insured. Accordingly, there is no evidence of RICO injury and Forest is entitled to judgment as a

matter of law in that regard with respect to Painters and Ramirez.

## B. Causation

Although plaintiffs Painters and Ramirez have failed to establish a genuine issue of material fact as to the existence of a RICO injury, Forest does not dispute that there is a genuine issue of material fact as to the efficacy of the drugs for Kiossovski's daughter.  The Court will therefore proceed to consider the other elements of a RICO claim with respect to Kiossovski.

Forest contends that Kiossovski can show neither but-for nor proximate causation.  There is no but-for causation because neither Kiossovski nor her daughter's doctor was exposed to off-label promotion.  Forest suggests that Kiossovski cannot establish proximate causation because she cannot establish a direct causal relationship between the alleged injury and Forest's alleged off-label promotion.  Forest also asserts that the causal chain is broken by the intervening diagnosis of bipolar disorder of Kiossovski's daughter.

Plaintiffs retort that, with respect to proximate causation, they are not required to show individual direct reliance on fraudulent conduct but rather need only show that consumers were foreseeable targets of Forest's off-label promotion.  They also dispute Forest's but-for causation

argument, suggesting that there is evidence that would allow a reasonable jury to conclude that Kiossovski's prescriber was influenced by Forest's off-label promotion. They proffer testimony of the prescriber that, although he could not recall any off-label promotion, he could not "rule out" the possibility that he had seen some advertisement from Celexa at some point years ago.

To succeed on their RICO claims, plaintiffs must show that Forest's alleged mail or wire fraud was a "but for" cause of their injuries as well as the proximate cause. See, e.g., George Lussier Enters., Inc. v. Subaru of New England, Inc., 393 F.3d 36, 51 (1st Cir. 2004) (citing Holmes v. Secs. Investor Prot. Corp., 503 U.S. 258, 268 (1992)).

In its discussion of proximate causation, the Supreme Court in Holmes acknowledged that it was

> virtually impossible to announce a black-letter rule that will dictate the result in every case.

503 U.S. at 272 n.20. The Court held, however, that proximate cause was essentially a "judicial tool used to limit a person's responsibility for the consequences of that person's own acts". Id. at 268. It suggested some factors for consideration in the proximate cause inquiry, including the directness of the relationship between the injury and alleged conduct, concerns about administrability and the avoidance of multiple recoveries

and the societal interest in deterring illegal conduct. Id. at 268-69. Direct, first-party reliance on a defendant's alleged misstatement, however, is not required. Bridge v. Phoenix Bond & Indemnity Co., 553 U.S. 639, 649 (2008).

Forest presents evidence that neither dependent of the individual plaintiffs suffered from pediatric major depressive disorder ("MDD"). Kiossovski's daughter suffered from a major depressive episode and it is undisputed that the symptoms of a major depressive episode are not the same as a diagnosis of MDD. After discontinuing her Celexa treatment, the daughter was diagnosed with bipolar disorder. Forest contends that the proximate cause of her alleged injury was the physician's failure correctly to diagnose and prescribe appropriate treatment because the physician mistakenly prescribed Celexa to a patient with a bipolar disorder.

Plaintiffs are not required to produce evidence that there was "direct reliance" by the physicians to satisfy the proximate cause element in a private RICO claim predicated on mail or wire fraud. See, Neurontin II, 712 F.3d at 58 (citing Bridge, 553 U.S. at 649). A plaintiff can, instead, satisfy the proximate causation requirement by providing evidence that plaintiff was the intended victim of a fraudulent scheme and that the injury was a foreseeable and natural consequence of the scheme. Neurontin II, 712 F.3d at 58.

Plaintiffs establish a genuine issue of material fact with respect to proximate causation by suggesting that both prescribing doctors chose Celexa and Lexapro to treat depression. The intervening diagnoses do not necessarily break the causal chain because a jury could conclude that promotion of the drugs for pediatric MDD would make foreseeable prescription by a doctor of the drugs for other forms of pediatric depression. See Neurontin II, 712 F.3d at 58-59 (finding that a reasonable jury could have concluded that defendant was an intended victim and that the economic injury was a "foreseeable and natural consequence" of the scheme).

With respect to but-for causation, a plaintiff must produce evidence that he/she was injured by reason of a defendant's violation. Bridge, 553 U.S. at 653-54. It is undisputed that Dr. Barnett, Kiossovski's physician, had no recollection of discussing Celexa with a Forest sales representative and that his employer, Overlake Hospital, did not allow sales representatives on the premises. Although plaintiffs admit that Dr. Barnett, has no recollection of exposure to a Forest sales representative, plaintiffs dispute defendants' contention that he was never exposed to fraudulent promotion. They rely heavily on Dr. Barnett's testimony that it was "possible" he

> could have seen something like that [off-label promotion] and it could have had some impact on my willingness to consider Celexa.

-22-

A mere possibility that the doctor could have, at some point, encountered off-label promotion, although he has no memory of it, does not rise to the level of a disputed material fact. Plaintiffs also claim in their opposition memorandum that Dr. Barnett was called upon by Forest sales representatives "as evidenced by the call note database". Plaintiffs do not cite to any such call notes, however, nor do they offer any evidence that any such notes establish that Dr. Barnett was exposed to fraudulent, off-label promotion. When

> a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial.

Anderson, 477 U.S. at 250 (1986) (quoting Fed. R. Civ. P. 56(e)) (internal quotation marks omitted). No reasonable jury could conclude that Forest's off-label promotion prompted Dr. Barnett to prescribe Celexa.

Construing the facts (and making all reasonable inferences) in favor of the non-moving plaintiffs, the Court finds that plaintiffs have not provided sufficient evidence of but-for causation. Accordingly, Forest is entitled to judgment as a matter of law with respect to Painters and Kiossovski.

## 2. Washington Consumer Protection Act

In its opposition memorandum, plaintiffs concede that Kiossovski's state law and unjust enrichment claims "rise and fall with the RICO claims".

To prevail on a claim under the Washington Consumer Protection Act ("WCPA"), a plaintiff must demonstrate (1) an unfair or deceptive act or practice (2) occurring in trade or commerce, (3) a public interest impact, (4) injury to plaintiff in her business or property and (5) causation. Panag v. Farmers Ins. Co. of Washington, 204 P.3d 885, 889 (Wash. 2009). Under Washington law, "a causal link is required between the unfair or deceptive acts and the injury suffered by plaintiff". Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 719 P.2d 531, 539 (Wash. 1986)(en banc). For the reasons discussed above, Kiossovski cannot establish but-for causation and, accordingly, Forest is entitled to judgment as a matter of law on Kiossovski's state law claims.

### 3. Minnesota Consumer Fraud Act and Minnesota Unfair Trade Practices Act

Forest also moves for summary judgment on Painters' Minnesota state law claims brought under the Minnesota Consumer Fraud Act ("MCFA") and the Minnesota Unfair Trade Practices Act ("MUTPA"). Forest avers that (1) there is no causal relationship between the alleged injury and the alleged

fraudulent promotion, (2) Painters did not suffer any economic injury and (3) the lawsuit does not benefit the public.

The MCFA prohibits any person from using fraud or misrepresentation with the intent that others rely thereon in connection with the sale of merchandise. Minn. Stat. § 325F.69, subd. 1. The MUTPA precludes the knowing misrepresentation of true quality, ingredients or origin of merchandise in connection with the sale of merchandise. § 325D.13. The statutory scheme creates a private right of action under these statutes. § 8.31, subd. 3a.

To establish a violation under the Minnesota consumer protection statutes, a plaintiff must demonstrate that the purchaser paid for a defective product. See, e.g., O'Neil v. Simplicity, Inc., 553 F. Supp. 2d 1110, 1115 (D. Minn. 2008) (dismissing claims brought under the Minnesota consumer protection statutes that a children's crib was defective where plaintiffs had not alleged any injury). To bring an action under § 8.31, subd. 3a, the plaintiff must show "a causal relationship between the alleged injury and the wrongful conduct that violates the statute". Group Health Plan, Inc. v. Philip Morris, Inc., 621 N.W.2d 2, 13 (Minn. 2001).

As discussed with respect to Painters' RICO claims, Painters has not proffered evidence sufficient to establish an injury, because it has not presented evidence of inefficacy for

any insured. <u>K.A.C.</u> v. <u>Benson</u>, 527 N.W.2d 553, 562 (Minn. 1995) (holding that where a plaintiff was "unable to establish an injury", there was no basis for recovery under the MCFA) (internal quotation marks omitted).  Because Painters has failed to establish facts suggesting that Celexa or Lexapro were ineffective for any of Painters' insureds, Forest is entitled to summary judgment on Painters' Minnesota state law claims.

### ORDER

For the foregoing reasons,

- Painters' motion for partial summary judgment on Forest's statute of limitations affirmative defense (<u>Painters</u>) (Docket No. 661) is **DENIED AS MOOT**,

- Forest's cross-motion for summary judgment on all claims (<u>Painters</u>) (Docket No. 676) is, with respect to Painters' state law claims, **ALLOWED,** and is, with respect to the statute of limitations defense, **DENIED AS MOOT,**

- Forest's motions for summary judgment on all claims (<u>Painters</u> and <u>Kiossovski</u>) (Docket Nos. 797 and 798) are **ALLOWED.**


**So ordered.**

/s/ Nathaniel M. Gorton_____
Nathaniel M. Gorton
United States District Judge

Dated January 26, 2018